**In the Matter Of:**

LISA PRINCE vs TIVOLI BI

1:25-CV-3679

**ARIANIT JAKUPAJ**

*July 09, 2026*

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------X
LISA PRINCE,

PLAINTIFF,

-against- Case No.: 1:25-CV-3679

TIVOLI BI LLC, MEL MANAGEMENT CORP., d/b/a STELLAR MANAGEMENT; CULLEN & ASSOCIATES, P.C.; and KEVIN CULLEN,

DEFENDANTS.
-------------------------------------------X

DATE: July 9, 2026

TIME: 10:53 A.M.

DEPOSITION of the Defendant, ARIANIT JAKUPAJ, taken by the Plaintiff, pursuant to a Court Order and to the Federal Rules of Civil Procedure, before Miriam Schweke, a Notary Public of the State of New York.

A P P E A R A N C E S:

BROOKLYN LEGAL SERVICES
Attorneys for the Plaintiff
LISA PRINCE
105 Court Street, 4th floor
Brooklyn, New York 11201
BY: KAILYN GAINES, ESQ.

ROBERT L. ARLEO, ESQ.
Attorneys for the Defendants
TIVOLI BI LLC, MEL MANAGEMENT CORP.,
d/b/a STELLAR MANAGEMENT;
380 Lexington Avenue
New York, New York 10168
BY: ROBERT L. ARLEO, ESQ.

KAUFMAN DOLOWICH
Attorneys for the Defendants
CULLEN & ASSOCIATES, P.C.; and KEVIN
CULLEN
One Battery Park Plaza
11th Floor, Suite 1120
New York, New York 1000
BY: ADAM M. MARSHALL, ESQ.

THE LAW OFFICE OF AHMAD KESHAVARZ
Attorney for Defendants
16 Court Street, Suite 2600
Brooklyn, New York 11241
BY: AHMAD KESHAVARZ, ESQ.

ALSO PRESENT:
SAMA KATNANI

* * *

F E D E R A L S T I P U L A T I O N S

IT IS HEREBY STIPULATED AND AGREED by and between the counsel for the respective parties herein that the sealing, filing and certification of the within deposition be waived; that the original of the deposition may be signed and sworn to by the witness before anyone authorized to administer an oath, with the same effect as if signed before a Judge of the Court; that an unsigned copy of the deposition may be used with the same force and effect as if signed by the witness, 30 days after service of the original & 1 copy of same upon counsel for the witness.

IT IS FURTHER STIPULATED AND AGREED that all objections except as to form, are reserved to the time of trial.

* * * *

A. JAKUPAJ

A R I A N I T  J A K U P A J, called as a witness, having been first duly sworn by a Notary Public of the State of New York, was examined and testified as follows:

EXAMINATION BY
MS. GAINES:

Q. Please state your name for the record.
A. Arianit Jakupaj.
Q. What is your address?
A. 44 West 28th Street, New York, New York 10001.
MR. MARSHALL: I'd like a mini copy of today's deposition.
Q. Good morning, Mr. Jakupaj. My name is Kailyn Gaines. I represent Lisa Prince in this matter. We are here today for the deposition of the corporate designee of Mel Management Corp. d/b/a as Stella Management Corporation, and BI LLC pursuant to Federal Rules of Civil Procedure 30(b)6.
Can you, please, state your full name, again, for the record?

A. JAKUPAJ

A. Sure. Arianit Jakupaj.

Q. And have you ever taken a deposition before?

A. Unfortunately --

MR. ARLEO: Objection. Hang on. Hang on. I don't think he's taken one. I think he's appeared at one.

Q. Have you ever appeared at a deposition before?

A. Yes.

Q. How many times before?

A. Not sure.

Q. Could you estimate, please?

A. 10, 15 throughout my years.

Q. When was the last time that you appeared in a deposition?

A. Last week.

Q. I'll still go over the ground rules; although, I'm sure you're familiar having just appeared in one.

A. Sounds good.

Q. Do you understand that you're under oath today, and that your testimony

A. JAKUPAJ

has the same force and effect as if you were testifying in court before a judge and a jury?

A. I do.

Q. And do you understand that you are required to provide the whole truth. So that if I ask something, like, who did you speak with, you must tell me everyone that you spoke with?

A. I do.

Q. For my part, I'll try to ask anything else, or is that all to make sure that I'm getting a complete answer; does that make sense?

A. Yes.

Q. And for your part, if you answer a question incompletely and you later recall that there's more to a previous answer, will you tell me and complete your answer?

A. Will do.

Q. Are you feeling well today?

A. Yes.

Q. Are you taking any medication

A. JAKUPAJ

-- or have you taken any medication in the last 24 hours that would affect your ability to testify truthfully and accurately?

A. No.

Q. Is there any reason, medical, physical, or otherwise that would prevent you from giving your full and complete testimony today?

A. No.

Q. Is there any reason that you would not be able to understand my questions?

A. No.

Q. If at any time you do not understand a question, will you let me know?

MR. ARLEO: Hold it. Hold it. Hold it. Hold it. Just hold it. Is there any reason why you wouldn't be able to understand my questions? Well, how can you ask him that? How can you ask him that question if you haven't asked him any questions?

A. JAKUPAJ
Hang on a second, and then you can talk. So if he does not understand your question, he'll say that, I don't understand your question. But to draw a blanket assertion that he can't understand it before he even testifies is -- it's non-sensicle, but go ahead.
Q. Okay. He's already answered that question.
If at any time you do not understand a question, will you let me know so that I can rephrase it?
A. Yes.
Q. If I ask you a question and you did not ask me to rephrase it, is it fair to say that you understood the question?
MR. ARLEO: You know what, I am going to object to all of this. This is a waste of time. You've not even asked any questions. If he doesn't understand, he'll tell you. If you need to re-explain it, he will explain it. But I am not going to go

A. JAKUPAJ

on listening to a potential hypotheticals as to what could happen as to his interpretation of your question. So, please, start your deposition. Just start your deposition.

MS. GAINES: Okay. No. I am going to ask the question again.

Q. If I ask you a question and you do not understand --

MR. ARLEO: Note my objection to this entire line of questioning.

MS. GAINES: Understood.

Q. If I ask you a question and you do not ask me to rephrase, is it fair to say that you understood the question?

MR. ARLEO: Object.

Q. You can answer the question. I'll say it again.

If I ask you a question and you do not ask me to rephrase, is it fair to say that you understood the question?

A. Yes.

Q. Thank you. Will you answer all

A. JAKUPAJ

questions verbally as opposed to a gesture so that the court reporter can take down your answer?

MR. ARLEO: You know what, I am going stop all this. I've never heard this in a deposition, and I am going to stop it now.

MS. GAINES: These are standard questions.

MR. ARLEO: It may be standard to you, but in my 35 years of practice, I've never heard this. So start questioning him, or we're going to go to the magistrate.

MS. GAINES: I am going to continue.

MR. ARLEO: Listen, I'm not going to sit here for 20 minutes and listen to you ask questions on how he's going to interpret your questions.
Ask your questions, and then you'll see what happens.

MS. GAINES: Okay. Mr. Arleo,

A. JAKUPAJ
your objection is noted. I'm going to ask this question, again.
Q. Will you answer all questions verbally as opposed to gestures so the court reporter can take down your answers?
MR. ARLEO: We're done. We're done. We're done. Don't answer. Let's get the magistrate on the phone. I am not going to sit here and listen to this for a half an hour.
MS. GAINES: If you're going to call the magistrate over admonitions, you can feel free to call the magistrate.
MR. ARLEO: What admonitions? You're asking him ridiculous questions.
MS. GAINES: I am asking him to answer questions verbally for the record.
MR. ARLEO: Here's what we're going to do to avoid all this, you get another five minutes to ask these

A. JAKUPAJ

questions and then you're --

MS. GAINES: This is my deposition, Rob, and I can ask him as many admonitions as I'd like.

MR. ARLEO: And this is my client, and I have a right to protect him.

MS. GAINES: So call the magistrate because we are going to finish our question.

MR. ARLEO: And I just said, I'll give you five minutes. Go, finish your question and then --

MS. GAINES: It might be 10. It might be 15. It might be 20.

MR. ARLEO: You're going to spend 15 minutes asking him on questions of your questions, that's what you're going to do?

MS. GAINES: This is my deposition. I am going to ask you the question -- Mr. Arianit, I am going to ask you the question again.

MR. ARLEO: Then we'll just

A. JAKUPAJ

call her now. Stop. Don't ask anything.

MS. GAINES: Are you going to call the magistrate?

MR. ARLEO: Yes. I am calling her now. Give me one second to get her number.

Let's lay the groundwork here nice and early, and I'll be happy to participate in this deposition, but I am not going to waste my client's time nor my time.

(Called Magistrate)

Go ahead and continue your questions.

Q. Mr. Jakupaj, give me one second. Mr. Jakupai, will you answer all questions verbally as opposed to gestures so the court reporter can take down your answers?

A. Yes.

Q. I will try to ask clear questions and allow you to finish your answers. Please allow me to finish my question before you begin your answer.

A. JAKUPAJ

Will you do that?

A. Yes.

MR. ARLEO: Robert Arleo.

THE REPORTER: What?

MR. ARLEO: Hold on. I got a callback from the magistrate, please. Well, they just hung up, so go ahead.

Q. If your counsel makes an objection, unless you're instructed not to answer, will you still answer the question?

A. Yes.

Q. You've been designated as a representative of Tivoli, BI LLC, to testify on its behalf pursuant to Rule 30(b)6, correct?

A. Correct.

Q. You have, also, been designated as a representative of Mel Management Corporation doing business as Stellar Management to testify on its behalf pursuant to Rule 30(b)6, correct?

A. Yes.

Q. Do you understand that as a 30(b)6 witness, you are required to educate

A. JAKUPAJ

yourself with all reasonably available information known or reasonably available to Tivoli BI LLC, and Stellar Management on the designated topics?

A. Yes.

Q. Have you done so?

A. Can you repeat your question?

MR. ARLEO: Hang on a second. Object to the question. I discussed his requirements as to what he's supposed to testify to, and he understands why he's here. So if you're not going to ask him details of what Rule 30(b)6 is, he understands he's here to testify as a representative on behalf of the two defendants --

Q. Mr. Jakupai, I am going to you ask, again, have you educated yourself on the topics designated in the Deposition Notice?

A. Can you repeat? Sorry. I didn't hear you.

Q. Yes.

A. JAKUPAJ

Have you educated yourself on the topics listed in the Deposition Notice?

A. Yes.

Q. Mr. Jakupai, is there anybody better prepared than you to answer the questions in the topics listed in the Deposition Notice?

MR. ARLEO: Objection. Go ahead. Answer it.

THE WITNESS: No idea. Maybe.

Q. Who would be better prepared to answer the questions in the topics?

MR. ARLEO: Objection.

Q. You can answer.

A. I'm not certain. It depends on the question. There are other people that probably will answer -- or have more knowledge than me on some of these questions.

Q. If I ask you a question and somebody has more knowledge than you on that topic, will you let me know?

A. Yes.

Q. What did you do to prepare for

A. JAKUPAJ

today's deposition?

MR. ARLEO: Objection.

Q. You can answer.

A. I scanned through the questions and the responses that we had, and I'm vaguely familiar with this case as I have been a property manager for the said location on and off throughout the time.

Q. What documents did you review to prepare for the deposition today?

A. Well, I think the questions, the questionnaires, and then the responses that you sent to -- well, I am assuming you guys.

Q. Did you review anything else?

A. No. Her file that I know from before, but, no.

Q. When you say her file, where is that file kept?

A. It could be in the main office or in the side office, one or the other.

Q. So did you go to the main office or the site office and look at the physical file?

A. JAKUPAJ

A. No.

Q. So when you say that you reviewed that file, what do you mean?

A. Like I said, I was the property manager of that location. I probably scanned it throughout the time because this case is a longstanding case.

Q. So when you say that you reviewed the file, you just mean that you're familiar with that file from your work?

A. Correct.

Q. Okay. Does that file still exist in the office?

A. I am not sure. I haven't been in that office in the past couple of years.

Q. Who would know if that file still exists?

A. The property manager, the assistants that are on the site.

Q. Okay. And who are those -- what are those names?

A. Jessica Shepard is one, and the other one is Lauren. But that building,

A. JAKUPAJ

currently, doesn't have a property manager for the past week or so.

Q. With whom did you speak when you were preparing for your testimony today?

A. I talked to the attorney.

Q. Did you talk to anybody else?

A. No. Our in-house counselor and the attorney.

Q. And that is Fred Bonnier, who's on the call?

A. Correct.

Q. Do you have anything in front of you in the room that you're sitting in?

A. I have my bookbag, my computer, some paperwork. That's it.

Q. What is up on your computer screen?

A. What you're seeing.

Q. Anything else?

A. No, nothing else.

Q. What kind of paperwork do you have with you?

A. I have a bunch of vacancies. I

A. JAKUPAJ
have a bunch of my work, my paperwork, yes.
Q. Do you have any paperwork that's related to this case?
A. I have the questions that were sent, yes, and the answers.
Q. And that's the responses to our discovery requests, or is that something else?
A. That's correct.
Q. Okay. If you're consulting a document to answer a question that I ask, will you tell me what document you're looking at?
A. Yes.
Q. Is anyone else in the room with you?
A. No.
Q. And will you refrain from messaging or communicating with your counsel or anyone else via text or online messenger during this deposition?
A. Will do.
Q. And if you need a break at any time, will you let me know?

A. JAKUPAJ

A. Yes.
Q. We can take a break as long as there's no question pending; do you understand that?
A. Yes.
Q. Okay. Great. Mr. Jakupai, what is your phone number?
A. 212-507 -- actually, no -- 973-418-3703.
Q. What was the phone number you were giving me before?
A. It was my office phone.
Q. Is this your personal phone number?
A. This is my cell number.
Q. Can I have your office number, too, or do you --
A. The business phone number is sufficient.
Q. What is your date of birth?
A. X/XX/XXXX.
MR. ARLEO: I'll ask that we stipulate to confidentiality on his date of birth, not to be used in any

A. JAKUPAJ
transcript or any filings.
MS. GAINES: We agree.
Q. What is your current employment?
A. Property manager for Stellar Management.
Q. And how long have you been employed as a property manager for Stellar?
A. 22, 21, 23 years.
Q. What do you do as a property manager?
A. I'm responsible for the day-to-day operations of my portfolio, certain buildings that I have under my portfolio.
Q. What kind of buildings do you have under your portfolio right now?
A. Mainly rental.
Q. Are those in Brooklyn, mostly, or are those all across the city?
A. No. They're -- currently, I don't have Brooklyn. I have Upper West Side and the town in Manhattan and Lower East Side.

A. JAKUPAJ

Q. How many buildings are you the property manager for?
A. 12, 13 right now.
Q. Have you always managed around, like, 12 or 13 or...
A. Well, it fluctuates from 7 to 15 at any time. It depends on what the ownership decides to change, the portfolios.
Q. Since working for Stellar, have you always worked as a property manager, or have you had other roles?
A. Always as property manager.
Q. Were you ever the property manager for the building at 49 Crown Street?
A. Yes.
Q. And can you tell me a little bit about your education?
A. Bachelor's degree.
Q. Do you have any professional certifications?
A. No.
Q. It sounds, like, you, also,

A. JAKUPAJ

regularly do depositions on behalf of Stellar.

Can you tell me a little bit about that?

MR. ARLEO: Objection.

Q. You can answer.

MR. ARLEO: Hang on a second. He's not testified that he's been deposed on behalf of the defendants, but if you want to ask him that question, that's fine.

Q. Have you been deposed on behalf of Stellar Management before?

A. Yes.

Q. Can you tell me a little bit about the circumstances under which you were deposed for Stellar?

A. It depends on a case-by-case. Sometimes it's just a slip-and-fall. Sometimes it's a -- I had a human right's case or -- it depends. Various cases. A lot of times, they're insurance.

Q. Okay. Got it. Can you tell me what Tivoli BI LLC is?

A. JAKUPAJ

A. It's a rental building in Brooklyn.
Q. Okay. So is it true that that's the LLC that owns 49 Crown Street? I am just trying to understand.
A. Yeah, that's the entity.
Q. And who are the officers of Tivoli?
A. No idea. Tivoli BI LLC is the owner and Stellar Management is the managing agent.
Q. But you don't know who is the -- who are, like, the officers or the owners of Tivoli as an entity?
A. I do not.
Q. Do you know who has decisionmaking authority for that entity?
A. I do not.
Q. Do you speak to anybody -- or have you ever spoken to anybody individually for Tivoli?
A. On what sense, individually?
Q. Like, would you as somebody from -- actually, so, like, what is the

A. JAKUPAJ

relationship between Stellar and Tivoli?
A. Stellar manages Tivoli as a managing agent for Tivoli.
Q. Are there ever occasions where somebody from Stellar is speaking to somebody from Tivoli; are there --
A. I'm not aware. I do not know.
Q. Are you familiar with someone named -- I am just going to mispronounce their name -- but it is, Srdanovic? This is the person who's registered as the head officer with Tivoli on HPD.
A. Can you say that name again?
Q. The last name is, I believe, Srdano- -- Srdanovic. It's S-R-D-A-N-O- --
A. Srdanovic, yes.
Q. Who is that person?
A. He is a director of operations. He's my supervisor.
Q. Tell me how to say that again. I'm sorry.
A. Srdanovic. But can you spell that first name?
What was the first name?

A. JAKUPAJ

Q. Sorry. Let me just, like -- Srdanovic is how you said the last name?
A. Correct. That's the same person we are talking about.
Q. Yeah. The first name is, S-M-A-J-L-J-E?
A. Smajlje.
Q. Smajlje Srdanovic?
A. Yes.
Q. Okay. Thank you. And you said that's the director of operations for who?
A. For Stellar Management.
Q. And were you aware that that's, also, the person who's registered as the head officer for Tivoli?
A. No. I was not aware.
Q. What is Mr. Sradanovic's role as director of operations; what does he do?
A. He manages, like, facility manager. He's in charge of -- or he is the boss of all the property managers.
Q. Do you know how many property managers there are?
A. On and off from 8 to 12. It

A. JAKUPAJ

depends.

Q. Do you know what the association between Tivoli BI LLC and Tivoli Towers Housing Co., LLC, is?

A. No.

Q. Do you know what the association between Tivoli BI LLC and Tivoli Associates is?

A. No.

Q. Do you know how many buildings Tivoli owns?

A. Well, my understanding is only that building, 49 Crown. That's the only entity name, and that's the only building under that entity name.

Q. And Tivoli owns the building at 49 Crown Street?

A. Tivoli BI LLC, yes.

Q. And that building is, also, known as Tivoli; is that right?

A. Yes.

Q. Do you know how long Tivoli BI LLC has owned that building?

A. 2010.

A. JAKUPAJ

Q. Do you know if anyone else has ownership interest in that building?
A. I do not.
Q. Can you tell me what Mel Management Corporation is?
A. It's Stellar Management. It's Mel Management doing business as Stellar Management.
Q. And you said that Stellar Management is a property management company?
A. Correct.
Q. Does Stellar Management manage buildings other than the ones that are owned by Tivoli?
A. Yes.
Q. How many building does Stellar Management manage?
A. I don't know the total number.
Q. Who is Lorna Blackman?
A. The property manager for the building.
Q. Is she another property manager -- so she is a property manager for Tivoli,

A. JAKUPAJ

you said; is that right?

A. Correct, but no longer with us.

Q. Okay. I am just trying to understand. So -- but did she work for Stellar or just for Tivoli?

A. She worked for Stellar Management. One of the buildings under her portfolio was Tivoli BI LLC.

Q. Did she manage other buildings as well apart from that?

A. Yes.

Q. I asked you how many buildings Stellar manages. You said that you didn't know.

Can you estimate, roughly?

A. 100.

Q. And how long has Stellar -- does Stellar presently manage the building at 49 Crown Street?

A. Yes.

Q. And how long has it managed that building?

A. Since 2010.

THE REPORTER: Kailyn, are you

A. JAKUPAJ

saying Crown or Ground Street?

MS. GAINES: Crown. Crown.

Q. What does it mean to manage the building; what does Stellar do?

A. They are responsible for day-to-day operations of that particular property.

Q. What do day-to-day operations include?

A. Maintenance, leasing, cleaning, things of that nature.

Q. Anything else other than maintenance, leasing, and cleaning?

A. Day-to-day operations. So you can name hundreds of them. They have employees, staffing -- responsible for the staffing, safety, security of the building, et cetera.

Q. What decisions does Stellar make in regards to the building?

A. Like I said, operations, day-to-day operations, decisions. And those are made by Stellar Management.

Q. And when you say, those are

A. JAKUPAJ

made by this management, who in management is making those kinds of operational decisions?

A. You can take from the staff to the property manager to other officers of Stellar Management accounting, legal, leasing. There is a lot of departments within Stellar that makes those decisions.

Q. Is there anyone, like, ultimate decisionmaker? Like, who is the -- is that Mr. Weil?

Like, who would be the ultimate boss?

A. Well, I do not know. I guess whoever is the boss of Stellar Management currently, which whoever is the CEO of -- currently of Stellar Management, that's the ultimate boss.

Q. Do you know who that is?

A. Yes.

Q. Who is that?

A. Matt Limbo and Ryan Jackson.

Q. So you were formally the property manager at 49 Crown Street?

A. JAKUPAJ
A. Yes.
Q. How long were you the property manager there?
A. Ten years. 10, 12 years.
Q. During that time period?
A. 2010 till 2022, I would say, '23, on and off. There was probably -- sometimes I wasn't even doing those things for years, but somebody else was in there, but, mainly, I was involved in the building throughout those years.
THE REPORTER: Okay. She had troubleshooting the audio issue.
MR. ARLEO: I'm sorry, they're having troubleshooting an audio issue?
THE REPORTER: Yes.
MR. ARLEO: Thank you.
So we're taking a ten-minute break?
THE REPORTER: Yes.
MR. ARLEO: Okay. Thank you.
THE REPORTER: You're welcome.
(Whereupon, a break was taken.)
MS. GAINES: Back on the

A. JAKUPAJ

record.

Q. Okay. Mr. Jakupai, I was asking, when did you -- or why did you stop being the property manager for 49 Crown Street?

A. Because my portfolio changed. The ownership decided to put me on another location.

Q. Okay. Can you tell me the regulatory status of the building at 49 Crown Street?

A. No. I cannot tell you regulatory. I know there's an agreement between HPD, Michelana, and Tivoli BI LLC but --

THE REPORTER: Can you speak into the mic? You said that there was an agreement between...

THE WITNESS: Between Tivoli and HPD and other entities, but I will not be able to speak to the specifics of that agreement -- or regulatory, rather.

Q. I believe you mentioned, also,

A. JAKUPAJ

that there's an agreement involving Michelana?

A. That's correct.

Q. Can you tell me what that means?

A. No.

Q. Do you know anything about what it means to be a Michelana building?

A. No.

Q. Do you know how long there's been an agreement between HPD and the building?

A. 2010 from when we took over or when we started managing, since then.

Q. Is the building rent stabilized?

A. Yes -- or it's a mix. You have some -- a lapse, some fair market, some -- it's differently, but that's not my part. That's where Lisa comes in.

Q. For the rent stabilized tenants in the building, how is rent set?

A. A leasing question.

Q. Okay. So are you prepared to

A. JAKUPAJ
speak to questions about leasing?
A. No.
Q. Who would we ask questions about leasing?
A. Someone from our leasing department. There is a leasing person that is onsite. Currently there now is Jessica.
Q. What is Jessica's last name?
A. Let me just find it to spell it.
Q. I may have that name, actually.
Is that Jessica Seepersad?
A. Seepersad, yes.
Q. That's S-E-E-P-E-R-S-A-D?
A. Yes.
Q. Okay. Can you tell me how many people work for Stellar?
A. I do not know.
Q. Can you estimate how many people work for Stellar?
A. A couple hundred.
Q. And what are the different departments?
A. Leasing, management,

A. JAKUPAJ

accounting, asset management, legal. So there's --

Q. And do each of those departments exist for each building, or how does that work?

A. Well, they're just in the umbrella, in the actual main office, but they are involved, depending on the needs, throughout the portfolios as needed.

Q. You mentioned leasing, management, accounting, legal, asset management.

Are there any other departments?

A. Construction. Those are the things that come up to mind now.

Q. Is your testimony that there may be other departments, but they're not coming to mind today?

A. Yes.

Q. Are there any, like, organizational trees or documents that show that -- the different departments?

A. I do not know.

A. JAKUPAJ

Q. Who would know whether other documents existed?

A. I am not sure, but somebody in the higher-ups, I guess, in the main office.

Q. Can you tell me -- so you mentioned one person who is a higher-up than you, and that's Mr. Srdanovic, who is the director of operations.

Who's higher up than him?

A. That will be the CEO of the company --

Q. Okay.

A. -- for that particular department, but each department has their own heads and manages them well.

Q. Okay. So Mr. Srdanovic is the head of management?

A. Yes.

Q. And there's different department-heads for each of the different departments?

A. Yeah.

Q. And, I guess, what I am trying

A. JAKUPAJ

to understand is, are those -- like, in each individual building, is there a department-head, or is there just a department-head for Stellar organizational-wide?

A. Organization. Not each building has different department-heads.

Q. Is it true, though, that there might be -- like, there might be people who work for a different department who only work on one particular building?

A. Yes.

Q. Like, for example, could there be leasing -- people who work in leasing who only work in leasing at one building?

A. Yes.

Q. But then they would, ultimately, answer to the director of leasing for Stellar?

A. That's correct.

Q. Who at Stellar communicates with tenants?

A. How they communicate? I'm sorry.

A. JAKUPAJ

Q. Who? Who?
Like, would be responsible for communicating with tenants?
A. Different building -- different people are responsible.
Q. I want to know everybody who might be responsible for communicating with a tenant.
A. I mean, you can start with a porter. You can start with a super. You can start with the resident coordinator, property manager, whoever's involved in leasing. Whoever from the legal department, potentially. So there is numerous people who communicate with tenants.
Q. At 49 Crown Street, is there a management office in the building?
A. Yes.
Q. And who works in that management office; like, what are the different roles?
A. You have Jessica, who is on the leasing, and then you have another person

A. JAKUPAJ

who is on the maintenance side, management side, who are there Monday to Friday. And then the property manager, most likely, will be there two or three times a week, one time a week, depending on who is the manager. And then other staff will come and go, which is the superintendent; assistant super, potentially, can communicate who is in the office and communicate with the tenants.

Q. When a tenant reaches out to management, is that documented in any way?

A. If there is a work order, usually you would generate the work order. That will be documented, yes, but, otherwise, it depends, I guess, on circumstances.

Q. I just want to go back to, you said that there's a main office and a site office before?

A. No. For Tivoli, it's only the site office. Main office is the main headquarters, yeah.

Q. So there's a headquarters for

A. JAKUPAJ

Stellar?

A. Correct.

Q. And where is that?

A. Address I gave for this was 44 West 28th Street.

Q. Okay. Got it. And then the site office is the office at Tivoli Towers?

A. That is correct, on-site.

Q. And tenant files might be kept in either office?

A. I would say most of them would be in site office, maybe. Depends on a needs -- need -- case-by-case. Basically, that they were needed in the main office, but 99 percent of them should be on the site office. Sorry.

Q. So you mentioned work orders.

How do tenants put in work orders?

A. They call the office or they stop by the office and then you log in that work order in one of our management systems that -- we have a Yardi that we currently use.

A. JAKUPAJ

Q. Can you tell me the name of that system again?
A. Yardi.
Q. Can you spell that? I'm sorry.
A. It's Y-A-R-D-I.
Q. Are there other management systems that you use?
A. No. Currently, no.
Q. How long have you used that system?
A. Maybe ten years or so.
Q. Does that just document work orders, or does it document other tenant concerns or needs?
A. Yeah, the memos. There are -- lease renewals can be attached in there. Any type of notices can be attached, so...
Q. Does it create, like, a file or a profile for each tenant?
A. Each tenant has their own ledger; mainly, it's in there to -- but the file not, per se, creative. There will be attachments based on the, I guess, needs or the usages. But a general ledger is

A. JAKUPAJ

created for each tenant via Yardi, yes.

Q. And you mentioned, like, memos and lease renewals and other notices are kept in that -- in Yardi as attachments.

What other documents are kept there?

A. Those are the main documents that are kept there, but any type of notices, any type of communication -- let's say that there was a notice sent to the tenant, it will be attached there.

Q. What about, like, if the tenant sends an e-mail or management sends an e-mail back, would that be reflected in Yardi?

A. No.

Q. Where would that be kept?

A. Just whoever communicated with that person. That's --

Q. Like, in whatever individual e-mail?

A. Yes.

Q. To your knowledge, does anyone ever delete attachments, or is anything

A. JAKUPAJ

that's uploaded there just stay there?

A. I do not know.

Q. When a tenant submits a work order or reaches out to Stellar, how long does it take for them to, typically, get a response?

A. I mean, it varies, I guess, from within 24 hours, 48 hours. Sometimes it's more work need, so a work order might stay open but after the initial assessment. So it varies on the severity and on what exactly is needed to complete that task.

Q. Can you describe the types of communications that are sent to tenants?

A. We are talking 49 Crown, correct?

Q. Yes.

A. Well, just pretty standard. It's just a memo, usually, or a phone call or a notice, memos. Those are the communications that either they're posted throughout the building or they're sent individually to the particular tenants.

Q. Like, for what reasons might

A. JAKUPAJ

management be sending an individual memos of a tenant?

A. Whatever manager you're trying to address. There is a nuance complaint from afar from above. There is a leak that you need access. There is, for that particular building, that specific lease specification, you just send a memo that you need to stop by and bring the paperwork if there's any type of construction that is going on, any type of water shutdowns that will be happening and affecting particular tenants or particular lines, things of those natures.

Q. Are memos sent about, like, bills or money that is owed?

A. Rent arrear letters are sent, yeah.

Q. And when you say that these memos are sent, how are they sent?

A. There were mailed, or they're put underneath their door. It depends.

Q. What would it depend on?

A. If something is happening

A. JAKUPAJ
tonight, are you just going to put the memo underneath the door, because there's no timeframe on -- for the mail out to the post office.

THE REPORTER: After what? Speak in towards...

THE WITNESS: Depends on the nature. If there's something that's transpiring tonight, most likely you will get a memo put underneath the door, not mailing as the time constraint.

Q. Is it fair to say that every memo that is sent would, also, be captured in Yardi?

A. No.

Q. Where would these memos be documented?

A. If it's a general memo, probably nowhere. I just send, create it, print it, and post it.

Q. When you say general memo, does that mean a memo that's sent to all tenants or just like a --

A. JAKUPAJ

A. Correct, all tenants, certain lines, certain floors. You're notifying them of an elevator shutdown. You're notifying them that there's work happening on this line. So things of those will not be kept anywhere.

Q. But if you are sending, like, an individual memo to a tenant about repairs in their unit or a leak or a nuisance or something like that, are those things kept in Yardi?

A. Generally, yes. You print it out and you attach, but it depends. Standard procedure, yes.

Q. Now, I'm going to ask -- so there's a list of people that were disclosed in the initial disclosures. I just want to ask what each of these people does and what information that they would have at the building and whether they're currently at the building. I will ask that for each.

So are you familiar with Wanda Sanchez?

A. JAKUPAJ

A. Yes.

Q. Who is Wanda Sanchez?

A. Leasing in the main office.

Q. The main office at 49 Crown?

A. No. Main office, Main H view at 28th Street.

Q. How long has she been leasing at the main office?

A. Not sure. Ten years or more.

Q. Are you familiar with Stacy Perez?

A. Yes.

Q. Who is Stacey Perez?

A. She's one of our paralegals and works in the legal department.

Q. And that's at the main office?

A. Yes.

Q. How long has she been a paralegal at the main office?

A. 16 years, but that's a rough estimate. I am not certain of the exact.

Q. Are you familiar with Maria Figueroa?

A. Yes.

A. JAKUPAJ

Q. Who is that?

A. She was a leasing agent onsite into the late hours.

Q. You said she was.

Does she currently work for Stellar still or no?

A. No longer works for Stellar.

Q. Okay. How long -- or, I guess, for what time period was she the onsite leasing agent at Tivoli?

A. 6 to 8 years.

Q. Ending when?

A. I do not know. Maybe eight years -- six to eight years ago, maybe.

Q. So, maybe, like, 2020 to, what -- like, 2012 to 2020 or something like that?

A. Yes. Roughly, correct.

Q. You mentioned Jessica Seepersad earlier.

Can you tell me, again, what she does?

A. She is currently the leasing agent for the said property.

A. JAKUPAJ

Q. Current leasing agent at Tivoli Towers?

A. At Tivoli Towers, yes.

Q. How long has she been there?

A. Six years, maybe.

Q. Are you familiar with Quanto Williams?

A. Yes.

Q. Who is that?

A. She is a resident coordinator -- or she was a resident coordinator for the property, for the Tivoli Towers, 49 Crown.

Q. When you say resident coordinator, what does a resident coordinator do?

A. Like, associate -- another -- assistant -- property manager assistant. So, basically, she is responsible for the maintenance part of that building. All the maintenance requests go through her.

Q. But she would only be for -- dedicated to Tivoli Towers?

A. She was only for that.

A. JAKUPAJ

Q. Is she currently there?
A. No.
Q. When did she leave?
A. Maybe four, five months ago.
Q. How long did she work as a resident coordinator?
A. Five years -- four, five years.
Q. Are you familiar with Francine Schiff?
A. Yes.
Q. Who is that?
A. Leasing director for Stellar Management out of the main office.
Q. What does she do as the leasing director?
A. She oversees all the -- our portfolio leasing responsibilities.
Q. What might those include?
A. Renting departments, ensuring the leases are -- sending lease renewals and things of that nature.
Q. How long has she worked as the leasing director for Stellar?
A. Over 20, 25 years, maybe.

A. JAKUPAJ

Q. Are you familiar with Fredric Bonnaire?

A. Yes.

Q. Who is that?

A. He's our in-house counselor at the main office.

Q. How long has he been the in-house counsel?

A. I think, five years, six years.

Q. What does he do as in-house counsel?

A. Any legal matters that need to be addressed go through him portfolio-wise.

Q. Like what?

A. Anything to do with legal.

Q. Can you give me an example?

A. What we were just discussing about. That any legal cases that are started. Legal cases that need assistance; that we need guidance from him on a particular matter. He's there to assist in those matters.

Q. You, also, mentioned Lorna Blackman.

A. JAKUPAJ

Can you remind me what Lorna Blackman does?

A. You mentioned it, not me.

Q. Sorry. We discussed Lorna Blackman.

Can you tell me, again, what Lorna Blackman does?

A. She was a property manager for that property.

Q. She's no longer the property manager?

A. That's correct.

Q. When did she leave?

A. Three weeks ago, maybe four weeks ago, roughly.

Q. Why did she leave?

A. No idea.

Q. How long was she the property manager before she left?

A. Like three years or so I would say.

Q. Are you familiar with Carol Rowley?

A. Yes.

A. JAKUPAJ
Q. Who's that?
A. She was the resident coordinator at the said property.
Q. During what time period was she the resident coordinator?
A. Not too long, but, I think, it was about from 2016, maybe, to 2022. I'm not sure of the dates. About four or five years.
Q. Are you familiar with Melissa Castro?
A. Yes.
Q. Who's Melissa Castro?
A. She was one of the paralegals who worked for us, Stellar Management.
Q. During what time period was she a paralegal?
A. I think she left about four or five years ago, and I am not sure how long, but, maybe, about ten years prior she worked at Stellar.
Q. Are you familiar with Arisalyn Senidos?
A. As a name, but, I think, she

A. JAKUPAJ

was one of the paralegals.

Q. Do you recall during what time period she worked?

A. No.

Q. Are you familiar with Chanelle Hill?

A. Yes.

Q. Who's that?

A. One of the resident coordinators for 49 Crown.

Q. Is she, currently, a resident coordinator?

A. No.

Q. During what time period was she a resident coordinator?

A. I think, like, two or three years, maybe, from 2019 till about '22, roughly.

Q. And then, lastly, in the initial disclosures, Kent Security Services was used.

Can you describe what role Kent Security Services plays with Stellar?

A. There was a security company

A. JAKUPAJ

for the said property that have -- wants two people onsite daily.

Q. How long has Kent Security Services been the security company for 49 Crown?

A. I do not know.

Q. Can you estimate?

A. Ten years, maybe. And I do not know if they're there now or not.

Q. Thank you. What e-mail platform does Stellar Management use?

A. Microsoft.

Q. So, like, Outlook?

A. Outlook, yes.

Q. Did they use Outlook -- have they always used Outlook?

A. Yes.

Q. Does Stellar use any messaging platforms?

A. Teams here and there, but not in general.

Q. When a property manager is communicating with somebody, like, a resident coordinator, for example, how

A. JAKUPAJ

would they typically be communicating?

A. E-mail, mailing, or phone calling or in-person.

Q. Are e-mails ever deleted?

A. I do not know.

Q. As part of a request for documents, whether landlord defendants have internal communications among themselves without counsel concerning Ms. Prince or her unit which have not been disclosed, your attorney answered, my client advises that the only other documents maybe e-mails which were deleted on their end or e-mails which were taken by former employees.

Do you know which e-mails may have been deleted in this matter?

A. I do not.

Q. Do you know which e-mails may have been taken?

A. I do not.

Q. Is it regular practice for e-mails to be deleted or for former employees to take e-mails with them?

THE REPORTER: Robert, did you

A. JAKUPAJ

say something?

THE WITNESS: No.

MS. GAINES: Sorry. Yeah, I'll repeat the question.

Q. Is it regular practice for e-mails to be deleted or for former employees to take e-mails with them?

A. I do not know.

Q. Do you know what steps were taken to look for e-mails relating to Ms. Prince to turnover to us?

A. I do not.

Q. Did you want to go through your e-mails related to Ms. Prince?

A. No.

Q. Do you know if anybody else on staff had to go through their e-mails as related to Ms. Prince?

A. I do not know.

Q. If you wanted to find all of the documents or e-mails that Stellar had about Ms. Prince, what would you do?

MR. ARLEO: Objection. Go ahead, you can answer.

A. JAKUPAJ
THE WITNESS: I do not know. I am not an IT person, so I'm assuming somebody from IT, but I do not know.
Q. Is one of the things that you would do pulling up the file in Yardi?
MR. ARLEO: Objection. He just answered he doesn't know.
Q. You can answer the question.
A. I do not know.
Q. Are there records on Yardi about Ms. Prince?
A. I do not now.
Q. But your previous testimony is that there's a -- that Yardi creates ledgers for tenants, correct?
A. That's correct.
Q. So does Ms. Prince have a ledger?
A. If she is a tenant, yes.
Q. She is a tenant.
So does she have a ledger?
A. Yes.
Q. Would that ledger be stored in Yardi?

A. JAKUPAJ

A. Yes.
Q. So is there a Yardi file for Ms. Prince?
A. Yes.
Q. Did you ever send any e-mails about Ms. Prince?
A. I do not recall.
Q. Is your testimony that you may have sent e-mails about Ms. Prince?
A. I do not no recall if I did or did not.
Q. If you did send e-mails about Ms. Prince, who would those e-mails have gone to?
A. I do not know.
Q. Do you have any familiarity with any communications that were sent about Ms. Prince?
A. I do not.
Q. Who would have knowledge about the communications that were sent about Ms. Prince?
A. Whoever was involved in the property and on whatever matter was needed

A. JAKUPAJ

to be addressed.

Q. But it's true that you are involved in that property, correct?

A. That's correct.

Q. And it's, also, true that you are the corporate representative who was selected to testify today, correct?

A. Correct.

Q. Is it true that one of the topics that you were noticed to be prepared on to testify to is, for example, the identify this person has communicated with regarding the debt?

A. Can you repeat the question, please?

Q. Is it true that you one of the topics that you were noticed to be prepared for was -- I am looking at a couple of -- so identities of persons that were communicated with, the substance of communications?

A. Yes.

Q. But your testimony is that you do not have any knowledge about

A. JAKUPAJ

communications that were made about Ms. Prince?

A. Me, personally? Correct. That's what you asked me.

Q. When you say me, personally, what do you mean?

A. You asked, do you know if you had communicated with anyone regarding Ms. Prince, and I said, I do not know.

Q. Are you aware of other communications that were made about Ms. Prince?

A. As stated previously, it depends on the matter. Whoever was involved in the property, they would communicate this to each other or whoever was -- whatever is the matter, to resolve the matter. So either tenants, residents, coordinator, a leasing agent, a paralegal would have been communicating on a particular matter, and that included Lisa Prince.

Q. Are you familiar with those communications?

A. JAKUPAJ

Are you prepared to testify about those communications?

A. No, not familiar.

Q. Did you review documents on Yardi about Ms. Prince?

A. No.

Q. Did you review physical documents about Ms. Prince on a computer?

A. No.

Q. And from 2016 to 2020, as property manager, you did not have any communications about Ms. Prince?

A. I do not know.

Q. Are you aware of any invoices or billing statements that have been sent to Ms. Prince?

A. I am not.

Q. Why are you not familiar with those?

A. I am not familiar.

Q. Do you know whether invoices or billing statements have ever been sent to Ms. Prince?

A. Every tenant gets a rent bill.

A. JAKUPAJ

So she probably would have received a rent statement. So...

Q. Have you reviewed any of those?

A. No.

Q. Who is in charge of billing?

A. Well, it comes from Ms. Banks that we use those are to generate the rent for both of them and mail the rent bills directly to them.

Q. What bank is used at 49 Crown Street?

A. I do not know.

Q. Who would know?

A. Somebody in the office that handles this.

Q. You said that the bank generates the bill?

A. Correct.

Q. Is that bill then sent to somebody at Stellar?

A. It's mailed directly to the tenants, so a third-party, and, then, it's mailed directly to the tenants, individual addresses.

A. JAKUPAJ

Q. So the bank mails the bill directly to the tenant?

A. Either the bank or another entity affiliated with them.

Q. So your testimony is that Stellar is not involved in mailing bills to the tenants?

A. That's correct.

Q. How does the bank -- are you familiar with the way that the bank keeps these records?

A. No.

Q. Or with how the bank generates their bills?

A. No.

Q. Have you ever seen any of these bills?

A. Yes.

Q. On what occasions would you see these bills?

A. When the tenants come to me and they show me the rent statement, either they --

Q. I'm sorry.

A. JAKUPAJ

Is it anybody's job to review these bills?

A. I do not know.

Q. Who would know if it was somebody's job?

A. Controller, maybe.

Q. Who is the controller?

A. Eric Odegard.

Q. Can you spell that for me?

A. Eric. And then O-D-G-A-R-D.

Q. O-D-G?

A. O-D-D-J-A-R-D.

Q. I am sorry. O-D-E- -- oh, Oddgard, O-D-E-G-A-R-D?

A. Yes.

Q. And that's the controller?

A. Yes.

Q. What does the controller do?

A. I do not know.

Q. So then why did you testify that this person would review the bills?

A. Because he's in charge. He's the controller. He must know.

Q. But when you say he must know

A. JAKUPAJ

as the controller, who makes you say that the controller must know?

A. That's his department.

Q. So what department is the controller responsible for?

A. I do not know.

Q. So when you just testified that's his department, what department are you referring to?

A. Can you repeat that?

Q. When you just testified that's his department, what is his department?

A. Accounting, financing. So that must be his department.

Q. So is the controller in charge of accounting and financing?

A. Yes.

Q. So Stellar maintains individual, like, ledgers in the Yardi system; is that correct?

A. Yes.

Q. But then separately, the bank sends -- the bank is keeping its own records; is that right?

A. JAKUPAJ

A. Yes.

Q. And then the bank is sending bills to tenants?

A. Or an entity affiliated with the bank sends it.

Q. So these are the bank, and your testimony is, the bank and Stellar are keeping independent ledgers?

A. I do not know if it's the same ledger or independent ledgers.

Q. Who at Stellar is responsible for maintaining ledgers?

A. I do not know.

Q. Do you know whether it's somebody for each individual building or if it's somebody for Stellar as a whole?

A. Stellar as a whole.

Q. Do you know whether ledgers are maintained or updated automatically or manually?

A. I do not know.

Q. Like, who would know?

A. Not sure.

Q. So you don't know who is

A. JAKUPAJ

responsible for keeping or updating ledgers?

A. Correct.

Q. Mr. Jakupai, did you hear my question?

A. No.

Q. Do you know who accepts payments that are made by tenants?

A. Who accepts payments from tenants?

Q. Yes.

A. Site offices. Some of the site offices do accept, and then the bank that we usually -- or online, you can make payments.

Q. And, so, if someone is paying -- if someone is mailing a check, where is the check being mailed to?

A. It's a P.O. Box somewhere, and then, like I said, the bank or an entity receives it, and then they are the ones who post it into the tenant's ledger.

Q. So Stellar does not do it -- does not handle that money?

A. JAKUPAJ

A. Maybe somebody in Stellar does, but I do not know.
Q. You mentioned earlier that Stellar sometimes, then, memos about rent arrears.
How does Stellar learn of these rent arrears?
A. By checking individual ledgers.
Q. Does Stellar consult with the bank at all before sending a memo?
A. No. The bank posts them, and then you're able to visually see whatever's posted.
Q. I guess I am trying to understand, the bank posts the payment made to its own ledger?
A. To Yardi.
Q. To where? I am sorry.
A. To Yardi.
Q. So the bank, also, has access to the ledger that is in -- that is maintained in Yardi?
A. That is my understanding.
Q. Who is responsible for drafting

A. JAKUPAJ

memos about rent arrears?
A. The resident coordinator, property manager, someone from paralegal can send those rent arrears letters.
Q. Anybody else?
A. Those are the three main ones that come to mind.
Q. Are arrears letters, typically, saved in Yardi?
A. No. I do not believe so.
Q. Why not?
A. I do not know.
Q. You, also, mentioned monthly bills to tenants.
How are monthly bills drafted?
A. The bank sends them -- mails them to the individual addresses.
Q. So Stellar is not involved in the billing process?
A. As far as I know, no.
Q. So the bank would send the bill in advance of the payment being due?
A. Correct.
Q. And then if there are arrears

A. JAKUPAJ

or rent that is unpaid, Stellar would send a memo to the tenant about that amount; is that right?
A. That's correct.
Q. Are bills saved in Yardi?
A. The ledger has all the credits and debits.
Q. Are particular bills saved anywhere?
A. I do not know.
Q. Does Stellar ever bill tenants or services or other things outside of rent?
A. No.
Q. Does it ever charge fees for late payments?
A. Yes.
Q. How much is that charge?
A. It depends. Different buildings have different amounts.
Q. Does Stellar ever charge fees for failure to sign something on time?
A. I do not know.
Q. Does Stellar ever charge use in

A. JAKUPAJ

occupancy?

A. I do not know.

Q. Are there policies related to fees?

A. Can you repeat the question?

Q. Does Stellar maintain policies related to fees?

A. No.

Q. Okay. So, for example, when you just said that it might depend on whether -- or how much a late fee is, what would it depend on?

A. Well, whatever the agreements, I guess, they have of the ownership or the building or -- I am not certain.

Q. Are those agreements written?

A. I do not know.

Q. And who makes the decision about whether to bill a tenant for something other than rent?

A. I do not know.

Q. Like if, for example, a late fee, you don't know who would make the decision to add a late fee?

A. JAKUPAJ

A. Those are automatically generated. After the 10th of the month, the late fees are automatically generated. If it's 25 in one building, 50 in one building, 100 in one building. It depends on their leases probably. When they signed the lease, whatever lease that they sign.

Q. When you say, automatically generated, what do you mean?

A. Yardi automatically will implement the 10 -- after the 10th of the day, if that's the grace period or the 15th, automatically, it will generate the late fee.

Q. Who is in charge of offering renewal leases?

A. Leasing departments.

Q. Who manages offer and succession leases?

A. The leasing department.

Q. If a tenant moves out or dies, what happens to their account in Yardi?

A. If they vacate it, the apartment gets vacated. If they die and

A. JAKUPAJ

there's nobody in the unit, you vacate the apartment.

Q. I am asking about the account, like, the account in Yardi.

What happens to that account?

A. Once you vacate, that account is obsolete. It just stops charging.

Q. Is it deleted, the account?

A. I do not know.

Q. What would happen to an account if there were arrears on it?

A. When you vacant, the apartment goes vacant from that point in time, you send it to the legal department, and then they take the necessary steps they deem it needed.

Q. When you say you sent to legal, is that internal legal with Stellar?

A. That is correct.

Q. What happens if, like, family members were to remain in an apartment after a tenant moves out or dies, would an account be created for the occupants?

A. You have to go through the

A. JAKUPAJ

succession rights procedures, and if that one is granted, then, yes.

Q. Let's say, before succession was granted, would charges continue to accrue?

A. That's correct.

Q. And would you accept rent from that occupant?

A. It would depend on what type of agreement you make, but that's something that legal does.

Q. If an account is not in an occupant's name -- actually, excuse me. Yeah, strike that.

Do you know if there are policies around leases and renewal leases?

A. Leasing has policies, yes.

Q. It has written policies?

A. I do not know if there are written policies.

Q. Who would know?

A. Leasing department.

Q. Is there a separate department that manages Section 8?

A. JAKUPAJ
A. Certain people that have more knowledge that are involved in Section 8, yes, but not --
THE REPORTER: What?
MS. GAINES: Oh. Are you asking me to speak again or for the witness? Sorry.
THE REPORTER: For the witness. You said certain people that have more knowledge that are involved in Section 8, and then you said something else after that.
THE WITNESS: Of certain portfolios.
Q. Who are the people who have more knowledge on Section 8?
A. For the particular building, it would be Jessica and Wanda Sanchez.
Q. Are those the people who interface with HPD Section 8?
A. Yes.
Q. Does anybody else interface with Section 8?
A. Fran Schiff, potentially, for

A. JAKUPAJ

that particular building.

Q. Who would make the decision about whether to accept or place a Section 8 voucher?

A. I do not know.

Q. Do you know if there are policies around Section 8 vouchers?

A. I do not know.

Q. Who would know?

A. Leasing.

Q. Do you know how tenants are notified that a voucher has been placed in the building?

A. I do not.

Q. Does Stellar ever refuse to place Section 8 vouchers?

A. I do not know.

Q. Is information related to Section 8 kept in a tenant's Yardi account?

A. I do not know.

Q. Where would information about Section 8 as related to the tenant be kept?

A. I do not know.

Q. Can you tell me how many

A. JAKUPAJ

members there are of Stellar's internal legal department?

A. I do not know.

Q. Can you estimate?

A. Five.

Q. How many lawyers and how many paralegals of that five would you estimate?

A. Two and three. Two lawyers, three paralegals, I would say.

Q. And does Stellar employ outside counsel as well?

A. Yes.

Q. What does Stellar employ outside counsel for?

A. Legal proceedings, attending courts.

Q. What kind of legal proceedings?

A. Well, I guess, it depends, varies. Any type of legal proceedings.

Q. So then what does the internal legal department do as opposed to outside counsel?

A. I do not know.

Q. Does internal legal attend

A. JAKUPAJ
legal proceedings?
MR. ARLEO: Objection. You can answer.
THE WITNESS: I do not know.
Q. Can you tell me which outside counsel Stellar employs?
MR. ARLEO: Objection.
THE WITNESS: I do not know. There is a handful, probably, depending on cases.
Q. Does Stellar, typically, work with the same law firms?
MR. ARLEO: Objection.
THE WITNESS: I do not know.
Q. Are you familiar with Cullen & Associates?
A. Yes.
Q. How are you familiar with them?
A. It's one of the attorneys that we use.
Q. How long has Stellar used Cullen & Associates?
A. I do not know.
Q. Can you estimate?

A. JAKUPAJ
A. 15 years.
Q. What type of work does Cullen & Associates do for Stellar?
A. I do not know.
Q. You don't have any kind of idea what kind of work Cullen & Associates does for Stellar, that's your testimony?
A. Correct.
Q. Do you know how much Stellar pays Cullen & Associates for its representation?
A. Do not know.
Q. Did you have any interaction with Cullen & Associates as a property manager for 49 Crown Street?
A. Yes.
Q. What was that interaction like?
A. He worked with us in tenants' matters in court or as -- if we needed any consultations.
Q. What kind of tenant matters?
A. Any type of tenant matters, including --
Q. Including -- I am sorry. Go

A. JAKUPAJ

ahead.

A. No, go ahead.

Q. Including what?

A. Including arrears.

Q. When you say consultation, what type of consultation would you do with Cullen & Associates?

A. It depends on the matter. We just needed guidance on how to proceed on a particular matter.

Q. Were Cullen & Associates typically the lawyers that you were consulting when you were working at 49 Crown?

A. Yes.

Q. How frequently were you working with them or consulting with them?

A. I do not know.

Q. Can you estimate?

A. Two, three times a month.

Q. Who with Stellar would be responsible for reaching out to Cullen & Associates if there was a question or if you wanted a consultation?

A. JAKUPAJ

A. Numerous people.

Q. Like who?

A. The property manager, paralegal, the tenant coordinator, and so on.

Q. Could any of those people make the decision to reach out?

A. Yes.

Q. Under what circumstances would you choose to reach out to Cullen & Associates?

A. I said it's a lot of circumstances, and any type of issues that you are not certain that if it's a legal matter, we are able to contact them and get guidance.

Q. How does Stellar determine which tenants it will sue in housing court?

A. Whoever doesn't pay rent, they get sued.

Q. Are there other reasons why Stellar would sue tenants?

A. Sure.

Q. Like what?

A. JAKUPAJ

A. Nuisance case, any lease breaches, et cetera.

Q. Who would make the decision for determining who should be sued?

A. Paralegal, property manager.

Q. Would Cullen & Associates ever tell Stellar that it should not sue a particular tenant?

MR. ARLEO: Objection.

THE WITNESS: I do not know.

Q. Was Stellar certain that it was going to sue all of the tenants that it brought to the lawyers, or was it looking for guidance about whether it could sue these tenants?

MR. MARSHALL: Objection to that one.

THE WITNESS: I do not know.

Q. What decisions were the lawyers making on Stellar's behalf?

MR. ARLEO: Object to the form.

A. I do not know.

Q. What role did Cullen & Associates play in trying to recover debt?

A. JAKUPAJ

A. Represent him, Stellar, to recover debt.

Q. In the ordinary course of business, did Stellar inform Cullen & Associates if a tenant was on Section 8 before a lawsuit was filed?

A. I would say yes.

Q. And in the ordinary course of business, would Stellar inform the attorneys about what the contract rent would be?

A. Yes.

Q. In the ordinary course of business, would Stellar tell the attorney how much the tenant owes in arrears?

A. Yes.

Q. Would Stellar ever rely on the attorney to calculate the arrears that were owed?

MR. MARSHALL: Objection to the form.

Q. You can answer.

A. I do not know.

Q. In the ordinary course of

A. JAKUPAJ

business, would Stellar tell the attorney whether to bring a non-payment case or a holdover case?
A. I do not know.
MR. MARSHALL: Objection to the form again.
Q. Who would make the decision about what kind of case to file?
A. Paralegals.
Q. Would anybody else make that decision?
A. I do not know.
Q. When you say paralegals, your testimony is that paralegals with Stellar were making a decision about what kind of case to file against tenants?
A. Yes, potentially.
Q. In the ordinary course of business, do the lawyers ever speak directly to the tenants?
A. I do not know.
Q. Who would be responsible for drafting notices about court cases that might be filed?

A. JAKUPAJ
MR. MARSHALL: Objection to the form.
THE WITNESS: I do not know.
Q. Do you know whether internal -- Stellar internal legal was drafted notices or if that was something that outside counsel would be doing?
A. A rent demand notice where send them internally, and outside counsel, if that's what you are asking.
Q. That is what I am asking.
Who would be responsible for serving rent demand notices?
MR. MARSHALL: Objection to the form.
THE WITNESS: We will mail those rent demands. I don't know what the outside counsel, how they will do it. I am assuming they will mail them as well.
Q. Who is responsible for addressing petitions for court cases?
A. I do not know.
Q. Do you know whether Stellar's

A. JAKUPAJ

internal legal department drafts petitions?

A. I do not know.

Q. Who views a petition and makes sure that it's accurate?

A. I do not know.

Q. Do you know if there's any kind of process for reviewing petitions and making sure they're accurate?

A. I do not know.

Q. Who would know?

A. I don't know.

Q. Do you know what happens when a tenant disputes a rent demand?

A. I do not.

Q. Do you know what the process is for resolving a lawsuit against a tenant?

A. I do not.

Q. If someone does not have a lease to an apartment, do you know what legal actions Stellar can take against them?

A. I do not.

Q. Do you know how Stellar can collect money from someone who doesn't have

A. JAKUPAJ

a lease?

A. I do not.

Q. Do you know what use-in-occupancy is?

A. No.

Q. Do you know if Stellar distinguishes between rent and use-in-occupancy?

A. I do not.

Q. Do you know if use-and-occupancy is distinguished in any way on a ledger?

A. I do not.

Q. I am going to mute us for one second. The question I want to go back to, I asked who was responsible for drafting petitions, and you said a paralegal, potentially.

My question was, who is responsible for making the decision to sue, and you said, paralegals, potentially.

Who else would be responsible for making the decision; is there anybody else?

A. JAKUPAJ

A. Property manager, resident coordinator.

Q. Anyone else?

A. That's the only ones I can think of.

Q. Okay. Thank you. Okay.

MR. ARLEO: So why don't we just take a lunch break and then come back at 1:45, how's that?

MS. GAINES: Sounds good to me.

(Whereupon, a break was taken.)

MR. ARLEO: Okay. Before the last break, my client had called in from his car as he was driving, and attorneys for plaintiffs didn't want to depose him, and I agreed with that. However, when we agreed that he would let me know when he was stationary, before we cut out, one of the attorneys for the plaintiff said, what a loser.

So which attorney said that?

MS. GAINES: You can make whatever record you want to make on

A. JAKUPAJ

the record.

MR. ARLEO: Are you denying that what a loser was not said?

MS. GAINES: You can say whatever you want. You can make whatever statement you want to make for the record.

MR. ARLEO: Well, I am not going to make any statement. It's clearly sanctionable in federal court. So the fact that no one is going to admit which one said it, then I'll get a copy of the transcript and make my application. Was the recording still on when the "what a loser" comment was made?

THE REPORTER: Who are you asking?

MR. ARLEO: I am asking the attorneys for the plaintiffs.

MS. GAINES: I'm not sure. But, again, you can finish making whatever comments you want to make.

MR. ARLEO: So let's be clear,

A. JAKUPAJ

no one's denying that "what a loser" was actually said, correct?

MS. GAINES: I want to make a -- also, remarks for the record, that we had agreed to take a break for lunch until 1:45. When we returned at 1:45, the witness was in a car driving. We asked the witness when he would be stationary. The witness said it would be at least 30 minutes. We are now returning to the record at 2:27 -- 2:25 we returned.

MR. ARLEO: At the end of that -- and after the end of the --

MS. GAINES: You made your remarks.

MR. ARLEO: No, I'm making it again.

One of the plaintiff's attorneys said, what a loser clearly referencing to the deponent. Start your questions.

MS. GAINES: This is my deposition. I'll start my questions

A. JAKUPAJ
when I want to start my questions.
Q. I have a couple questions, Mr. Jakupaj, about something that we addressed earlier, and then I'll move on. So I want to ask about IT.
Who does IT for Stellar?
A. I do not know.
Q. If you needed help with something related to tech, who would you contact?
A. One of the persons in the main office.
Q. Who?
A. Jared Aguilar.
Q. What is Jerry Aguilar's role?
A. Something in the IT. I am not sure.
Q. So you previously testified that you don't know who does IT?
A. I don't know who does IT. I tell him, and what he does and how he does it? I have no idea.
Q. Does anybody else do IT for Stellar?

A. JAKUPAJ

A. I do not know.
Q. Does anybody else work with Jerry?
A. I do not know.
Q. How long has Jerry done IT for Stellar?
A. I do not know.
Q. How does Stellar Management maintain its files, like, on what system?
A. You asked that. Yardi.
Q. Are there any other systems that Stellar uses to maintain files?
A. Not that I am aware of.
Q. On the ledger, if tenants dispute amounts that are charged on a ledger and the ledger is altered, how would those changes be made?
MR. ARLEO: Objection to form.
You can answer.
THE WITNESS: I am not following adjustment to the ledger. I am not following it.
Q. How would someone adjust the ledger?

A. JAKUPAJ

A. I have no idea. We don't have -- I don't have access to addressing the ledger.

Q. Are you looking at a computer right now?

A. I am.

Q. What are you looking at on your computer?

A. You. Whoever is talking to me.

Q. You're turning your head to face forward, too. Like, right now, you're turning forward.

What are you looking at when you're turning face forward?

A. I have a computer. I have cameras. I'm in my office.

Q. When you say face forward when you are looking away from me, what is that?

A. Cameras. A screen. Not a speaker.

Q. You're looking at another screen.

What is up on that other screen?

A. JAKUPAJ

A. Cameras of the property where I am at.

Q. Are you doing other work right now?

A. Talking to you right now.

Q. Are you doing other work right now?

A. No.

Q. Can I ask you to, please, refrain from doing other work right now during this deposition?

A. Sounds good.

MR. ARLEO: Arianit, can you shut those other cameras off and just focus in on this Zoom?

THE WITNESS: Okay.

Q. Thank you. If there were changes or alterations made to a ledger, how would those be reflected on the ledger? Actually, strike that. Let me go back.

Are employees able to manually alter a ledger?

A. They can do adjustments, yes, and deduct a charge, yes.

A. JAKUPAJ

Q. And to do so, they would go in through the system; is that right?

A. Yes.

Q. Would the ledger reflect anywhere that a change had been made?

A. Yes.

Q. How would that be reflected?

A. On the amounts, or if it was taking notes. It runs credit. It runs a charge. Whatever the adjustment was, hopefully, there's notes in there.

Q. When you say hopefully there's notes, what do you mean?

A. There is notes. I don't know. I don't know. You're asking a vague question. You're not asking a particular. So I cannot give a particular answer for that. There might be notes.

Q. Yeah, that's what I am asking. So I am --

MR. ARLEO: Excuse me. I've asked you to allow him to finish his answer before you speak.

MS. GAINES: Okay.

A. JAKUPAJ

Q. I was asking, why might there be notes at times and why might there not be notes at other times?

A. I just told you. It is, whoever is added, added a note or if they did not add it. It could be just a charge, another note. I am not certain, as we're not talking about specifics. We're talking, in general, about the thousands of ledgers.

Q. In addition to the file on Yardi, or the account on Yardi, are there, also, physical files about clients?

A. For that particular billing, there are physical files, also.

Q. Why are there both physical files and the Yardi files?

A. I do not know.

Q. When you were the property manager of the building, were there both physical files and the Yardi files?

A. Yes.

Q. Why was that?

A. HPD comes and inspects those

A. JAKUPAJ

files. It's a lot of paperwork, and at some point, we did not have Yardi. So these files were generated prior to having Yardi, and prior to having access on Yardi, some of this information in Yardi.

Q. Are there differences between the information in the physical file and the file that's on Yardi?

A. Possibly.

Q. What is an example of something that might be in a physical file but not in a Yardi file?

A. Additional paperwork on the actual file.

Q. Like what kind of additional paperwork?

A. Prior leases. Let's say some type of whatever. There is some indications they borrowed from this particular -- any type of information. Potentially, information that the leaseholder submitted and was not uploaded in Yardi prior to having Yardi. Work order, potentially, that was a handwritten

A. JAKUPAJ

work order at some point. Other notices. So there can be other stuff in that file.

Q. Thank you. And as a property manager of the building, were you, generally, familiar with the lawsuits that were brought against the tenants of the building?

A. Yes.

Q. Were you, generally, familiar with what the court had ordered with respect to the tenants of the building?

A. Not necessarily.

Q. For example, if the court had ordered that somebody could be evicted, were you, generally, aware of that?

A. Yes.

Q. Were you, generally, aware of, like, payment plans?

A. Yes, to some extent, but I have other portfolios. And, usually, with the tenant's coordinator, it was mainly handled less of the work. In order for it to be more informed, then, they will make notes into the --

A. JAKUPAJ

THE REPORTER: And, just, can you speak louder into the --

THE WITNESS: The complete sentence -- I mean, from where I started, the complete answer?

THE REPORTER: No. And you said, they will make notes into the.

THE WITNESS: They will make notes into the tenant's account, and they will, also, input dates on when the payments were due.

Q. If the court ordered that a tenant were entitled to a lease, is that something that you would, generally, be aware of as property manager?

A. Yes and no. Lease -- we'll go to leasing, and they will handle that part. We will just, maybe, be notified that this tenant received a notice.

Q. If the court had ordered that a tenant didn't, actually, owe them money that was sought, would you be aware of that, generally?

A. Not necessarily, no.

A. JAKUPAJ

Q. Are you familiar with a Joyce Lee?

A. As a name, yes.

Q. Why do you say, "as a name?"

A. She resided, if I recall, in one of the apartments in 49 Crown.

Q. Do you know how long she -- do you know which apartment she lived at?

A. I believe 28th Larry.

Q. Do you know how long she lived at that apartment?

A. I do not.

Q. Do you know whether she had a lease to that apartment?

A. Yes. She had a lease to that apartment.

Q. Do you know when her last week of that apartment was?

A. I do not.

Q. Do you know whether she had a rent-stabilized lease?

A. I do not.

Q. Do you know if there are records of her leases?

A. JAKUPAJ

A. I do not.

Q. If there were records of her leases, where would those be?

A. In the Yardi system and in the site office.

Q. Do you know whether Ms. Lee lived with anyone?

A. I do not.

Q. But, to your knowledge, Ms. Lee lived in the apartment alone?

A. I know somebody else was there, but I don't know if they lived or if they just visited. I am not sure.

Q. Do you know what happened to Ms. Lee?

A. Deceased, I believe.

THE REPORTER: What?

THE WITNESS: I believe deceased, dead.

Q. Do you know when she died?

A. I do not.

Q. Do you know if anyone lived in Apartment 2L after she died?

A. 2L?

A. JAKUPAJ

Q. 28. I am sorry, 28L?

A. Yes.

Q. Who was that?

A. I believe it was a grandson.

Q. Do you know that person's name?

A. Chris, Christopher, maybe. I am not certain.

Q. Did anyone else live in that apartment?

A. Not that I am aware.

Q. Are you familiar with Lisa Prince?

A. As a general -- as a name, yes.

Q. Who is Lisa Prince, to your knowledge?

A. To my understanding, she is the aunt of the gentleman we were talking, Chris Lee, I believe. Chris.

Q. Did she live in Unit 28L?

A. Not that I remember.

Q. To your knowledge, did Christian Lee and Lisa Prince ever seek succession rights to Apartment 28L?

A. Yes.

A. JAKUPAJ

Q. When was that?

A. I don't know what time, but I know Chris Lee requested a succession, and then there was some other paperwork back-and-forth, and then at some point, Lisa --

THE REPORTER: I'm sorry. That was what to them?

A. At some point, Christopher Lee requested after the tenant of record died, requested to file for -- take over the apartment, succession rights. And then at some point, Lisa Prince came along. I am not sure of the whole circumstances, but I had to take care of Chris Lee, and then she was the one that then requested the succession rights.

Q. Do you know whether succession rights were granted or denied?

A. I believe they were granted, but I do not know. I'm not certain.

Q. I am going to mute for one second.

Were you, Mr. Jakupaj, involved

A. JAKUPAJ

at all in decisionmaking around granting or denying succession rates to Christian Lee or Lisa Prince?

A. No, I am not. I was not.

Q. Who would have been responsible for that decision?

A. I believe this went to HPD.

Q. Who at Stellar would have been in discussion with HPD about succession rights?

A. Someone from leasing and our attorneys.

Q. Leasing and attorneys?

A. Yes.

Q. Are you aware that HPD determined that Christian Lee had succession rights since 2019?

A. I'm not.

Q. Do you know whether Stellar offered a lease after that determination?

A. I do not know.

Q. Do you know when Stellar first offered a lease to Christian Lee?

A. I do not.

A. JAKUPAJ

Q. Do you know when Stellar first offered a lease to Lisa Prince?

A. I do not.

Q. Do you know how many times Stellar attempted to evict Mr. Lee and Ms. Prince?

A. I do not.

Q. Are you aware of any attempts to evict Mr. Lee and Ms. Prince?

A. I am not aware.

Q. So as property manager for the building, you were not aware of any attempts to evict Lisa Prince or Christian Lee?

MR. MARSHALL: Objection to form.

Q. I am sorry. Can you repeat your answer? I didn't hear it.

A. I am not aware.

Q. Is it your testimony that there were no attempts to evict these tenants?

MR. MARSHALL: Objection to the form.

THE WITNESS: I answered, I am

A. JAKUPAJ

not aware.

MS. GAINES: I am going to request a brief break. Perhaps, Mr. Jakupaj, you can figure out how to turn off that sound during break.

A. I cannot figure that one out. It's my e-mail that is doing that. If I turn that one off, I have no volume.

Q. Okay.

MR. ARLEO: Hang on. Why do you want to take another break now?

MS. GAINES: I need to take five minutes. We can return in five minutes at 3:33.

MR. ARLEO: Do you have an idea of how much longer you have?

MR. MARSHALL: In five minutes, not 3:33.

MS. GAINES: 2:53. Yeah, five minutes.

MR. ARLEO: Do you have an idea of how much longer you're going to be?

A. JAKUPAJ

MS. GAINES: Yeah. It could be another couple of hours.

(Whereupon, a break was taken.)

Q. Mr. Jakupai, can you just remind me the years that you were property manager at 49 Crown Street?

A. 2010 to 2019, 2020. And then on and off a couple more times around 2022.

Q. Who would have made the decision in 2016 to bring a non-payment case against Christian Lee alleging $42,000.00 in arrears?

A. Paralegal, property manager, and/or resident coordinator.

Q. You were the property manager, though?

A. Okay.

Q. Yes or no?

A. Yes.

Q. Did you make the decision?

A. I do not remember.

Q. Do you remember whether Christian Lee had a lease at this time?

A. I do not.

A. JAKUPAJ

Q. Do you know which attorneys brought this case?

A. I do not, no.

Q. Would it surprise you to learn that it was Cullen & Associates?

A. I would not be surprised, no.

Q. Would you or someone else from Stellar have reviewed the petition in this case before it was filed?

A. I do not know.

Q. Do you know what happened to this case?

MR. MARSHALL: Objection to form.

THE WITNESS: I do not.

Q. Do you know why the landlord, ultimately, discontinued this case?

A. I do not.

MR. MARSHALL: Objection to form.

Q. Are you aware of administrative proceedings that were brought against Mr. Lee and Ms. Prince in 2016?

A. I do not remember.

A. JAKUPAJ

Q. Would you have been involved in the decisionmaking around bringing these proceedings?

A. Possibly.

Q. Do you recall whether or not you would have?

A. I do not recall.

Q. Who would have made the decision to sue Mr. Lee and Ms. Prince in 2017 for $56,000.00 in arrears?

MR. MARSHALL: Objection to the form.

THE WITNESS: It was the same parties that I advised prior, the property manager, paralegal, and/or a resident coordinator.

Q. And, again, you were the property manager at this time, correct?

A. That is correct.

Q. So it could have been you who made this decision?

A. Possibly.

Q. Do you know why this case was started?

A. JAKUPAJ

A. I do not.

Q. How were the decisions to make these cases -- to bring these cases documented?

A. I do not know.

Q. Are they documented anywhere?

A. I do not know.

Q. Who would know?

A. The legal department.

Q. Who was the paralegal or resident coordinator at that time who would have made the decision?

A. I do not remember who was the coordinator at that time.

Q. Why did the landlord initiate the 2024 non-payment lawsuit against Ms. Prince?

A. I do not know.

Q. Was the landlord aware that Ms. Prince had -- did not sign the lease at the time the lawsuit was filed?

A. I do not know.

Q. Why did the landlord allege that Ms. Prince had not paid her rent since

A. JAKUPAJ

September 2023 to May 2024?
A. I do not know.
Q. Do you know whether Ms. Prince had made any payments from September 2023 to May 2024?
A. I do not know.
Q. Do you know whether the attorney asked to see whether Ms. Prince had a lease?
A. I do not know.
Q. Do you know whether Ms. Prince had a lease at that time?
A. I do not.
Q. Do you know whether the attorney asked to see the ledger?
A. Repeat the question.
Q. Do you know whether the attorneys asked to see Ms. Prince's ledger before filing the 2024 non-payment case?
A. I do not know.
Q. Do you know whether Stellar reviewed the ledger before filing the 2024 case?
A. I do not know.

A. JAKUPAJ

Q. Do you know whether Stellar reviewed the petition before it was signed and filed?

A. I do not.

Q. Have you looked at the ledger in this case?

A. I did not.

Q. Do you know what happened to this lawsuit?

A. No, I do not.

Q. Do you know whether Ms. Prince spoke to anyone in management or legal about the rent advance?

A. I do not.

Q. Are you aware of any letters -- whether Ms. Prince sent any letters concerning the rent demands?

A. I am not aware.

Q. You testified earlier that you had reviewed the Deposition Notice topics, correct?

A. Correct.

MS. GAINES: I would like to mark the Deposition Notice as Exhibit

A. JAKUPAJ
1.
I can share it on the screen right
now and then e-mail it after, if that
works, Miriam?
THE REPORTER: Sure.
MS. GAINES: Can everyone see
my screen?
THE WITNESS: Yes.
Q. The Deposition Notice, is that
what we're looking at?
MR. MARSHALL: I can't see any
Deposition Notice.
MS. GAINES: You can't see the
Deposition Notice?
MR. MARSHALL: No. I got it.
MS. GAINES: Okay. Great.
Q. Mr. Jakupaj, do you see a
Deposition Notice on the screen?
A. Yes.
(Whereupon, Deposition Notice
was marked as Plaintiff's Exhibit 1
for identification as of this date by
the Reporter.)
Q. Is this what you testified to

A. JAKUPAJ

how you were viewed?

A. Correct.

Q. I am going to scroll past the instruction and definitions to the Notice, and I am going to scroll down to Number 13.

So it's true that you were instructed today to have information to testify as to the decision to file the 2024 lawsuit and to send bills and letters requesting a six-figure balance, including but not limited to, the basis for the decision, the information relied on for that decision, and communication about that decision, correct?

A. Correct.

MR. ARLEO: Hang on. I am going to object. You're referencing your Notice of Deposition with lists of the subjects that you intend to explore, and he is here to testify as a 30(b)6 witness. So you can go ahead and -- you can answer that question.

MS. GAINES: It would probably

A. JAKUPAJ
make sense for me to ask it again.
Q. So you were instructed today to come prepared to testify as to Number 13 -- and, actually, I can highlight it on the screen -- the decision to file the 2024 lawsuit. And this says, billed and ledgers requesting a six-figure balance, including but not limited to, the basis for the decision, the information relied on for that decision, and communication about that decision; is that correct?
A. Correct.
Q. And your testimony is that you don't have any information about that?
A. I wasn't on that building in 2024.
Q. Okay. However, you received a notice instructing you to prepare as to -- to testify as to that topic, correct?
A. Correct.
MR. ARLEO: Objection.
Q. And you are not prepared?
MR. ARLEO: Hang on a second.
Objection. You can characterize his

A. JAKUPAJ

testimony however he responds. Just because you listed it in the Notice is not going to guarantee you're going to get what you're looking for, but you can answer it.

Q. You were, also, instructed to be prepared to testify as to Number 14, the decision as to how much money should be alleged to -- should be alleged to you in the 2024 lawsuit, and that all bills and ledgers sent to plaintiff, including but not limited to, the basis for the decision, the information relied on for that decision, and communication about that decision; is that correct?

MR. ARLEO: Note my objection to the word, instructed. You can go answer this.

THE WITNESS: Yes.

Q. And your testimony is that you don't have any information as to those topics?

A. That's correct.

Q. Why not?

A. JAKUPAJ

A. I was working there at that time.

Q. Did you prepare as to that topic?

A. I just scanned through these documents.

Q. What documents?

A. What you've just shown me.

Q. This document that's on the screen right now?

A. That's correct.

Q. The Deposition Notice?

A. Yes.

Q. You didn't review anything else to prepare -- to testify as to that topic?

A. Correct.

MR. ARLEO: Objection. Objection. Note my objection. He's already testified as to what he reviewed today before he appeared at this deposition. That was broken up. I didn't hear that.

MS. GAINES: Yeah, there's an echo. Okay.

A. JAKUPAJ

Q. Okay. Mr. Jakupai, you were, also, noticed to be prepared to testify as to No. 15. The decision to sue plaintiff when she had paid her rent, including but not limited to, the basis of the decision, the information relied on for that decision, and communication about that decision; is that correct?

A. Correct.

Q. And it's your testimony that you don't have any information that's related to Topic No. 15?

A. That's correct.

Q. Did you prepare to testify as to Topic No. 15?

MR. ARLEO: Objection. You can answer.

THE WITNESS: No.

Q. Why not?

A. I just didn't look at the ledger.

Q. Why didn't you look at the ledger?

A. I didn't have time.

A. JAKUPAJ

Q. You were, also, noticed to be prepared to testify to No. 16. I am not going to highlight that. Number 16, how much the attorney defendants were paid or how much the landlord defendants paid for the 2024 lawsuit and for each collection or predicate notice that is in connection to the lawsuit; is that correct?

A. Correct.

Q. And is it your testimony that you have no information that's related to Topic No. 16?

A. That's correct.

Q. Did you prepare to testify as to Topic No. 16?

A. We don't have information to prepare on.

Q. You were instructed --

MR. ARLEO: Objection to the word instructed.

Q. You were noticed to have information as -- also, as related to Topic No. 21, the decision to sue Ms. Prince for alleged non-payment of rent for a time

A. JAKUPAJ

period, which is not provided in the lease; is that correct?

A. Correct.

Q. And is it your testimony that you do not have any information that's related to this topic?

A. Correct.

Q. Did you prepare to testify on this topic?

A. Yes.

Q. Then why don't you have any information about this?

A. I don't have access to that information.

Q. But you're prepared to testify on this?

A. I don't have information.

Q. Okay. But you said two seconds ago, I'm prepared.

THE REPORTER: Say that again.

MS. GAINES: I'll rephrase the question.

Q. So if you are prepared to testify on this topic, why don't you have

A. JAKUPAJ

information to share?

A. I don't have that information. So I can't share something of what I don't have.

Q. What did you do to prepare to testify as to Topic No. 21?

A. Nothing because I don't have anything in front of me. I wasn't provided with any information; therefore, nothing.

Q. Okay. So just to be clear, you said a few seconds ago that you didn't prepare to testify as to this topic.

A. Yeah. In general, I was prepared, in general, to testify about this, and I gave you all the information that I have, that I was privy to. I gave you all the information. You can rephrase it as many times as you want.

Q. I am not asking in general. I am asking, specifically, as to Topic No. 21.

A. Specifically, I already answered you. So you can ask five times the same question. I already answered you.

A. JAKUPAJ

Q. I am going to ask it, again.

MR. ARLEO: I'm going to object. Asked and answered. Move onto your next question, please.

Q. The decision to --

MR. ARLEO: Now you're harassing him. You are harassing him.

MS. GAINES: Your objection is noted for the record.

Q. The decision to sue Ms. Prince for alleged non-payment of rent for a time period in which she was not provided a lease, your testimony is, you do not have information to testify?

MR. ARLEO: Objection. Asked and answered.

Q. You can answer the question.

A. I answered it already.

Q. You can answer it again.

MR. ARLEO: Yeah, you know what, I'm going to stop this.

A. The same answer.

MR. ARLEO: Hang on, Arianit.

A. JAKUPAJ

Hang on, Arianit. Now this is harassment, all right? He just answered that I answered the question, and you told him, he can answer it again. He already answered it. Why would he have to answer it again? He already answered it. Why would he have to answer it again? He told you his answer. Move onto your next question.

Q. I'll move onto a different topic number. You were noticed to prepare as to No. 17 information about the identity of persons who issued the building statements and how they made the decision to issue them.

Is your testimony that you have information about this topic?

A. I do not.

Q. Why don't you?

A. I don't have information available.

Q. You were, also, noticed to -- actually, I am going to go back to that

A. JAKUPAJ

one.

Who would have that information?

A. I do not know.

Q. I am going to move to 18.

So you were noticed to prepare to testify as to the decision to seek either her billing statements or lawsuits for the time period you did not provide Ms. Prince a lease.

Are you prepared to testify as to this topic?

A. I don't have any information on the topic.

Q. Why did you not seek any information on this topic?

MR. ARLEO: Objection. Go ahead and answer the question.

THE WITNESS: I don't have information. No information was provided to me on that.

Q. Does the information exist?

A. I do not know.

Q. Who would know?

A. JAKUPAJ

A. I have no idea.

Q. I am going to stop sharing the screen and -- okay.

Are you aware that Stellar continues to bill Ms. Prince her six-figure amounts in debt?

A. I am not aware.

Q. Who makes the decisions about sending billing documents?

MR. ARLEO: Objection. Asked and answered.

Q. You can answer the question.

A. Billing? I already advised how billing is done. It gets --

THE REPORTER: Say that again. I'm sorry. You said billing. Say that again.

A. So the bank and the third-party do the billing for the particular tenants.

Q. Do you know what the statute of limitations on unpaid rent is?

A. No.

Q. Is it your responsibility as a property manager to know that?

A. JAKUPAJ

A. It is not.

Q. Whose responsibility would it be, if you know?

A. Legal department.

Q. Do you know how many letters demanding rent or rental arrears alleges rental agreements have been sent?

A. I do not.

Q. Do you know if Stellar regularly sues tenants for amounts that have been paid?

A. I'm not aware of that.

Q. Do you know whether Stellar has sued other tenants for amounts that have already been paid or for incorrect amounts?

A. I'm not aware.

MR. ARLEO: Objection. Arianit, wait. Objection to the form. You can answer the question.

THE WITNESS: I'm not aware.

Q. We cited four cases in our complaint. I guess I'll go back.

Have you reviewed the complaint in this case?

A. JAKUPAJ

A. No.

Q. Well, we cite four cases in the complaint in which the landlord owned by breakdown show that rent had already been paid or that the petition saw an incorrect amount.

Are you aware of these cases?

A. I am not.

Q. Do you know why these cases were brought?

A. I do not.

Q. When you were property manager -- or in your -- as a property manager now, are you ever aware of times where a tenant has been sued for money that they have already paid?

A. I am not aware of any case like that.

Q. Did Stellar intend to cause Ms. Prince to leave the building?

A. I'm not aware of that claim or that behavior.

Q. Are you aware of Stellar refusing to give Ms. Prince a key to a door

A. JAKUPAJ

with a ramp?

A. I am not aware.

Q. Do you know where information about such a situation would be documented?

A. I do not.

Q. If something like that were happening, like, a tenant requesting access to a door for a disability, who would deal with that?

A. That request will go to the site office.

Q. And who in the site office would handle that request?

A. The resident coordinator and/or the property manager, maybe.

Q. Is it your testimony that as property manager, you didn't deal with this kind of request?

A. I wasn't the property manager, and I am not the property manager of this said location currently. Ms. Prince wasn't even there when I was there.

Q. She was.

A. You received this claim in

A. JAKUPAJ

2024; didn't you just state that?

Q. Were you ever aware of a time that Ms. Prince was trapped inside of her apartment?

A. No.

Q. If something like that happens, how would that be documented?

A. Repeat the question.

Q. If a tenant was trapped inside of their apartment, how would that be dealt with?

MR. ARLEO: Can you, please, define trapped?

MS. GAINES: Locked inside her own apartment, unable to exit.

MR. ARLEO: Thank you.

THE WITNESS: They will reach out to the staff, the site staff, so they can assist them with a lock and entry or exit.

Q. Would the site staff ever be documented? If they were, would those be in the Yardi system or would they be somewhere else?

A. JAKUPAJ

MR. ARLEO: Again, I am going to ask you to allow him to finish speaking before you ask another question or ask a question based upon what he said. You got to give him a chance to speak, and the court reporter can't put down two people speaking at the same time. So, please, let him finish.

THE WITNESS: If the request was made during the working hours and in the site office, they will log in a work order. They will open a work order. If it was after-hours, there is a possibility that the super or whoever is on site, the staff, will go and assist without the open work order. So that possibly will not be documented.

Q. Thank you. Do you know whether Stellar has changed any of its practices in relation to filing rental arrears actions since the filing of this lawsuit?

A. I'm not aware.

A. JAKUPAJ

Q. Who would be aware?

A. The legal department.

Q. Anyone else?

A. That's the only one I can think of.

MS. GAINES: I want to take five minutes to talk with the team about final, and then we'll see if we're able to wrap up. 3:40, please.

(Whereupon, a break was taken.)

Q. Okay. Mr. Jakupai, together we have just reviewed Items 13 through 21 on the Deposition Notice.

So, just to be clear, you testified that in preparation for the deposition, you reviewed this list of topics, correct?

A. Yes.

Q. And then you spoke to both Mr. Arleo and, also, your in-house counsel to prepare for the deposition, correct?

A. Correct.

Q. You didn't take any other steps to prepare?

A. JAKUPAJ

A. That's correct.

Q. Were you aware that you were supposed to gather and review information to prepare for all of the topics you've listed in the Notice, including 13 through 21?

A. I reviewed whatever I was able to review.

Q. Were you aware that you were supposed to gather information about these topics?

MR. ARLEO: Objection. Asked and answered, but go ahead, answer it again.

MS. GAINES: And to be clear, it was a yes or no question.

Q. Were you aware that you were supposed to gather information to review?

A. I gathered whatever I could, whatever that was provided. That's all I did.

Q. Yes, you were aware that you were supposed to gather, or, no, you were not aware?

A. JAKUPAJ

A. You can take it as you wish. I just told you what I did.

Q. I am asking you a yes or no question. I want you to answer the question yes or no.

MR. ARLEO: Objection. He just -- he answered the question.

Q. Were you aware that you were supposed to gather and review information to prepare for all of the topics including 13 to 21, yes or no?

MR. ARLEO: Objection, asked and answered.

Q. You can answer the question.

MR. ARLEO: Asked and answered. He already did.

Q. You can answer the question.

MR. ARLEO: You're harassing him now.

Q. Then was it a yes or was it a no?

MR. ARLEO: That's how you characterized.

MS. GAINES: That's the

A. JAKUPAJ

question I am asking.

MR. ARLEO: He answered your question.

MS. GAINES: Okay. Did he answer it with a yes or with a no?

MR. ARLEO: He answered it as he saw fit.

Q. Mr. Jakupai, did you answer my question with a yes or with a no?

A. Yes and no.

Q. Did you gather and review information to prepare for these topics, including 13 through 21?

A. I already told you this question. I already advised you on that.

MR. ARLEO: Objection. Asked and answered. Ms. Gaines, you have to wait for me to lodge the objection, okay? Objection, asked and answered. Next question.

Q. You testified that you were given information to review as to these topics.

Did you gather any information

A. JAKUPAJ

on your own?

A. No.

Q. Were you aware that you were supposed to?

MR. ARLEO: Objection, asked and answered.

Q. You can answer the question.

MR. ARLEO: Arianit, I told you to wait. The transcript is going to show you keep asking him the same question that he has already answered. Move on to your next question.

Q. Did you gather any information on your own?

MR. ARLEO: Objection. Asked and answered.

Q. You can answer my question. It's the last question.

MR. ARLEO: No. No. No. No, you can't. You already answered it.

MS. GAINES: He did not. The question, whether you were aware to gather information on your own, was

A. JAKUPAJ

never answered.

MR. ARLEO: I believe he answered it, but go ahead, Arianit, and answer it again.

THE WITNESS: I already answered that. Whatever information was given in front of me, that's the information I reviewed, and I answered.

Q. So you did not gather any information on your own?

A. Whatever was given to me was reviewed.

Q. So were you aware that you should have gathered information by yourself, not what was given to you on your own, were you aware that was something you should do with respect to Topics 13 to 21?

MR. MARSHALL: Objection.

THE WITNESS: I reviewed whatever was in front of me.

MS. GAINES: This is non-responsive.

MR. ARLEO: No, it is not

A. JAKUPAJ

non-responsive. He's answering your question. He said he reviewed whatever was in front of him.

Q. How about this, are you refusing to answer the question? I am asking a simple question. I am asking a simple question. I am speaking.

MR. ARLEO: You're mischaracterizing his answer.

MS. GAINES: Please. Please.

Q. My question is simple, did you gather anything on your own to review?

MR. ARLEO: Objection. Asked and answered. Arianit, you have to wait until I lodge my objection. Objection, asked and answered, but go ahead and answer it again.

THE WITNESS: Ask the question again.

Q. Did you gather anything on your own as it related to Topics 13 through 21?

MR. ARLEO: Objection, asked and answered, but answer it again.

THE WITNESS: Information that

A. JAKUPAJ

was given to me that was printed and reviewed by me.

Q. Are you refusing to answer the question?

MR. ARLEO: Objection. You're mischaracterizing his testimony.

MS. GAINES: It's a super simple question.

MR. ARLEO: He has answered the question. He is not refusing. He keeps answering the same question you posed to him.

Q. Are you refusing --

MR. ARLEO: If you want to say he's refusing it, that's your incorrect interpretation of his answer. So, please, ask your next question.

Q. Are you refusing to answer the question with a yes or a no?

MR. ARLEO: Objection. Go ahead and answer.

THE WITNESS: I answered you all the questions.

A. JAKUPAJ

Q. Are you refusing to answer this question with a yes or a no?

MR. ARLEO: Objection, asked and answered.

Q. Will you answer this question with a yes or no, did you gather --

MR. ARLEO: I am glad you think this is funny.

MS. GAINES: Excuse me?

MR. ARLEO: You are harassing the deponent. Go to your next question. You're asking him if he refuses to answer a question that he's already answered. And he hasn't answered it the way you want him to answer it doesn't mean he's refusing to answer it. So, please.

MS. GAINES: I am asking if he's refusing to answer with a yes or a no, and it sounds like he's refusing.

Q. Are you refusing to answer the question?

MR. ARLEO: Here's what we're

A. JAKUPAJ

going to do, we're going to go to the magistrate.

THE REPORTER: Hello? Wait. Wait. Wait. You both are speaking at the same time.

MR. ARLEO: Hang on. Hang on. I'm going to state this for the record myself. Leave it for a ruling by the magistrate. You're claiming he's not answering, well, show her the transcript and then she will make a ruling. But, please, move onto your next question.

MS. GAINES: I will state for the record that the witness is refusing to answer the question. Did you gather information on your own to prepare for Topics No. 13 through 21 with a yes or a no?

MR. ARLEO: And you can tell the magistrate that.

MS. GAINES: Additionally, I'm noting for the record that the witness is refusing to answer the

A. JAKUPAJ

question, were you aware that you were supposed to gather information on your own to prepare for Topics 13 through 21? The witness is refusing to answer that question with a yes or a no.

MR. ARLEO: And for the record, this is a mischaracterization. But, again, I have no problem going to the magistrate for a ruling. Please ask your next question.

MS. GAINES: That's my last question. We're going to keep the deposition open until we have a witness who's prepared to testify as to Topics No. 13 to 21.

MR. ARLEO: You can make that argument and then serve whatever you want in writing.

Court Reporter, can I get an expedited copy of the transcript? I have an e-mail address.

THE REPORTER: Can you reach out to the agency and let them know?

A. JAKUPAJ

MR. ARLEO: I'll send you an e-mail, and you can tell me the agency.

MR. MARSHALL: I don't think I'll need the expedited version.

(Whereupon, at 3:52 P.M., the Examination of this witness was concluded.)

° ° ° °

A. JAKUPAJ

D E C L A R A T I O N

I hereby certify that having been first duly sworn to testify to the truth, I gave the above testimony.

I FURTHER CERTIFY that the foregoing transcript is a true and correct transcript of the testimony given by me at the time and place specified hereinbefore.

__________________________
ARIANIT JAKUPAJ

Subscribed and sworn to before me
this _____ day of ________________ 20___.

__________________________
NOTARY PUBLIC

A. JAKUPAJ

E X H I B I T S

PLAINTIFF EXHIBITS


| EXHIBIT NUMBER | EXHIBIT DESCRIPTION | PAGE |
|---|---|---|
| 1 | Notice of Deposition | 116 |


(Exhibits retained by Counsel.)

I N D E X


| EXAMINATION BY | PAGE |
|---|---|
| MS. GAINES | 4 |


INFORMATION AND/OR DOCUMENTS REQUESTED

INFORMATION AND/OR DOCUMENTS PAGE

(None)

QUESTIONS MARKED FOR RULINGS

PAGE LINE QUESTION

(None)

A. JAKUPAJ

E R R A T A

If there are any corrections to your deposition, indicate them on this sheet, give the page and line number, and reason for the change.

PAGE ____ LINE ____ REASON
____________________________ FROM
_______________________ TO
_______________________
PAGE ____ LINE ____ REASON
____________________________ FROM
_______________________ TO
_______________________
PAGE ____ LINE ____ REASON
____________________________ FROM
_______________________ TO
_______________________
PAGE ____ LINE ____ REASON
____________________________ FROM
_______________________ TO
_______________________
PAGE ____ LINE ____ REASON
____________________________ FROM

A. JAKUPAJ

____________________________ TO

____________________________

PAGE _____ LINE _____ REASON

__________________________________ FROM

____________________________ TO

____________________________

PAGE _____ LINE _____ REASON

__________________________________ FROM

____________________________ TO

____________________________

______________________________

A. JAKUPAJ

C E R T I F I C A T E

STATE OF NEW YORK )
: SS.:
COUNTY OF KINGS )

I, MIRIAM SCHWEKE, a Notary Public for and within the State of New York, do hereby certify:

That the witness whose examination is hereinbefore set forth was duly sworn and that such examination is a true record of the testimony given by that witness.

I further certify that I am not related to any of the parties to this action by blood or by marriage and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 30th day of July 2026.

miriam schweke

___________________________
MIRIAM SCHWEKE

**$**

**$42,000.00**
110:13

**$56,000.00**
112:11

**1**

**1**
116:2,22

**10**
5:16
12:15
33:5
75:12

**100**
30:17
75:6

**10001**
4:13

**10th**
75:3,12

**12**
23:4,6
27:25
33:5

**13**
23:4,6
117:6
118:4
134:13
135:6
136:12
137:14
139:19
140:22
143:19
144:4,17

**14**
119:8

**15**
5:16
12:16,18
23:8 82:2
121:4,13,
16

**15th**
75:14

**16**
49:21
122:3,4,
13,16

**17**
126:14

**18**
127:6

**1:45**
91:10
93:7,8

**2**

**20**
10:19
12:16
52:25

**2010**
28:25
30:24
33:7
35:14
110:8

**2012**
50:17

**2016**
55:8
64:11
110:11
111:24

**2017**
112:11

**2019**
56:18
107:18
110:8

**2020**
50:16,17
64:11
110:8

**2022**
33:7 55:8
110:9

**2023**
114:2,5

**2024**
113:17
114:2,6,
20,23
117:9
118:6,17
119:11
122:7
132:2

**21**
22:10
122:24
124:7,22
134:13
135:7
136:12
137:14
139:19
140:22
143:20
144:5,17

**212-507**
21:9

**22**
22:10
56:19

**23**
22:10
33:8

**24**
7:3 45:9

**25**
52:25
75:5

**28**
105:2

**28L**
105:2,20,
24

**28th**
4:12 42:6
49:7
103:10

**2:25**
93:13

**2:27**
93:13

**2:53**
109:21

**2L**
104:24,25

**3**

**30**
93:11

**30(b)6**
4:23
14:16,22,
25 15:15
117:22

**35**
10:12

**3:33**
109:16,20

**3:40**
134:10

**3:52**
145:7

**4**

**44**
4:12 42:5

**48**
45:9

**49**
23:16
25:5
28:14,18
30:20
32:25
34:5,11
40:18
45:16
49:5
51:13
56:11
57:5
65:11
82:16
83:14
103:7
110:7

**5**

**50**
75:5

**6**

**6**
50:12

**7**

**7**
23:7

**8**

**8** 27:25 50:12 77:25 78:3,12, 17,21,24 79:5,8, 17,20,23 86:6

**9**

**973-418-3703** 21:10

**99** 42:16

**A**

**ability** 7:4

**accept** 70:14 77:8 79:4

**accepts** 70:8,10

**access** 46:7 71:21 96:3 100:5 123:14 131:8

**account** 75:23 76:4,5,6, 7,9,11,24 77:13 79:20 99:13 102:10

**accounting** 32:7 37:2,12 68:14,17

**accrue** 77:6

**accurate** 89:5,9

**accurately** 7:5

**actions** 89:21 133:23

**actual** 37:8 100:15

**add** 74:25 99:7

**added** 99:6

**addition** 99:12

**additional** 100:14,16

**Additionally** 143:23

**address** 4:11 42:5 46:5 144:23

**addressed** 53:14 62:2 94:5

**addresses** 65:25 72:18

**addressing** 88:23 96:3

**adjust** 95:24

**adjustment** 95:22 98:11

**adjustments** 97:24

**administrative** 111:22

**admit** 92:13

**admonitions** 11:14,17 12:5

**advance** 72:23 115:14

**advised** 112:15 128:14 137:16

**advises** 58:12

**afar** 46:6

**affect** 7:3

**affecting** 46:13

**affiliated** 66:5 69:5

**after-hours** 133:15

**agency** 144:25 145:4

**agent** 25:12 26:4 50:3,11, 25 51:2 63:20

**agree** 22:3

**agreed** 91:17,18 93:6

**agreement** 34:14,19, 23 35:2, 12 77:11

**agreements** 74:14,17 129:8

**Aguilar** 94:15

**Aguilar's** 94:16

**ahead** 8:9 13:15 14:8 16:10 59:25 83:2,3 117:23 127:19 135:14 139:4 140:18 141:23

**allege** 113:24

**alleged** 119:10 122:25 125:13

**alleges** 129:7

**alleging** 110:12

**alter** 97:23

**alterations** 97:19

**altered** 95:17

**amount** 73:3 130:7

**amounts** 73:21 95:16 98:9 128:7 129:11, 15,16

**and/or** 110:15 112:16 131:15

**answering** 140:2 141:12 143:11

**answers** 11:6 13:20,24 20:6

**anybody's** 67:2

**apartment** 75:25 76:3,13, 22 89:20 103:9,12, 15,17,19 104:11,24 105:10,24

106:13 132:5,11, 16

**apartments**
103:7

**appeared**
5:8,10, 18,22 120:21

**application**
92:15

**argument**
144:19

**Arianit**
4:10 5:2 12:23 97:14 125:25 126:2 129:19 138:9 139:4 140:15

**Arisalyn**
55:23

**Arleo**
5:6 7:19 8:19 9:12,18 10:5,11, 18,25 11:7,17, 23 12:6, 12,17,25 13:6 14:4,6 15:9 16:9,14 17:3 21:23 24:6,8 33:15,19, 22 59:24 60:7 81:3,8,14 85:10,22 91:8,13 92:3,9, 20,25 93:14,18 95:19 97:14 98:22 109:11, 17,23 117:17 118:22,24 119:17 120:18 121:17 122:20 125:3,7, 17,22,25 127:18 128:11 129:18 132:13,17 133:2 134:21 135:13 136:7,13, 16,19,23 137:3,7, 17 138:6, 9,17,21 139:3,25 140:9,14, 23 141:6, 10,15,22 142:4,8, 11,25 143:7,21 144:8,18 145:2

**arrear**
46:18

**arrears**
71:6,8 72:2,5,9, 25 76:12 83:5 86:16,19 110:13 112:11 129:7 133:23

**assertion**
8:6

**assessment**
45:11

**asset**
37:2,12

**assist**
53:22 132:20 133:18

**assistance**
53:20

**assistant**
41:9 51:19

**assistants**
18:21

**associate**
51:18

**Associates**
28:9 81:17,23 82:4,7, 11,15 83:8,12, 24 84:12 85:7,25 86:6 111:6

**association**
28:4,8

**assuming**
17:14 60:3 88:20

**attach**
48:14

**attached**
43:17,18 44:12

**attachments**
43:24 44:5,25

**attempted**
108:6

**attempts**
108:9,14, 22

**attend**
80:25

**attending**
80:16

**attorney**
19:7,10 58:12 86:15,19 87:2 91:23 114:9,16 122:5

**attorneys**
81:20 86:11 91:16,21 92:21 93:20 107:13,14 111:2 114:19

**audio**
33:14,16

**aunt**
105:18

**authority**
25:18

**automatically**
69:20 75:2,4,9, 11,14

**avoid**
11:24

**aware**
26:8 27:14,17 63:11 64:15 95:14 101:16,18 102:16,23 105:11 107:16 108:9,11, 13,20 109:2 111:22 113:20 115:16,19 128:5,8 129:13, 17,21 130:8,15, 18,22,24 131:3 132:3 133:25 134:2 135:3,10, 18,23,25 136:9 138:4,24 139:15,18 144:2

**B**

**Bachelor's**
23:21

**back**

33:25 41:19 44:15 90:16 91:10 97:21 126:25 129:23

**back-and-forth** 106:6

**balance** 117:11 118:8

**bank** 65:11,17 66:2,4, 10,11,14 68:23,24 69:3,6,7, 8 70:14, 21 71:11, 12,16,21 72:17,22 128:19

**Banks** 65:7

**based** 43:24 133:5

**basically** 42:14 51:20

**basis** 117:12 118:9 119:13 121:6

**begin** 13:25

**behalf** 14:15,21 15:17 24:2,10, 13 85:21

**behavior** 130:23

**BI** 4:21 14:14 15:4 24:25 25:10 28:4,8, 19,23 30:9 34:15

**bill** 64:25 65:18,20 66:2 72:22 73:12 74:20 128:6

**billed** 118:7

**billing** 64:16,23 65:6 72:20 99:15 127:9 128:10, 14,15,17, 20

**bills** 46:17 65:9 66:7,15, 18,21 67:3,22 69:4 72:15,16 73:6,9 117:10 119:11

**birth** 21:21,25

**bit** 23:20 24:4,16

**Blackman** 29:21 53:25 54:3,6,8

**blanket** 8:6

**Bonnaire** 53:3

**Bonnier** 19:11

**bookbag** 19:16

**borrowed** 100:20

**boss** 27:22 32:14,16, 19

**Box** 70:20

**breaches** 85:3

**break** 20:24 21:3 33:20,24 91:9,12, 14 93:6 109:4,6, 12 110:4 134:11

**breakdown** 130:5

**bring** 46:10 87:3 110:11 113:4

**bringing** 112:3

**broken** 120:22

**Brooklyn** 22:20,23 25:3

**brought** 85:14 101:7 111:3,23 130:11

**building** 18:25 23:16 25:2 28:14,15, 17,20,24 29:3,18, 23 30:19, 23 31:5, 18,21 33:11 34:11 35:9,13, 16,23 37:5 39:3,8, 12,16 40:5,19 45:23 46:8 48:21,22 51:21 69:16 74:16 75:5,6 78:18 79:2,14 99:21 101:5,8, 12 108:13 118:16 126:15 130:21

**buildings** 22:15,17 23:2 28:11 29:15 30:8,10, 13 73:21

**bunch** 19:25 20:2

**business** 14:20 21:19 29:8 86:5,10, 15 87:2, 20

**C**

**calculate** 86:19

**call** 11:14,15 12:9 13:2,5 19:12 42:21 45:20

**callback** 14:7

**called** 4:2 13:14 91:14

**calling** 13:6 58:4

**cameras** 96:17,20 97:2,15

**captured** 47:15
**car** 91:15 93:8
**care** 106:16
**Carol** 54:23
**case** 17:7 18:8 20:4 24:22 85:2 87:3,4,9, 17 110:12 111:3,10, 13,18 112:24 114:20,24 115:7 129:25 130:18
**case-by-case** 24:19 42:14
**cases** 24:22 53:19,20 81:11 87:24 88:23 113:4 129:22 130:3,8, 10
**Castro** 55:12,14
**cell** 21:16
**CEO** 32:17 38:12
**certifications** 23:23
**cetera** 31:19 85:3
**chance** 133:7
**Chanelle** 56:6
**change** 23:9 98:6
**changed** 34:7 133:22
**characterize** 118:25
**characterized** 136:24
**charge** 27:21 65:6 67:23 68:16 73:16,19, 22,25 75:16 97:25 98:11 99:7
**charged** 95:16
**charges** 77:5
**charging** 76:8
**check** 70:18,19
**checking** 71:9
**choose** 84:11
**Chris** 105:7,19 106:4,16
**Christian** 105:23 107:3,17, 24 108:14 110:12,24
**Christopher** 105:7 106:10
**circumstances** 24:17 41:18 84:10,14 106:15
**cite** 130:3
**cited** 129:22
**city** 22:21
**Civil** 4:22
**claim** 130:22 131:25
**claiming** 143:10
**cleaning** 31:11,14
**clear** 13:22 92:25 124:11 134:15 135:16
**client** 12:7 58:12 91:14
**client's** 13:12
**clients** 99:14
**collect** 89:25
**collection** 122:7
**comment** 92:17
**comments** 92:24
**communicate** 39:24 40:16 41:10,11 63:17
**communicated** 44:19 62:13,21 63:9
**communicates** 39:22
**communicating** 20:20 40:4,8 57:24 58:2 63:21
**communication** 44:10 117:14 118:11 119:15 121:8
**communications** 45:15,22 58:9 61:18,22 62:22 63:2,12, 25 64:3, 13
**company** 29:12 38:13 56:25 57:5
**complaint** 46:5 129:23,24 130:4
**complete** 6:14,21 7:9 45:13 102:4,6
**computer** 19:16,18 64:9 96:5,9,16
**concerns** 43:15
**concluded** 145:9
**confidentiality** 21:24
**connection** 122:8
**constraint** 47:13
**construction**

37:16 46:11

**consult**
71:10

**consultation**
83:6,7,25

**consultations**
82:21

**consulting**
20:11 83:14,18

**contact**
84:16 94:11

**continue**
10:17 13:15 77:5

**continues**
128:6

**contract**
86:11

**controller**
67:7,8, 17,19,24 68:2,3,6, 16

**coordinator**
40:12 51:11,12, 16,17 52:7 55:4,6 56:13,16 57:25 63:20 72:3 84:5 91:3 101:22 110:15 112:17 113:12,15 131:15

**coordinators**
56:11

**copy**
4:15 92:14 144:22

**Corp**
4:20

**corporate**
4:19 62:7

**Corporation**
4:21 14:20 29:6

**correct**
14:16,17, 22 18:13 19:13 20:10 27:4 29:13 30:3 35:4 39:21 42:3,9 45:17 48:2 50:19 54:13 60:16,17 62:4,5,8, 9 63:4 65:19 66:9 68:21 70:4 72:24 73:5 76:20 77:7 82:9 93:3 112:19,20 115:22,23 117:3,15, 16 118:12, 13,20,21 119:16,24 120:12,17 121:9,10, 14 122:9, 10,14 123:3,4,8 134:18, 22,23 135:2

**counsel**
14:9 20:21 53:9,12 58:10 80:12,15, 23 81:7 88:8,10, 19 134:21

**counselor**
19:9 53:6

**couple**
18:17 36:22 62:19 94:3 110:3,9

**court**
6:3 10:3 11:6 13:19 82:20 84:19 87:24 88:23 92:12 101:11,14 102:13,21 133:7 144:21

**courts**
80:17

**create**
43:19 47:21

**created**
44:2 76:24

**creates**
60:15

**creative**
43:23

**credit**
98:10

**credits**
73:7

**Crown**
23:16 25:5 28:14,18 30:20 31:2,3 32:25 34:5,12 40:18 45:16 49:5 51:14 56:11 57:6 65:11 82:16 83:15 103:7 110:7

**Cullen**
81:16,23 82:3,7, 11,15 83:8,12, 23 84:11 85:7,24 86:5 111:6

**current**
22:4 51:2

**cut**
91:20

**D**

**d/b/a**
4:20

**daily**
57:3

**date**
21:21,25 116:23

**dates**
55:9 102:11

**day**
75:13

**day-to-day**
22:14 31:7,9, 15,23

**dead**
104:20

**deal**
131:9,18

**dealt**
132:11

**debits**
73:8

**debt**
62:14 85:25 86:3 128:7

**deceased**
104:17,20

**decided**
34:8

**decides**
23:9

**decision**
74:19,25 79:3 84:8 85:4 87:8,12, 16 90:21, 24 107:7 110:11,21 112:10,22 113:13 117:9,13, 14,15 118:6,10, 11,12 119:9,13, 15,16 121:4,6, 8,9 122:24 125:6,12 126:16 127:8

**decisionmaker**
32:11

**decisionmaking**
25:18 107:2 112:3

**decisions**
31:20,23 32:4,9 85:20 113:3 128:9

**dedicated**
51:24

**deduct**
97:25

**deem**
76:16

**defendants**
15:18 24:10 58:8 122:5,6

**define**
132:14

**definitions**
117:5

**degree**
23:21

**delete**
44:25

**deleted**
58:5,14, 17,23 59:7 76:9

**demand**
88:9,14 89:14

**demanding**
129:7

**demands**
88:18 115:18

**denied**
106:20

**denying**
92:3 93:2 107:3

**department**
36:7 38:16 39:11 40:15 49:16 68:4,5,9, 13,15 75:21 76:15 77:23,24 80:3,22 89:2 113:10 129:5 134:3

**department-head**
39:4,5

**department-heads**
38:22 39:8

**departments**
32:8 36:24 37:5,15, 19,24 38:23 52:20 75:18

**depend**
46:24 74:11,13 77:10

**depending**
37:9 41:6 81:11

**depends**
16:16 23:8 24:19,22 28:2 41:17 42:13 46:23 47:8 48:14 63:15 73:20 75:6 80:19 83:9

**deponent**
93:22 142:12

**depose**
91:17

**deposed**
24:10,13, 18

**deposition**
4:15,19 5:4,11,18 9:6,7 10:7 12:4,22 13:11 15:21 16:3,8 17:2,11 20:22 93:25 97:12 115:21,25 116:10, 13,15,19, 21 117:19 120:13,22 134:14, 17,22 144:15

**depositions**
24:2

**describe**
45:14 56:23

**designated**
14:13,18 15:5,21

**designee**
4:20

**details**
15:15

**determination**
107:21

**determine**
84:18

**determined**
107:17

**determining**
85:5

**die**
75:25

**died**
104:21,24 106:11

**dies**
75:22 76:23

**differences**
100:7

**differently**
35:20

**directly**
65:10,22, 24 66:3 87:21

**director**
26:19 27:12,19 38:10 39:19 52:13,16, 24

**disability**
131:9

**disclosed**
48:18 58:11

**disclosures**
48:18 56:21

**discontinued** 111:18
**discovery** 20:8
**discussed** 15:10 54:5
**discussing** 53:18
**discussion** 107:10
**dispute** 95:16
**disputes** 89:14
**distinguished** 90:12
**distinguishes** 90:8
**document** 20:12,13 43:13,14 120:10
**documented** 41:13,16 47:19 113:5,7 131:5 132:8,23 133:20
**documents** 17:10 37:23 38:3 44:6,8 58:8,13 59:22 64:5,9 120:7,8 128:10
**door** 46:23 47:3,12 130:25 131:9
**drafted** 72:16 88:6
**drafting** 71:25 87:24 90:17
**drafts** 89:2
**draw** 8:6
**driving** 91:15 93:9
**due** 72:23 102:12
**duly** 4:3

**E**

**e-mail** 44:14,15, 22 57:11 58:3 109:8 116:4 144:23 145:3
**e-mails** 58:5,13, 14,16,19, 23,24 59:7,8, 11,15,18, 22 61:6, 10,13,14
**earlier** 50:21 71:4 94:5 115:20
**early** 13:10
**East** 22:25
**echo** 120:25
**educate** 14:25
**educated** 15:20 16:2
**education** 23:20
**effect** 6:2
**elevator** 48:4
**employ** 80:11,14
**employed** 22:9
**employees** 31:17 58:15,24 59:8 97:22
**employment** 22:5
**employs** 81:7
**end** 58:14 93:14,15
**Ending** 50:13
**ensuring** 52:20
**entire** 9:13
**entities** 34:21
**entitled** 102:14
**entity** 25:7,15, 18 28:15, 16 66:5 69:5 70:21
**entry** 132:21
**Eric** 67:9,11
**estimate** 5:15 30:16 36:20 49:22 57:8 80:5,8 81:25 83:20
**evict** 108:6,10, 14,22
**evicted** 101:15
**exact** 49:22
**Examination** 4:6 145:8
**examined** 4:5
**excuse** 77:14 98:22 142:10
**Exhibit** 115:25 116:22
**exist** 18:15 37:5 127:23
**existed** 38:3
**exists** 18:19
**exit** 132:16,21
**expedited** 144:22 145:6
**explain** 8:25
**explore** 117:21
**extent** 101:20

**F**

**face** 96:12,15, 18
**facility** 27:20
**fact** 92:12
**failure** 73:23
**fair** 8:17

9:16,22 35:19 47:14

**familiar** 5:21 17:7 18:11 26:9 48:24 49:11,23 51:7 52:9 53:2 54:23 55:11,23 56:6 63:24 64:4,19, 21 66:11 81:16,19 101:6,10 103:2 105:12

**familiarity** 61:17

**family** 76:21

**federal** 4:22 92:11

**fee** 74:12,24, 25 75:15

**feel** 11:15

**feeling** 6:23

**fees** 73:16,22 74:5,8 75:4

**Figueroa** 49:24

**figure** 109:5,7

**file** 17:17,19, 20,25 18:4,10, 11,14,18 43:19,23 60:6 61:3 87:9,17 99:12 100:8,9, 12,13,15 101:3 106:12 117:9 118:6

**filed** 86:7 87:25 111:10 113:22 115:4

**files** 42:10 95:10,13 99:14,16, 18,22 100:2,4

**filing** 114:20,23 133:23,24

**filings** 22:2

**final** 134:9

**financing** 68:14,17

**find** 36:10 59:21

**fine** 24:12

**finish** 12:11,14 13:23,24 92:23 98:23 133:3,10

**firms** 81:13

**fit** 137:8

**floors** 48:3

**fluctuates** 23:7

**focus** 97:16

**force** 6:2

**form** 85:22 86:22 87:7 88:3,16 95:19 108:17,24 111:15,21 112:13 129:20

**formally** 32:24

**forward** 96:12,13, 15,18

**Fran** 78:25

**Francine** 52:9

**Fred** 19:11

**Fredric** 53:2

**free** 11:15

**frequently** 83:17

**Friday** 41:3

**front** 19:14 124:9 139:8,22 140:4

**full** 4:25 7:9

**funny** 142:9

**G**

**Gaines** 4:7,17 9:8,14 10:9,16, 25 11:13, 20 12:3, 9,15,21 13:4 22:3 31:3 33:25 59:4 78:6 91:11,24 92:5,22 93:4,16, 24 98:25 109:3,14, 21 110:2 115:24 116:7,14, 17 117:25 120:24 123:22 125:10 132:15 134:7 135:16 136:25 137:5,18 138:23 139:23 140:11 141:8 142:10,19 143:15,23 144:13

**gather** 135:4,11, 19,24 136:10 137:12,25 138:15,25 139:11 140:13,21 142:7 143:18 144:3

**gathered** 135:20 139:16

**gave** 42:5 124:16,17

**general** 43:25 47:20,23 57:22 99:10 105:14 124:14, 15,20

**generally** 48:13 101:6,10, 16,18 102:15,24

**generate** 41:15 65:8 75:14

**generated** 75:3,4,10 100:4
**generates** 65:18 66:14
**gentleman** 105:18
**gesture** 10:2
**gestures** 11:5 13:18
**give** 12:13 13:7,16 53:17 98:18 130:25 133:6
**giving** 7:9 21:12
**glad** 142:8
**good** 4:16 5:23 91:11 97:13
**grace** 75:13
**grandson** 105:5
**granted** 77:3,5 106:20,21
**granting** 107:2
**Great** 21:7 116:17
**ground** 5:20 31:2
**groundwork** 13:9
**guarantee** 119:4
**guess** 32:15 38:5,25 41:17 43:24 45:8 50:9 71:15 74:15 80:19 129:23
**guidance** 53:21 83:10 84:17 85:15
**guys** 17:15

**H**

**half** 11:11
**handful** 81:10
**handle** 70:25 102:18 131:14
**handled** 101:22
**handles** 65:16
**handwritten** 100:25
**Hang** 5:6,7 8:2 15:9 24:8 109:11 117:17 118:24 125:25 126:2 143:7
**happen** 9:3 76:11
**happened** 104:15 111:12 115:9
**happening** 46:13,25 48:5 131:8
**happy** 13:10
**harassing** 125:8 136:19 142:11
**harassment** 126:3
**he'll** 8:4,23
**head** 26:12 27:16 38:19 96:11
**headquarters** 41:24,25
**heads** 38:17
**hear** 15:24 70:5 108:19 120:23
**heard** 10:7,13
**higher** 38:11
**higher-up** 38:8
**higher-ups** 38:5
**highlight** 118:5 122:4
**Hill** 56:7
**hold** 7:19,20 14:6
**holdover** 87:4
**hour** 11:12
**hours** 7:3 45:9 50:4 110:3 133:12
**housing** 28:5 84:19
**how's** 91:10
**HPD** 26:13 34:15,21 35:12 78:21 99:25 107:8,10,16
**human** 24:21
**hundred** 36:22
**hundreds** 31:16
**hung** 14:8
**hypotheticals** 9:3

**I**

**idea** 16:11 25:10 54:18 82:6 94:23 96:2 109:17,23 128:2
**identification** 116:23
**identify** 62:13
**identities** 62:20
**identity** 126:14
**implement** 75:12
**in-house** 19:9 53:6,9,11 134:21
**in-person** 58:4

**include** 31:10 52:19

**included** 63:22

**including** 82:24,25 83:4,5 117:11 118:8 119:12 121:5 135:6 136:11 137:14

**incompletely** 6:18

**incorrect** 129:16 130:6 141:17

**independent** 69:9,11

**indications** 100:20

**individual** 39:3 44:21 46:2 48:9 65:24 68:20 69:16 71:9 72:18

**individually** 25:22,23 45:24

**inform** 86:5,10

**information** 15:3 48:20 79:19,22 100:6,8, 21,22 117:8,13 118:10,15 119:14,22 121:7,12 122:12, 17,23 123:6,13, 15,18 124:2,3, 10,16,18 125:16 126:14, 19,22 127:4,14, 17,21,23 131:4 135:4,11, 19 136:10 137:13, 23,25 138:15,25 139:7,9, 12,16 140:25 143:18 144:3

**informed** 101:24

**initial** 45:11 48:18 56:21

**initiate** 113:16

**input** 102:11

**inside** 132:4,10, 15

**inspects** 99:25

**instructed** 14:10 117:8 118:3 119:7,18 122:19,21

**instructing** 118:19

**instruction** 117:5

**insurance** 24:23

**intend** 117:20 130:20

**interaction** 82:14,18

**interest** 29:3

**interface** 78:21,23

**internal** 58:9 76:19 80:2,21, 25 88:5,6 89:2

**internally** 88:10

**interpret** 10:21

**interpretation** 9:4 141:17

**invoices** 64:15,22

**involved** 33:11 37:9 40:13 61:24 62:4 63:16 66:7 72:19 78:3,11 106:25 112:2

**involving** 35:2

**issue** 33:14,17 126:17

**issued** 126:15

**issues** 84:14

**Items** 134:13

**J**

**Jackson** 32:23

**Jakupai** 13:17 15:19 16:5 21:7 34:3 70:5 110:5 121:2 134:12 137:9

**Jakupaj** 4:10,16 5:1,2 6:1 7:1 8:1 9:1 10:1 11:1 12:1 13:1,16 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1,4 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1

103:1
104:1
105:1
106:1,25
107:1
108:1
109:1,5
110:1
111:1
112:1
113:1
114:1
115:1
116:1,18
117:1
118:1
119:1
120:1
121:1
122:1
123:1
124:1
125:1
126:1
127:1
128:1
129:1
130:1
131:1
132:1
133:1
134:1
135:1
136:1
137:1
138:1
139:1
140:1
141:1
142:1
143:1
144:1
145:1

**Jared**
94:15

**Jerry**
94:16
95:4,6

**Jessica**
18:24
36:8,13
40:24
50:20
78:19

**Jessica's**
36:9

**job**
67:2,6

**Joyce**
103:2

**judge**
6:3

**jury**
6:4

**K**

**Kailyn**
4:17
30:25

**keeping**
68:24
69:9 70:2

**Kent**
56:21,23
57:4

**key**
130:25

**kind**
19:23
22:17
80:18
82:6,7,22
87:9,16
89:7
100:16
131:19

**kinds**
32:3

**knowledge**
16:19,22
44:24
61:21
62:25
78:3,11,
17 104:10
105:16,22

**L**

**landlord**
58:8
111:17
113:16,
20,24
122:6
130:4

**lapse**
35:19

**Larry**
103:10

**lastly**
56:20

**late**
50:4
73:17
74:12,23,
25 75:4,
15

**Lauren**
18:25

**law**
81:13

**lawsuit**
86:7
89:17
113:17,22
115:10
117:10
118:7
119:11
122:7,9
133:24

**lawsuits**
101:6
127:9

**lawyers**
80:7,9
83:13
85:14,20
87:20

**lay**
13:9

**leak**
46:6
48:10

**learn**
71:7
111:5

**lease**
43:17
44:4 46:8
52:21
75:8 85:2
89:20
90:2
102:14,17
103:15,
16,22
107:21,24
108:3
110:24
113:21
114:10,13
123:2
125:15
127:11

**leaseholder**
100:23

**leases**
52:21
75:7,17,
20 77:17
100:18
103:25
104:4

**leasing**
31:11,14
32:8
35:24
36:2,5,6,
7,25
37:11
39:15,16,
20 40:14,
25 49:4,8
50:3,11,
24 51:2
52:13,15,
18,24
63:20
75:18,21
77:18,23
79:11
102:18
107:12,14

**leave**
52:4
54:14,17
130:21
143:9

**ledger**
43:22,25
60:19,22,
24 69:11
70:23
71:17,22
73:7
90:13
95:15,17,
22,25
96:4
97:19,20,
23 98:5
114:16,
19,23

115:6
121:22,24

**ledgers**
60:16
68:20
69:9,11,
13,19
70:3 71:9
99:11
118:7
119:12

**Lee**
103:3
104:7,10,
16
105:19,23
106:4,10,
16 107:3,
17,24
108:6,10,
15
110:12,24
111:24
112:10

**left**
54:20
55:19

**legal**
32:7
37:2,12
40:14
49:16
53:13,16,
19,20
76:15,18,
19 77:12
80:3,16,
18,20,22,
25 81:2
84:15
88:6
89:2,21
113:10
115:13
129:5

134:3

**letters**
46:18
72:5,9
115:16,17
117:10
129:6

**Limbo**
32:23

**limitations**
128:22

**limited**
117:12
118:9
119:13
121:6

**lines**
46:14
48:3

**Lisa**
4:17
35:21
63:22
105:12,
15,23
106:7,14
107:4
108:3,14

**list**
48:17
134:17

**listed**
16:3,7
119:3
135:6

**listen**
10:18,20
11:11

**listening**
9:2

**lists**
117:19

**live**
105:9,20

**lived**
103:9,11
104:8,11,
13,23

**LLC**
4:21
14:14
15:4
24:25
25:5,10
28:4,5,8,
19,24
30:9
34:15

**location**
17:9 18:6
34:9
131:22

**lock**
132:20

**Locked**
132:15

**lodge**
137:19
140:16

**log**
42:22
133:13

**long**
21:3 22:8
28:23
30:18,22
33:3
35:11
43:10
45:5
49:8,19
50:9 51:5
52:6,23
53:8
54:19

55:7,20
57:4
81:22
95:6
103:8,11

**longer**
30:3 50:8
54:11
109:18,24

**longstanding**
18:8

**looked**
115:6

**Lorna**
29:21
53:24
54:2,5,8

**loser**
91:22
92:4,17
93:2,21

**lot**
24:23
32:8
84:13
100:2

**louder**
102:3

**Lower**
22:24

**lunch**
91:9 93:7

**M**

**made**
31:24
32:2
63:2,12
70:9
71:16

92:17
93:16
95:18
97:19
98:6
110:10
112:9,22
113:13
114:5
126:16
133:12

**magistrate**
10:15
11:9,14,
16 12:10
13:5,14
14:7
143:3,10,
22 144:11

**mail**
47:4 65:9
88:17,21

**mailed**
46:22
65:22,24
70:19

**mailing**
47:12
58:3 66:7
70:18

**mails**
66:2
72:17

**main**
17:21,23
37:8 38:5
41:20,23
42:15
44:8
49:4,5,6,
9,17,20
52:14
53:7 72:7
94:12

**maintain**
74:7
95:10,13

**maintained**
69:20
71:23

**maintaining**
69:13

**maintains**
68:19

**maintenance**
31:11,14
41:2
51:21,22

**make**
6:13,15
31:21
70:15
74:24
77:11
79:3 84:7
85:4
87:8,11
91:24,25
92:6,7,
10,15,24
93:4
101:24
102:8,9
110:21
113:3
118:2
143:12
144:18

**makes**
14:9 32:9
68:2
74:19
89:4
128:9

**making**
32:3
85:21
87:16
89:9
90:21,24
92:23
93:18

**manage**
29:14,19
30:10,19
31:4

**managed**
23:5
30:22

**management**
4:20,21
14:19,21
15:4 22:7
24:14
25:11
27:13
29:6,7,8,
9,11,14,
19 30:8
31:24
32:2,7,
16,18
36:25
37:2,12,
13 38:19
40:19,22
41:2,13
42:23
43:7
44:14
46:2
52:14
55:16
57:12
95:9
115:13

**manager**
17:8
18:6,20
19:2
22:6,9,12
23:3,12,
14,16
27:21
29:22,24,
25 32:6,
25 33:4
34:5
40:13
41:4,7
46:4
51:19
54:9,12,
20 57:23
64:12
72:4
82:16
84:4 85:6
91:2
99:21
101:5
102:16
108:12
110:7,14,
16
112:16,19
128:25
130:13,14
131:16,
18,20,21

**managers**
27:22,24

**manages**
26:3
27:20
30:14
38:17
75:19
77:25

**managing**
25:12
26:4
35:15

**Manhattan**
22:24

**manually**
69:21
97:22

**Maria**
49:23

**mark**
115:25

**marked**
116:22

**market**
35:19

**MARSHALL**
4:14
85:17
86:21
87:6
88:2,15
108:16,23
109:19
111:14,20
112:12
116:12,16
139:20
145:5

**Matt**
32:23

**matter**
4:18
53:22
58:17
61:25
63:15,18,
19,22
83:9,11
84:16

**matters**
53:13,23
82:20,22,
23

**means**
35:6,9

**medical**
7:7

**medication**
6:25 7:2

**Mel**
4:20
14:19
29:5,8

**Melissa**
55:11,14

**members**
76:22
80:2

**memo**
45:20
46:9
47:2,11,
15,20,23,
24 48:9
71:11
73:3

**memos**
43:16
44:3
45:21
46:2,16,
21 47:18
71:5 72:2

**mentioned**
34:25
37:11
38:8
42:18
44:3
50:20
53:24
54:4 71:4
72:14

**messaging**
20:20
57:19

**messenger**
20:22

**mic**
34:18

**Michelana**
34:15
35:3,9

**Microsoft**
57:13

**mind**
37:17,20
72:8

**mini**
4:14

**minutes**
10:19
11:25
12:13,18
93:11
109:15,
16,19,22
134:8

**Miriam**
116:5

**mischaracterization**
144:9

**mischaracterizing**
140:10
141:7

**mispronounce**
26:10

**mix**
35:18

**Monday**
41:3

**money**
46:17
70:25
89:25
102:22
119:9
130:16

**month**
75:3
83:21

**monthly**
72:14,16

**months**
52:5

**morning**
4:16

**move**
94:5
125:4
126:10,12
127:6
138:13
143:13

**moves**
75:22
76:23

**mute**
90:15
106:23

**N**

**named**
26:10

**names**
18:23

**nature**
31:12
47:9
52:22

**natures**
46:15

**necessarily**
101:13
102:25

**needed**
37:10
42:15
45:13
61:25
76:17
82:20
83:10
94:9

**nice**
13:9

**non-payment**
87:3
110:11
113:17
114:20
122:25
125:13

**non-responsive**
139:24
140:2

**non-sensicle**
8:8

**Notary**
4:4

**note**
9:12
99:6,8
119:17
120:19

**noted**
11:2
125:11

**notes**
98:10,12,
14,15,19
99:3,4
101:24
102:8,10

**notice**
15:22
16:3,8
44:11
45:21
88:9
102:20
115:21,25
116:10,
13,15,19,
21 117:5,
19 118:19
119:3
120:13
122:8
134:14
135:6

**noticed**
62:11,18
121:3
122:2,22
126:13,24
127:7

**notices**
43:18
44:4,10
87:24
88:6,14
101:2

**notified**
79:13
102:19

**notifying**
48:3,5

**noting**
143:24

**nuance**
46:5

**nuisance**
48:11
85:2

**number**
13:8
21:8,11,
15,16,17,
19 29:20
117:6
118:4
119:8
122:4
126:13

**numerous**
40:16
84:2

**O**

**O-D-D-J-A-R-D**
67:13

**O-D-E-**
67:14

**O-D-E-G-A-R-D**
67:15

**O-D-G**
67:12

**O-D-G-A-R-D**
67:11

**oath**
5:25

**object**
8:20 9:18
15:10
85:22
117:18
125:4

**objection**
5:6 9:12
11:2
14:10
16:9,14
17:3 24:6
59:24
60:7
81:3,8,14
85:10,17
86:21
87:6
88:2,15

95:19 108:16,23 111:14,20 112:12 118:22,25 119:17 120:18,19 121:17 122:20 125:10,17 127:18 128:11 129:18,19 135:13 136:7,13 137:17,20 138:6,17 139:20 140:14, 16,17,23 141:6,22 142:4

**obsolete**
76:8

**occasions**
26:5 66:20

**occupancy**
74:2

**occupant**
77:9

**occupant's**
77:14

**occupants**
76:24

**Oddgard**
67:15

**Odegard**
67:9

**offer**
75:19

**offered**
107:21,24 108:3

**offering**
75:16

**office**
17:21,22, 24 18:15, 17 21:13, 17 37:8 38:6 40:19,22 41:10,20, 21,23 42:8,11, 13,15,17, 21,22 47:5 49:4,5,6, 9,17,20 52:14 53:7 65:15 94:13 96:17 104:6 131:12,13 133:13

**officer**
26:13 27:16

**officers**
25:8,14 32:6

**offices**
70:13,14

**on-site**
42:9

**one's**
93:2

**online**
20:21 70:15

**onsite**
36:8 50:3,10 57:3

**open**
45:11 133:14,18 144:15

**operational**
32:3

**operations**
22:14 26:19 27:12,19 31:7,9, 15,22,23 38:10

**opposed**
10:2 11:5 13:18 80:22

**order**
41:14,15 42:23 45:5,10 100:25 101:2,23 133:14, 15,19

**ordered**
101:11,15 102:13,21

**orders**
42:18,20 43:14

**ordinary**
86:4,9, 14,25 87:19

**Organizatio n**
39:7

**organizatio nal**
37:23

**organizatio nal-wide**
39:6

**Outlook**
57:14,15, 16,17

**oversees**
52:17

**owe**
102:22

**owed**
46:17 86:20

**owes**
86:16

**owned**
28:24 29:16 130:4

**owner**
25:11

**owners**
25:15

**ownership**
23:9 29:3 34:8 74:15

**owns**
25:5 28:12,17

**P**

**P.M.**
145:7

**P.O.**
70:20

**paid**
113:25 121:5 122:5,6 129:12,16 130:6,17

**paperwork**
19:17,23 20:2,3 46:10 100:2,14, 17 106:5

**paralegal**
49:20 55:18 63:20 72:4 84:5 85:6 90:18 110:14 112:16 113:11

**paralegals**
49:15 55:15 56:2 80:8,10 87:10,14, 15 90:22

**part**
6:12,17 35:20 51:21 58:7 102:18

**participate**
13:11

**parties**
112:15

**past**
18:17 19:3 117:4

**pay**
84:20

**paying**
70:17

**payment**
71:16 72:23 101:19

**payments**
70:9,10, 16 73:17 102:12 114:5

**pays**
82:11

**pending**
21:4

**people**
16:17 36:18,21 39:10,15 40:6,16 48:17,19 57:3 78:2,10, 16,20 84:2,7 133:8

**percent**
42:16

**Perez**
49:12,14

**period**
33:6 50:10 55:5,17 56:4,15 75:13 123:2 125:14 127:10

**person**
26:12,18 27:5,15 36:7 38:8 40:25 44:20 60:3 62:13 67:22

**person's**
105:6

**personal**
21:14

**personally**
63:4,6

**persons**
62:20 94:12 126:15

**petition**
89:4 111:9 115:3 130:6

**petitions**
88:23 89:2,8 90:18

**phone**
11:10 21:8,11, 13,14,19 45:20 58:3

**physical**
7:8 17:25 64:8 99:14,16, 17,22 100:8,12

**place**
79:4,17

**plaintiff**
91:21 119:12 121:4

**plaintiff's**
93:20 116:22

**plaintiffs**
91:16 92:21

**plans**
101:19

**platform**
57:12

**platforms**
57:20

**play**
85:25

**plays**
56:24

**point**
76:14 100:3 101:2 106:6,10, 14

**policies**
74:4,7 77:17,18, 19,21 79:8

**porter**
40:11

**portfolio**
22:14,16, 18 30:9 34:7 52:18

**portfolio-wise**
53:14

**portfolios**
23:10 37:10 78:15 101:21

**posed**
141:13

**possibility**
133:16

**possibly**
100:10 112:5,23 133:19

**post**
47:5,22 70:23

**posted**
45:22 71:14

**posts**
71:12,16

**potential**
9:2

**potentially**
40:15 41:9 78:25 87:18 90:19,22 100:22,25

**practice**
10:13 58:22 59:6

**practices**
133:22

**predicate**
122:8

**preparation**
134:16

**prepare**
16:25 17:11 118:19 120:4,16 121:15 122:15,18 123:9 124:6,13 126:13 127:7 134:22,25 135:5 136:11 137:13 143:19 144:4

**prepared**
16:6,12 35:25 62:11,18 64:2 118:4,23 119:8 121:3 122:3 123:16, 20,24 124:15 127:12 144:16

**preparing**
19:5

**presently**
30:19

**pretty**
45:19

**prevent**
7:8

**previous**
6:20 60:14

**previously**
63:14 94:19

**Prince**
4:18 58:10 59:12,15, 19,23 60:12,18 61:4,7, 10,14,19, 23 63:3, 10,13,23 64:6,9, 13,17,24 105:13, 15,23 106:14 107:4 108:3,7, 10,14 111:24 112:10 113:18, 21,25 114:4,9, 12 115:12,17 122:24 125:12 127:11 128:6 130:21,25 131:22 132:4

**Prince's**
114:19

**print**
47:22 48:13

**printed**
141:2

**prior**
55:21 100:4,5, 18,24 112:15

**privy**
124:17

**problem**
144:10

**procedure**
4:23 48:15

**procedures**
77:2

**proceed**
83:10

**proceedings**
80:16,18, 20 81:2 111:23 112:4

**process**
72:20 89:8,16

**professional**
23:22

**profile**
43:20

**property**
17:8 18:5,20 19:2 22:6,9,11 23:3,12, 14,15 27:22,23 29:11,22, 24,25 31:8 32:6,25 33:3 34:5 40:13 41:4 50:25 51:13,19 54:9,10, 11,19 55:4 57:2,23 61:25 62:4 63:16 64:12 72:4 82:15 84:4 85:6 91:2 97:2 99:20 101:4 102:16 108:12 110:6,14, 16 112:16,19 128:25 130:13,14 131:16, 18,20,21

**protect**
12:7

**provide**
6:7 127:10

**provided**
123:2 124:9 125:14 127:22 135:21

**Public**
4:4

**pulling**
60:6

**pursuant**
4:22 14:15,22

**put**
34:8 42:19 46:23 47:2,11 133:8

**Q**

**Quanto**
51:7

**question**
6:18 7:17,24 8:4,5,11, 13,16,18 9:5,9,10, 15,17,19, 21,23 11:3 12:11,14, 23,24 13:25 14:11 15:8,10 16:17,21 20:12 21:4 24:12 35:24 59:5 60:9 62:15 70:6 74:6 83:24 90:16,20 98:17 114:17 117:24 123:23 124:25 125:5,19 126:5,11 127:19 128:13 129:20 132:9 133:5 135:17 136:5,6, 8,15,18 137:2,4, 10,16,21 138:8,12, 14,19,20, 24 140:3, 6,7,8,12, 19 141:5, 9,11,12, 19,21 142:3,6, 13,14,24 143:14,17 144:2,6, 12,14

**questioning**
9:13 10:14

**questionnaires**
17:13

**questions**
7:14,22, 25 8:22 10:2,10, 20,22,23 11:4,19, 21 12:2, 19 13:15, 18,23 16:7,13, 20 17:5, 12 20:5 36:2,4 93:23,25 94:2,3 141:25

**R**

**ramp**
131:2

**rates**
107:3

**re-explain** 8:24
**reach** 84:8,11 132:18 144:24
**reaches** 41:12 45:5
**reaching** 83:23
**reason** 7:7,12,21
**reasons** 45:25 84:22
**recall** 6:19 56:3 61:8,11 103:6 112:6,8
**received** 65:2 102:20 118:18 131:25
**receives** 70:22
**record** 4:9,25 11:22 34:2 91:25 92:2,8 93:5,12 106:11 125:11 143:9,16, 24 144:8
**recording** 92:16
**records** 60:11 66:12 68:25 103:25 104:3
**recover** 85:25 86:3
**referencing** 93:22 117:18
**referring** 68:10
**reflect** 98:5
**reflected** 44:15 97:20 98:8
**refrain** 20:19 97:11
**refuse** 79:16
**refuses** 142:14
**refusing** 130:25 140:6 141:4,11, 14,16,20 142:2,17, 20,22,23 143:17,25 144:5
**registered** 26:12 27:15
**regular** 58:22 59:6
**regularly** 24:2 129:11
**regulatory** 34:11,14, 24
**related** 20:4 59:15,19 74:4,8 79:19,23 94:10 121:13 122:12,23 123:7 140:22
**relating** 59:11
**relation** 133:23
**relationship** 26:2
**relied** 117:13 118:10 119:14 121:7
**rely** 86:18
**remain** 76:22
**remarks** 93:5,17
**remember** 105:21 110:22,23 111:25 113:14
**remind** 54:2 110:6
**renewal** 75:17 77:17
**renewals** 43:17 44:4 52:21
**rent** 35:16,22, 23 46:18 64:25 65:2,8,9 66:23 71:5,8 72:2,5 73:2,14 74:21 77:8 84:20 86:11 88:9,14, 18 89:14 90:8 113:25 115:14,18 121:5 122:25 125:13 128:22 129:7 130:5
**rent-stabilized** 103:22
**rental** 22:19 25:2 129:7,8 133:23
**Renting** 52:20
**repairs** 48:10
**repeat** 15:8,23 59:5 62:15 68:11 74:6 108:18 114:17 132:9
**rephrase** 8:14,17 9:16,22 123:22 124:18
**reporter** 10:3 11:6 13:19 14:5 30:25 33:13,18, 21,23 34:17 47:6 58:25 78:5,9 92:18 102:2,7 104:18 106:8 116:6,24 123:21 128:16 133:8 143:4 144:21,24
**represent** 4:17 86:2
**representation** 82:12
**representative** 14:14,19 15:17

62:7
**request** 58:7 109:4 131:11, 14,19 133:11
**requested** 106:4,11, 12,17
**requesting** 117:11 118:8 131:8
**requests** 20:8 51:22
**required** 6:7 14:25
**requirements** 15:11
**resided** 103:6
**resident** 40:12 51:11,12, 15,16 52:7 55:3,6 56:10,12, 16 57:25 72:3 91:2 110:15 112:17 113:12 131:15
**residents** 63:19
**resolve** 63:18
**resolving** 89:17
**respect** 101:12 139:19
**responds** 119:2
**response** 45:7
**responses** 17:6,13 20:7
**responsibilities** 52:18
**responsibility** 128:24 129:3
**responsible** 22:13 31:6,17 40:3,6,8 51:20 68:6 69:12 70:2 71:25 83:23 87:23 88:13,22 90:17,21, 23 107:6
**return** 109:15
**returned** 93:7,13
**returning** 93:12
**review** 17:10,16 64:5,8 67:2,22 120:15 135:4,9, 19 136:10 137:12,23 140:13
**reviewed** 18:4,10 65:4 111:9 114:23 115:3,21 120:21 129:24 134:13,17 135:8 139:9,14, 21 140:3 141:3
**reviewing** 89:8
**ridiculous** 11:18
**right's** 24:21
**rights** 77:2 105:24 106:13, 18,20 107:11,18
**Rob** 12:4
**Robert** 14:4 58:25
**role** 27:18 56:23 85:24 94:16
**roles** 23:13
40:23
**room** 19:15 20:16
**rough** 49:21
**roughly** 30:16 50:19 54:16 56:19
**Rowley** 54:24
**Rule** 14:15,22 15:15
**rules** 4:22 5:21
**ruling** 143:9,13 144:11
**runs** 98:10
**Ryan** 32:23

**S**

**S-E-E-P-E-R-S-A-D** 36:15
**S-M-A-J-L-J-E** 27:7
**S-R-D-A-N-O-** 26:16
**safety** 31:18
**Sanchez** 48:25 49:3 78:19
**sanctionable** 92:11
**saved** 72:10 73:6,9
**scanned** 17:5 18:7 120:6
**Schiff** 52:10 78:25
**screen** 19:19 96:20,23, 25 116:3, 8,19 118:6 120:11 128:4
**scroll** 117:4,6
**seconds** 123:19 124:12
**Section** 77:25 78:3,12, 17,21,24 79:5,8, 17,20,23 86:6
**security** 31:18 56:21,24, 25 57:4,5
**seek** 105:23 127:8,16

**Seepersad**
36:13,14 50:20

**selected**
62:8

**send**
46:9 47:21 61:6,13 72:5,22 73:2 76:15 88:9 117:10 145:2

**sending**
46:2 48:8 52:21 69:3 71:11 128:10

**sends**
44:14 68:24 69:6 72:17

**Senidos**
55:24

**sense**
6:15 25:23 118:2

**sentence**
102:5

**separate**
77:24

**separately**
68:23

**September**
114:2,5

**serve**
144:19

**services**
56:21,24 57:5 73:13

**serving**
88:14

**set**
35:23

**severity**
45:12

**share**
116:3 124:2,4

**sharing**
128:3

**Shepard**
18:24

**show**
37:23 66:23 130:5 138:11 143:11

**shown**
120:9

**shut**
97:15

**shutdown**
48:4

**shutdowns**
46:12

**side**
17:22 22:24,25 41:2,3

**sign**
73:23 75:8 113:21

**signed**
75:7 115:3

**simple**
140:7,8, 12 141:9

**sit**
10:19 11:10

**site**
17:24 18:21 41:20,23 42:8,13, 17 70:13 104:6 131:12,13 132:19,22 133:13,17

**sitting**
19:15

**situation**
131:5

**six-figure**
117:11 118:8 128:6

**slip-and-fall**
24:20

**Smajlje**
27:8,9

**somebody's**
67:6

**sought**
102:23

**sound**
109:6

**sounds**
5:23 23:25 91:11 97:13 142:21

**speak**
6:9 19:4 25:20 34:17,22 36:2 47:7 78:7 87:20 98:24 102:3 133:7

**speaker**
96:21

**speaking**
26:6 133:4,9 140:8 143:5

**specific**
46:8

**specifically**
124:21,23

**specification**
46:9

**specifics**
34:23 99:9

**spell**
26:23 36:10 43:5 67:10

**spend**
12:18

**spoke**
6:10 115:13 134:20

**spoken**
25:21

**Sradanovic's**
27:18

**Srdano-**
26:16

**Srdanovic**
26:11,16, 17,23 27:3,9 38:9,18

**stabilized**
35:17,22

**Stacey**
49:14

**Stacy**
49:11

**staff**
32:5 41:7 59:18 132:19,22 133:17

**staffing**
31:17,18

**standard**
10:9,11 45:19 48:15

**start**
9:5,6 10:14 40:10,11, 12 93:22, 25 94:2

**started**
35:15 53:20 102:6 112:25

**state**

4:4,8,24 132:2 143:8,15

**stated** 63:14

**statement** 65:3 66:23 92:7,10

**statements** 64:16,23 126:16 127:9

**stationary** 91:20 93:10

**status** 34:11

**statute** 128:21

**stay** 45:2,11

**Stella** 4:21

**Stellar** 14:20 15:4 22:6,9 23:11 24:3,14, 18 25:11 26:2,3,6 27:13 29:7,8, 10,14,18 30:6,7, 14,18,19 31:5,20, 24 32:7, 9,16,18 36:18,21 39:5,20, 22 42:2 45:5 50:7,8 52:13,24 55:16,22 56:24 57:12,19 59:22 65:21 66:7 68:19 69:8,12, 17,18 70:24 71:2,5,7, 10 72:19 73:2,12, 22,25 74:7 76:19 79:16 80:11,14 81:7,12, 22 82:4, 8,10 83:22 84:18,23 85:8,12 86:2,5, 10,15,18 87:2,15 88:6 89:21,24 90:7 94:7,25 95:7,9,13 107:9,20, 23 108:2, 6 111:9 114:22 115:2 128:5 129:10,14 130:20,24 133:22

**Stellar's** 80:2

85:21 88:25

**steps** 59:10 76:16 134:24

**stipulate** 21:24

**stop** 10:6,8 13:2 34:4 42:22 46:10 125:23 128:3

**stops** 76:8

**stored** 60:24

**Street** 4:12 23:17 25:5 28:18 30:20 31:2 32:25 34:6,12 40:18 42:6 49:7 65:12 82:16 110:7

**strike** 77:15 97:21

**stuff** 101:3

**subjects** 117:20

**submits** 45:4

**submitted** 100:23

**substance** 62:21

**succession** 75:20 77:2,4 105:24 106:4,13, 18,19 107:3,10, 18

**sue** 84:19,23 85:8,13, 15 90:21 112:10 121:4 122:24 125:12

**sued** 84:21 85:5 129:15 130:16

**sues** 129:11

**sufficient** 21:20

**super** 40:11 41:9 133:16 141:8

**superintendent** 41:8

**supervisor** 26:20

**supposed** 15:12 135:4,11, 19,24 136:10 138:5 144:3

**surprise** 111:5

**surprised** 111:7

**sworn** 4:3

**system** 43:3,11 68:21 95:10 98:3 104:5 132:24

**systems** 42:23 43:8 95:12

**T**

**taking** 6:25 33:20 98:10

**talk** 8:3 19:8 134:8

**talked** 19:7

**talking** 27:5 45:16 96:10 97:6 99:9,10 105:18

**task** 45:13

**team**
134:8

**Teams**
57:21

**tech**
94:10

**ten**
33:5
43:12
49:10
55:21
57:9

**ten-minute**
33:20

**tenant**
40:9
41:12
42:10
43:14,20,
21 44:2,
12,13
45:4 46:3
48:9
60:20,21
64:25
66:3 73:3
74:20
75:22
76:23
79:23
82:22,23
84:5 85:9
86:6,16
89:14,17
102:14,
20,22
106:11
130:15
131:8
132:10

**tenant's**
70:23
79:20
101:22
102:10

**tenants**
35:22
39:23
40:4,17
41:11
42:19
45:15,24
46:14
47:24
48:2
60:16
63:19
65:23,24
66:8,22
69:4
70:9,11
72:15
73:12
79:12
84:19,23
85:13,16
87:17,21
95:15
101:7,12
108:22
128:20
129:11,15

**tenants'**
82:19

**testified**
4:5 24:9
68:8,12
94:19
115:20
116:25
120:20
134:16
137:22

**testifies**
8:8

**testify**
7:4
14:15,21
15:12,16
62:8,12
64:2
67:21
117:9,21
118:4,20
119:8
120:16
121:3,15
122:3,15
123:9,16,
25 124:7,
13,15
125:16
127:8,12
144:16

**testifying**
6:3

**testimony**
5:25 7:10
19:5
37:18
60:14
61:9
62:24
66:6 69:8
82:8
87:15
108:21
118:14
119:2,21
121:11
122:11
123:5
125:15
126:18
131:17
141:7

**text**
20:21

**things**
31:12
33:9
37:17
46:14
48:6,12
52:22
60:5
73:13

**third-party**
65:23
128:19

**thousands**
99:10

**till**
33:7
56:18

**time**
5:17 7:16
8:12,21
13:13
17:9 18:7
20:25
23:8 33:6
41:6
47:12
50:10
55:5,17
56:3,15
73:23
76:14
106:3
110:24
112:19
113:12,
15,22
114:13
120:3
121:25
122:25
125:13
127:10
132:3
133:9
143:6

**timeframe**
47:4

**times**
5:13
24:23
41:5
83:21
99:3,4
108:5
110:9
124:19,24
130:15

**Tivoli**
14:14
15:4
24:25
25:9,10,
15,22
26:2,3,4,
7,13
27:16
28:4,5,8,
9,12,17,
19,21,23
29:16,25
30:6,9
34:15,20
41:22
42:8
50:11
51:2,4,
13,24

**today**
4:18 5:25
6:23 7:10
17:11
19:6
37:20
62:8
117:8
118:3
120:21

**today's**
4:15 17:2

**told**
99:5
126:5,10
136:3
137:15

138:9

**tonight**
47:2,10

**topic**
16:23 118:20 120:5,16 121:13,16 122:13, 16,23 123:7,10, 25 124:7, 13,21 126:13,19 127:13, 15,17

**topics**
15:5,21 16:3,7,13 62:11,18 115:21 119:23 134:18 135:5,12 136:11 137:13,24 139:19 140:22 143:19 144:4,17

**total**
29:20

**Towers**
28:5 42:8 51:3,4, 13,24

**town**
22:24

**transcript**
22:2 92:15 138:10 143:12 144:22

**transpiring**
47:10

**trapped**
132:4,10, 14

**trees**
37:23

**troubleshooting**
33:14,16

**true**
25:4 39:9 62:3,6, 10,17 117:7

**truth**
6:7

**truthfully**
7:4

**turn**
109:6,9

**turning**
96:11,13, 15

**turnover**
59:12

**type**
43:18 44:9,10 46:11,12 77:10 80:20 82:3,23 83:7 84:14 100:19,21

**types**
45:14

**typically**
45:6 58:2 72:9

81:12 83:13

**U**

**ultimate**
32:10,13, 19

**ultimately**
39:19 111:18

**umbrella**
37:8

**unable**
132:16

**underneath**
46:23 47:3,11

**understand**
5:24 6:6 7:13,17, 22 8:3,5, 7,13,23 9:11 14:24 21:5 25:6 30:5 39:2 71:16

**understanding**
28:13 71:24 105:17

**understands**
15:13,16

**understood**
8:18 9:14,17, 23

**unit**
48:10 58:11

76:2 105:20

**unpaid**
73:2 128:22

**updated**
69:20

**updating**
70:2

**uploaded**
45:2 100:23

**Upper**
22:23

**usages**
43:25

**use-and-occupancy**
90:12

**use-in-occupancy**
90:5,9

**V**

**vacancies**
19:25

**vacant**
76:13,14

**vacate**
75:24 76:2,7

**vacated**
75:25

**vague**
98:16

**vaguely**
17:7

**varies**
45:8,12

80:20

**verbally**
10:2 11:5,21 13:18

**version**
145:6

**view**
49:6

**viewed**
117:2

**views**
89:4

**visited**
104:14

**visually**
71:13

**volume**
109:9

**voucher**
79:5,13

**vouchers**
79:8,17

**W**

**wait**
129:19 137:19 138:10 140:16 143:4,5

**Wanda**
48:24 49:3 78:19

**wanted**
59:21 83:25

**waste**

8:21 13:12

**water**
46:12

**week**
5:19 19:3 41:5,6 103:18

**weeks**
54:15,16

**Weil**
32:12

**West**
4:12 22:23 42:6

**whatever's**
71:13

**whoever's**
40:13

**Williams**
51:8

**word**
119:18 122:21

**work**
18:12 20:2 30:5 36:18,21 37:6 39:11,12, 15,16 41:14,15 42:18,19, 23 43:13 45:4,10 48:5 50:6 52:6 81:12 82:3,7 95:3 97:4,7,11 100:24 101:2,23 133:14,18

**worked**
23:12 30:7 52:23 55:16,22 56:4 82:19

**working**
23:11 83:14,17 120:2 133:12

**works**
40:21 49:16 50:8 116:5

**wrap**
134:10

**writing**
144:20

**written**
74:17 77:19,21

**X**

**X/xx/xxxx**
21:22

**Y**

**Y-A-R-D-I**
43:6

**Yardi**
42:24 43:4 44:2,5,16 47:16 48:12 60:6,11, 15,25 61:3 64:6 68:20 71:18,20, 23 72:10 73:6 75:11,23 76:5 79:20 95:11 99:13,18, 22 100:3, 5,6,9,13, 24 104:5 132:24

**years**
5:16 10:12 18:17 22:10 33:5,10, 12 43:12 49:10,21 50:12,15 51:6 52:8,25 53:10 54:21 55:10,20, 21 56:18 57:9 82:2 110:6

**York**
4:4,12,13

**Z**

**Zoom**
97:16