UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - )
LISA PRINCE, )
Plaintiff, ) Case No.:
- against - ) 1:25-CV-3679
TIVOLI BI LLC, MEL MANAGEMENT )
CORP., d/b/a STELLAR MANAGEMENT; )
CULLEN & ASSOCIATES, PC; and )
KEVIN CULLEN, )
Defendants. )
- - - - - - - - - - - - - - - - - - )

REMOTE 30(b)(6) DEPOSITION
OF JESSICA SEEPERSAD

Reported by:
Kim M. Brantley
Job No: J15533685



JESSICA SEEPERSAD

Wednesday, September 30, 2026
Time: 10:08 a.m.

Remote deposition of 30(b)(6) witness JESSICA SEEPERSAD, held via Zoom, before Kim M. Brantley, Court Reporter and Notary Public of the State of New York.

APPEARANCES:

Attorneys for the Plaintiff:
LAW OFFICES OF AHMAD KESHAVARZ
16 Court Street - 26th Floor
Brooklyn, New York 11241
(718) 522-7900
Email: ahmad@newyorkconsumerattorney.com
BY: KAILYN GAINES, ESQUIRE
AHMAD KESHAVARZ, ESQUIRE
SAMAR KATNANI, ESQUIRE
CRAIG SIMONDS, ESQUIRE



JESSICA SEEPERSAD

APPEARANCES CONTINUED:

Attorneys for Defendants Tivoli Bi, LLC and Mel Management Corp. d/b/a Stellar Management:
ROBERT ARLEO, ESQUIRE, PC
1345 Avenue of the Americas - FL 33
New York, New York 10105
(212) 551-1115
Email: robertarleo@gmail.com
BY: ROBERT ARLEO, ESQUIRE

Attorneys for Defendants Cullen & Associates, PC and Kevin Cullen:
KAUFMAN DOLOWICH VOLUCK
135 Crossways Park Drive - Suite 201
Woodbury, New York 11797
(516) 283-8731
Email: emarshall@kaufmandolowich.com
BY: ADAM M. MARSHALL, ESQUIRE

ALSO PRESENT:
LINDSEY ETIENNE,
Tivoli Towers Maintenance Coordinator



JESSICA SEEPERSAD

P R O C E E D I N G S

JESSICA SEEPERSAD

called as a witness by Counsel for the Plaintiff, and, after having been first duly sworn by the Notary Public, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR THE PLAINTIFF
BY MS. GAINES:

Q. Would you please state your full name for the record.
**A. Full name is Jessica Ann Seepersad.**
Q. Would you please state your current address for the record.
**A. 281 East 49th Street, Brooklyn, New York, 11203.**
Q. Good morning, Ms. Seepersad.
**A. Good morning.**
Q. My name is Kailyn Gaines. I'm here with colleagues. We represent Lisa Prince in this lawsuit which is Prince vs. Stellar and Tivoli Bi as well as Cullen & Associates and Kevin Cullen.
**A. All right.**
Q. And we're here today for your deposition as the 30(b)(6) witness or the

Page 5

JESSICA SEEPERSAD

corporate designee of Stellar/Mel Management and Tivoli.

You just stated your name. Ms. Seepersad, have you ever had your deposition taken before?

**A. No.**

Q. So I'll just go over a few ground rules at the beginning...

First, do you understand that you are under oath today and that your testimony has the same force and effect as if you were testifying in court before a judge and a jury?

**A. Yes.**

Q. Do you understand that you are required to provide the whole truth when answering questions? So for example if I ask something like, "Who did you speak with?" you must tell me everyone that you spoke with.

**A. Yes.**

Q. And from that point I'll ask, "Anything else?" or, "Is that all?" to make sure I'm getting a complete answer.

Does that make sense?

**A. Yes.**

Page 6

**JESSICA SEEPERSAD**

Q. And for your part, if you answer a question incompletely and later recall that there's more to a previous answer, would you tell me and complete your answer?

**A. Yes.**

Q. Are you feeling well today?

**A. Yes, I'm fine.**

Q. Are you taking any medication or have you taken any medication in the last twenty-four hours that would affect your ability to testify truthfully and accurately?

**A. No.**

Q. Is there any reason medical, physical, or other wise that would prevent you from giving your full and complete testimony today?

**A. No.**

Q. If at any time you do not understand a question that I ask, will you let me know so that I can rephrase it?

**A. Yes.**

Q. And if I ask you a question and you do not ask me to rephrase it, is it fair to say that you understood the question?

**A. Yes.**

Page 7

**JESSICA SEEPERSAD**

Q. Will you answer all questions verbally as opposed to a gesture so that the court reporter can take down your answers?

**A. Yes.**

Q. I will try to ask clear questions and allow you to finish your answers. Please also allow me to finish my questions before you start to answer.

Can you agree to do that?

**A. Yes.**

Q. So you've been designated as a representative of Tivoli Bi, LLC to testify on its behalf pursuant to Rule 30(b)(6), correct?

**A. Correct.**

Q. And you've also been designated as a representative of Mel Management doing business as Stellar Management to testify on its behalf, pursuant to Rule 30(b)(6), correct?

**A. Correct.**

Q. Do you understand that as a 30(b)(6) witness you are required to educate yourself with all reasonably available information known or reasonably available to Tivoli and Stellar on the designated topics?

Page 8

JESSICA SEEPERSAD

**A. Yes.**

MR. ARLEO: Object to the form.

BY MS. GAINES:

Q. Have you done so?

**A. Yes.**

Q. If you do not know an answer to the question within your designated topics, will you let me know so that the record is clear?

**A. Yes.**

Q. What did you do to prepare for today's deposition?

**A. I read the form that was given to me, the deposition that was given to me. I did my research. I went through the information that we has provided.**

Q. Okay. Give me one second.

(Brief pause.)

BY MS. GAINES:

Q. So you said that you reviewed the form. Is that the deposition notice?

**A. Yes, mm-hmm.**

Q. Okay. And then you said that you did your research. What does that mean?

**A. I went to look within the documents**

Page 9

**JESSICA SEEPERSAD**

**that I have reported so that I could familiarize myself with the information.**

Q. Okay. What documents do you have?

**A. Just our system: So our rent ledgers, the notices that were provided that are documented in our system.**

Q. When you say your "system," what are you referring to?

**A. Our Yardi system.**

Q. So you reviewed the Yardi system. Did you review anything else?

**A. The notices per the documents for Section 8 and her succession.**

Q. Are those kept in Yardi or are those kept somewhere else?

**A. They're in Yardi.**

Q. Okay. And you said that those are the Section 8 notices and the succession notices?

**A. Correct.**

Q. Okay. Apart from the documents in Yardi, including the rent ledgers, the Section 8 notices, or the documents concerning Section 8 and the succession notices, did you review anything else in preparation for this deposition?

Page 10

JESSICA SEEPERSAD

**A. The leases that were provided.**

Q. And where are those leases kept?

**A. They are kept on site.**

Q. Where on site are they kept?

**A. They are kept in the leasing management office.**

Q. Are they kept in a file in the leasing management office?

**A. Correct.**

Q. Are there other documents kept in that file?

**A. The other documents kept in the file would be her income information, assets information, and her identifications.**

Q. Okay. Did you review any of that?

**A. Yes.**

Q. Okay. So is it fair to say that you reviewed the entire on site file?

**A. Yes.**

Q. Okay --

MR. ARLEO: Can I just make a statement on the record, and the plaintiff's counsel is probably unaware of it, and I make the same problem when I'm doing depositions...

Page 11

JESSICA SEEPERSAD

Please try not to follow up every answer to her question (sic) with the word "okay". After four hours or an hour it's tedious.

So, again, I make the same mistake. It was brought out to me and I'm working on not doing it. Thank you.

MS. GAINES: Thanks for that.

BY MS. GAINES:

Q. Okay, you reviewed the on-site file. It's our understanding from a previous deposition that there are two files kept for each tenant.

Is that correct?

MR. MARSHALL: Objection to the form.

BY MS. GAINES:

Q. You can answer.

**A. The "two files for each tenant"? I'm not necessarily sure what that would mean.**

**We have the previous tenant's information that she -- the previous tenant that was in the unit, and now we have the file for her information.**

**So I'm assuming those are the two files they're referring to.**

Page 12

**JESSICA SEEPERSAD**

Q. Okay. In a previous deposition we learned that there is a file that is kept for each tenant and that there is a separate file kept in storage as documents start to age, so that the one that is kept in the main office I guess is not over expansive.

Is that correct?

**A. I don't know.**

Q. Okay, who is responsible for file management?

**A. The file management on site in 49 Crown would be me.**

Q. Okay, and it's your testimony that there is only one physical file kept per tenant on site?

**A. Correct.**

Q. There is no storage area for files?

**A. There is a storage area. The only storage -- as I stated before, the only thing in storage would be for the previous tenant.**

Q. Okay. And you did not review anything in a storage file --

**A. No.**

Q. -- when you reviewed this case?

Page 13

JESSICA SEEPERSAD

**A. No.**
Q. Okay. Do you have any of the documents that you reviewed in front of you today?
**A. I have them on my desktop screen.**
Q. Okay, and what do you have on your desktop screen?
**A. I have the succession notice that she was approved. I have her Yardi tenant information on screen.**
Q. Do you have anything else on screen?
**A. No, no.**
Q. Okay. If you are consulting a document to answer a question, will you tell me which document you're looking at?
**A. Yes.**
Q. Is there anyone else in the room with you?
**A. Yes.**
Q. Who else is in the room with you?
**A. Our maintenance coordinator.**
Q. Okay. Are you testifying right now from an office?
**A. Yes.**
Q. Is that at 49 Crown Street?

Page 14

JESSICA SEEPERSAD

**A. Yes.**
Q. Will you refrain from messaging or communicating with your counsel or anyone else via text or online messenger during this deposition?
**A. Yes.**
Q. And will you refrain from doing other work --
MR. ARLEO: I'm going to object to that question to the extent that it implies that I am coaching the deponent as she's testifying --
MS. GAINES: I'm not implying that.
MR. ARLEO: When you ask them to confirm that they're not communicating with me, that's the implication.
Again, you can continue.
BY MS. GAINES:
Q. Will you refrain from communicating with anybody else during the course of this deposition?
**A. Yes.**
Q. Will you refrain from doing other work during this deposition?
**A. Yes.**

Page 15

**JESSICA SEEPERSAD**

Q. And if you need to take a break at any time, will you let me know?
**A. Yes.**
Q. And we can take a break as long as there is no question pending. Do you understand?
**A. Yes.**
Q. Can you provide a work phone number, please.
**A. (646) 518-7636.**
Q. What is your current employment?
MR. ARLEO: Hang on. For the record, I'll state for the record I'm directing plaintiff's counsel not to directly communicate at any time with the deponent.
Have all communications sent to me.
MS. GAINES: Okay.
BY MS. GAINES:
Q. What is your current employment?
**A. I am the recertification occupancy specialist.**
Q. "Recertification," what was the second word?
**A. Occupancy.**
Q. Oh, gotcha. Who do you work for?

Page 16

JESSICA SEEPERSAD

**A. For Stellar Management, Tivoli Towers.**
Q. Does that mean you work specifically at Tivoli Towers?
**A. Correct.**
Q. How long have you worked for Stellar Management?
**A. I have worked for Stellar since May of 2023.**
Q. Where did you work before that?
**A. I work at Progressive Management.**
Q. What did you do at Progressive Management?
**A. I was a leasing agent.**
Q. Since coming to work at Stellar in May, 2023, have you always worked as a recertification occupancy specialist?
**A. Yes.**
Q. Have you always worked specifically at Tivoli Towers?
**A. Yes.**
Q. And Tivoli Towers is the building at 49 Crown Street. Is that correct?
**A. Correct.**
Q. Can you describe the training that

Page 17

JESSICA SEEPERSAD
you've had to work as a recertification occupancy specialist?
**A. To be a recertification specialist you have to take what's called a COS exam, which is a certified occupancy specialist certification.**
Q. Can you tell me a little bit about that?
**A. So the certification is basically the breakdown of how to recertify a tenant's income, how to determine whether the applicant or tenant is eligible for any type of program, if they're eligible for the unit within the leasing process.**
Q. And then you had to take an exam?
**A. Yes.**
Q. Can you tell me a little bit about what you do as a recertification occupancy specialist? What are your responsibilities?
**A. So my responsibility is on an annual basis I have to contact all the tenants and require them to submit new income information and documentation to assess what their rent would be for that year.**
Q. Who is that documentation submitted to?
**A. It's submitted to our -- within our**

Page 18

**JESSICA SEEPERSAD**
**Yardi system, and then it is submitted to HPD.**
Q. How does HPD use that information?
**A. HPD uses that information for our Mitchell-Lama Program for our government funding.**
Q. Do you do anything else apart from asking for new income information and submitting it to HPD in your role?
**A. In my role I work with tenants on assisting with their understanding the rent breakdowns. I'm also the person that collects information that needs to be submitted to our Section 8 coordinators and our financial department. Anything that is tenants' concerns, I'm the one that answers it; I'm the one that helps them.**
Q. What kind of tenant concerns do you deal with?
**A. Anything regarding their rent ledgers, rent payments, if they receive any type of documentation from Section 8 that needs to be sent off to them or if they want family composition letters, anything within the household.**
Q. Is there anything else that you do in your role?

Page 19

JESSICA SEEPERSAD
**A. No.**
Q. Who manages you?
**A. Can you rephrase the question?**
Q. Who is your supervisor or manager? Do you have one?
**A. Yes. I have Francine Schiff and Ethan Shalom.**
Q. Okay, what are their roles?
**A. Francine is the director of operations, and Ethan is our assets management.**
Q. Do those people work at Tivoli Towers specifically or do they work at Stellar?
**A. They work at Stellar Management.**
Q. In the main office?
**A. Correct.**
Q. What is the association between Tivoli Bi, LLC and Tivoli Towers Housing Co., LLC?
**A. I believe they're just d/b/a's or a/k/a's. I'm not sure how to phrase it. But it's the same company. I believe for our tax purposes it's under Tivoli Bi, LLC, and I believe for our management it's the Tivoli Towers, Co.**
Q. What is the association between Tivoli Bi, LLC and Tivoli Associates?

Page 20

JESSICA SEEPERSAD
**A. That I do not know.**
Q. How many buildings does Tivoli own?
**A. One.**
Q. Which building is that?
**A. 49 Crown Street.**
Q. Does anyone else have ownership interest in the building?
**A. I do not know that.**
Q. Who would know that?
**A. Our financial department.**
Q. And who is in charge of the financial department?
**A. That would be Eric Odegard.**
Q. And is Eric Odegard the -- is he in finances at Stellar or Tivoli?
**A. He's at Stellar Management.**
Q. Okay. Who is the ultimate decision maker for Stellar Management?
**A. I think that would be -- I'm sorry, can you rephrase the question?**
Q. Sure. So you mentioned that Francine Schiff or Ethan Shalom are the people that you answer to at Stellar.
Who do they answer to?

Page 21

JESSICA SEEPERSAD

**A. I believe they answer to the partners.**
Q. Who are the partners?
**A. I don't know the names offhand. I know one is Matthew Lebo (phon). I'm not sure of our other co-owner.**
Q. What kind of things is Stellar responsible for in regards to the building?
**A. They assign the management.**
Q. When you say "assign the management," what do you mean?
**A. They are the ones that hire the individuals that work in the building.**
Q. So what I'm trying to understand is, so there are folks in work in the main office at Stellar, correct?
**A. Mm-hmm, yes.**
Q. People like Ethan and Francine?
**A. Yes.**
Q. What kinds of decisions do those people make as related to a building like 49 Crown Street?
**A. So Francine is the one that ultimately approves the applications of the tenants that are approved here. She is the first sign. She's the**

Page 22

JESSICA SEEPERSAD

**first person to review the file before it's sent off to HPD.**
**Ethan ultimately deals with our assets as far as how the money gets handled within the building.**
Q. When you say that Francine is the first person to approve the file, what kind of file? What kind of file are you referring to?
**A. When a unit is up for lease, when I'm processing an applicant, once I finish the file, she reviews the file to make sure that all the documents are in place. She makes sure that the person is eligible. She's the one that approves the application prior to it being sent off to HPD for final approval.**
Q. Is that just for new applicants, or is that for recertification or other situations, too?
**A. It's for internal transfers and external move-ins.**
Q. Can you explain what an internal transfer is?
**A. An internal transfer is when a tenant, a current tenant wants to be transferred between units, whether it is for downsizing or upgrading**

Page 23

JESSICA SEEPERSAD

**the unit.**
Q. Would Francine also be the person responsible for approving succession?
**A. Yes, she reviews and signs off on the succession applications prior to them being sent to HPD.**
Q. Okay, so we talked about Francine. We talked about Ethan and their responsibilities as related to Tivoli.
Are there other folks at Stellar's main office who make decisions as related to Tivoli Towers?
**A. The other person that would make decisions would be Nitti Jafar (phon), which would be our property manager.**
Q. Is that the same person as Nitti Yakopi? Is the last name --
**A. Yes, yes.**
Q. Okay, sure.
What is Nitti's roll?
**A. He's our property manager.**
Q. Is he on site at Tivoli Towers, or does he work somewhere else?
**A. He works between multiple buildings.**

Page 24

JESSICA SEEPERSAD

**He's on site a couple days out the week.**
Q. What kinds of decisions does Nitti make as related to the building?
**A. The decisions that he makes are for our renovation, repairs.**
**Anything that needs to be done within our tenant units, he's the one that will direct our maintenance staff on what needs to be done.**
Q. Does he make any other kind of decisions?
**A. No.**
Q. How long has Nitti been a property manager for Tivoli Towers?
**A. Currently he's been a property manager for four months.**
Q. Who was the property manager prior to that?
**A. Lorna Blackman.**
Q. How long was Ms. Blackman the property manager at Tivoli Towers?
**A. For two years.**
MR. ARLEO: I'm going to note my objection. You have previously deposed these two individuals who answered these questions.

Page 25

JESSICA SEEPERSAD

You already have the answers. But go ahead.
BY MS. GAINES:
Q. What is Francine Schiff's role?
MR. ARLEO: Objection, asked and answered.
But go ahead and answer again.
**THE WITNESS: She's the director of operations.**
BY MS. GAINES:
Q. How long has she worked as the director of operations?
**A. I wouldn't have that answer. She was here before I got here.**
Q. Has Ethan also worked in his role for the entire time that you've worked at Stellar?
**A. No, he was assigned to our building about three months ago.**
Q. Who made decisions related to assets before Ethan?
**A. I don't have that answer.**
Q. So apart from Francine Schiff, Ethan Shalom, and Nitti Yakopie, is there anybody else at Stellar who makes decisions as related to Tivoli Towers?

Page 26

JESSICA SEEPERSAD

**A. No.**
Q. Can you describe Tivoli Towers as a building; how many units?
**A. Okay, so our building is a thirty-three-story building. We have thirty-three floors; we have three hundred and twenty-one units.**
Q. Can you describe the regulatory size of the building?
**A. Can you rephrase it?**
Q. What is the regulatory size of the building, or does the building participate in any government or agency programs?
**A. This building --**
MR. ARLEO: Objection to the form.
BY MS. GAINES:
Q. You can you answer.
**A. This building is a Mitchell-Lama building, Section 236 Program.**
Q. What does that mean?
**A. This building is an income-based building, so we have what's called basic rent as well as fair-market rent. So when a tenant recertifies with their income and assets, their**

Page 27

**JESSICA SEEPERSAD**

**income determines what number they fall on, either the basic in between, or they pay the max, which we cannot exceed without HPD approval.**
Q. Is the building rent stabilized?
**A. No.**
Q. Are there any rent-stabilized units in the building?
**A. No.**
Q. What rights do tenants have under the regulatory agreement with Mitchell-Lama?
MR. MARSHALL: Objection to the form.
BY MS. GAINES:
Q. You can answer.
**A. I don't know regulatory agreements, so I wouldn't be able to attest to that.**
Q. Do tenants have the right to a renewal lease?
MR. MARSHALL: Objection to the form.
BY MS. GAINES:
Q. You can answer.
**A. Yes.**
Q. Do tenants have succession rights?
MR. MARSHALL: Objection to the form.

Page 28

JESSICA SEEPERSAD

BY MS. GAINES:
Q. You can answer.
**A. If it is approved, yes.**
Q. What rights do tenants have or what responsibilities does the building have as related to terminating a tenant?
MR. MARSHALL: Objection to the form.
BY MS. GAINES:
Q. You can answer.
**A. Can you rephrase the question?**
Q. Sure. Given the building's part of the Mitchell-Lama Program, are there any rules related to terminating a tenant?
**A. Terminating a tenant would be if the tenant refuses to recertify their documentation, if there is a refusal in paying any rent arrears or rent within the building, which would be an event for them to be evicted.**
Q. Can the building terminate tenants for reasons apart from the ones that you just named?
**A. Unless it's a legal situation where there are legal cases put against them, no.**
Q. I have a couple questions about file management.

Page 29

JESSICA SEEPERSAD

**A. Yes.**

Q. So what kinds of files and records does Stellar keep about tenants?

**A. So the files that we keep we have -- within our tenant files on site we have any notices that are sent to the tenant, any legal information that is sent to the tenant, that is sent to us to be put in the file...**

**I have all of their identifications; all the family household composition; I have the income and assets information within the file; we have the original applications that are in the file; and we have the leases.**

Q. And when you're referring to the file now, which file are you referring to?

**A. The tenant file on site.**

Q. Okay, and that's separate from the Yardi file?

**A. Yes. Yardi is our digital file where everyone has access to within our Stellar Management company whose assigned to our building, and the tenant files are all on site for us.**

Q. Who is accessing the tenant onsite file?

Page 30

JESSICA SEEPERSAD

**A. That would be myself and our maintenance coordinator.**

Q. Nobody else?

**A. The only other person would be our property manager. Those are the three of us.**

Q. You just described the onsite file includes notices that are sent to tenants...

What kinds of notices might be sent to a tenant?

**A. Notices are sent to tenants if they have the renewal. I send the renewals for our annual recertification, so that would be within it. If there is a maintenance issue and we need access, we have access that is within that file.**

**We have anything as far as if the tenant has a nuisance, letter, or if there is any type of discrepancy within their leases, it's in that file; and parking as well. If they have parking, we have parking notices in that file as well.**

Q. Okay. What about arrears notices or billing statements; are those things kept in a file?

**A. Our arrears notices that are sent from our onsite office are in that file. Rent arrears letters are sent through a third-party company.**

Page 31

JESSICA SEEPERSAD

Q. Can you describe the difference between the two?

**A. So our on site, we do a monthly billing cycle where we will run a report within Yardi, and it will give us everyone that has rent arrears, and we will send out the letters to the tenant.**

**On the other side is our billing department. They have their own report that they send to our third-party company called GSB. They take our report and then they send the billing receipts with the slips on it for the tenants to pay the rent.**

Q. Okay. So those are two separate notices that is go out to tenants -- do they go out to tenants at different times of the month?

**A. Yes. So the tenants get the rent receipts prior to the 1st of the month. Our rent arrears letters go out on the 15th.**

Q. And the onsite monthly bill letters, are those automatically generated, or just somebody -- how are they generated?

**A. They're generated through our system. I Yardi we have to run a report, so any tenant that has any type of arrears would pop up in our system, and it will generate a letter that is already preformatted, and it would just adjust based on the tenant and the amount, the rent arrear dates.**

Page 32

JESSICA SEEPERSAD

Q. Does anyone review those letters?

**A. They're reviewed before they're sent out.**

Q. What is the review? How would somebody review the letters?

**A. We manually review them. Any tenant that is under twenty dollars, we don't send them the rent arrears letter.**

Q. Is that the only thing that the review comprises of, just determining whether or not it's less than twenty dollars?

**A. Yes, that's the only review we do.**

Q. And who does that?

**A. That would be our maintenance coordinator.**

Q. Who is the maintenance coordinator?

**A. Her name is Lindsay Etienne.**

Q. Can you spell that?

Page 33

JESSICA SEEPERSAD

**A. Her first or last name?**

Q. Her last name.

**A. Last name is Etienne.**

Q. How long has Lindsey been the maintenance coordinator at Tivoli Towers?

**A. She's been our maintenance coordinator since May.**

Q. Who was the maintenance coordinator before Lindsey?

**A. Her name is Kwanna Williams.**

Q. And how long was Kwanna Williams the maintenance coordinator?

**A. She was the maintenance coordinator here for two years.**

Q. Does the maintenance coordinator have other responsibilities as related to billing?

**A. No.**

Q. Do you know who the maintenance coordinator was before Kwanna Williams?

**A. No, I don't have knowledge of that.**

Q. What else does the maintenance coordinator do?

**A. The maintenance coordinator does all of our maintenance concerns. So she puts in the work**

Page 34

**JESSICA SEEPERSAD**

**order tickets when the tenants have any repairs in the building. She is the one that contacts our vendor. She puts in our purchasing for our supplies, and she coordinates any type of scheduled maintenance that needs to be done.**

Q. And also just to ask, are you on site at the building five days a week?

**A. Yes.**

Q. And is the maintenance coordinator also on site five days a week?

**A. Correct.**

Q. So back to the notices, you said that onsite monthly billing reports, the ones that are generated from Yardi, are kept in that onsite file for tenants.

Is that right?

**A. Yes.**

Q. And then there's separate notices that are generated by the third-party billing, and that was a company I think that you called GSB.

Is that right?

**A. Yes.**

Q. Do you know what GSB stands for?

**A. No, I don't know.**

Page 35

**JESSICA SEEPERSAD**

Q. How are the GSB billing receipts generated?

**A. So our billing department runs their report on a monthly basis, and they send that report out to GSB for them to generate the rent receipt billing that is sent to the tenants.**

Q. And where are those kept?

MR. MARSHALL: Objection to the form.

BY MS. GAINES:

Q. You can answer.

**A. I would not know where those are kept.**

Q. Who would know?

**A. Our billing department.**

Q. I apologize if I asked this before, but did you tell us who was in charge of the billing department?

**A. That would be Eric Odegard.**

Q. Do you, or the property manager, or the maintenance coordinator ever take notes about tenants or tenant situations?

**A. As far as what?**

Q. Let's say like you meet with a tenant about a tenant concern. Would you ever take notes about that kind of situation?

Page 36

JESSICA SEEPERSAD

**A. Anything with a tenant concern, whether if it's billing, it's usually answered when they're in my presence.**

**If there is a tenant complaint that is usually filed with a -- that's usually filled out with a form, if the tenant wants to supply a form, like supply a statement for any type of complaint.**

**That's the only thing I would think of.**

Q. How do you all internally communicate with tenants within the office?

**A. Between us and our main office, or on site are you referring to?**

Q. Both, but let's start with on site.

**A. On site would be in person between each other.**

Q. Do you ever send emails or texts?

**A. Not with each other, no.**

Q. What if you needed for example a property manager on a day that they were off? Say, how would you communicate with them?

**A. That I would either call or email possibly.**

Q. How would you communicate with the folks at the main office?

Page 37

JESSICA SEEPERSAD

**A. With phone call or email.**
Q. Do you ever meet with the folks at the main office?
**A. No.**
Q. If you wanted to find and document information that Stellar had about Lisa Prince, what would you do?
**A. I would go within our internal files that we -- I would go within our site file that is here, or I would -- well, I would only go through our file here; anything else I would contact our legal department or I'd contact Francine.**
Q. Does the legal department maintain its own file about tenants?
**A. I'm not sure if they have their own file, no.**
Q. Does Francine maintain her own files about tenants?
**A. No.**
Q. To your knowledge has Stellar produced all documents in its possession, custody, and control regarding Ms. Prince?
**A. Yes.**
Q. What steps have been taken to make sure

Page 38

JESSICA SEEPERSAD

that this is true?
**A. We have --**
MR. ARLEO: Objection to the line of questioning. The documents were produced through my office.
So go ahead and answer.
**THE WITNESS: Well, we would have -- the files were sent -- our file on site was sent to our legal department.**
BY MS. GAINES:
Q. Who sent the file?
**A. I did. I sent the entire file that I had regarding Ms. Prince to our legal department.**
Q. Is that both the onsite file and the Yardi file?
**A. They have access to the Yardi file. So I just needed to send them the file that we had on site.**
Q. When you say "they had access," who had access?
**A. The legal department, they have access to Yardi.**
Q. Did you ever search for emails or text messages regarding Ms. Prince that may have been

Page 39

JESSICA SEEPERSAD

in like your custody and control or in other staff members' custody and control?
**A. I searched the emails, yes.**
Q. Were those emails turned over?
**A. Legal department has those emails.**
Q. Did you search for text messages?
**A. No.**
Q. Did anybody else search for text messages?
**A. No.**
Q. How did you send the file to Legal?
**A. Through email.**
Q. Because if I understand, it's a physical file, so did you scan the file and send it to legal? Is that what you did?
**A. Yes.**
Q. Who can add or remove documents from the onsite file?
**A. I can add documents. I don't remove anything.**
Q. Does anyone ever remove files from the on site?
**A. The only person that would remove a tenant file would be our property manager. If**

Page 40

**JESSICA SEEPERSAD**

**they had housing court, they would need to take the original file with them.**
Q. Would they return it after?
**A. Yes.**
Q. Can anyone add or remove documents from the Yardi system?
**A. I would say yes, but they would not.**
Q. When you say "you would say," why would you say yes?
**A. It's a digital file. If there was a mistake we'd able to remove anything.**
**Of something's possibly duplicated, I'd be able to delete a duplicated file.**
Q. But why do you think that no one would?
**A. Yardi's for our recordkeeping. Everything that is uploaded is information that has been sent prior -- either not sent to our site office and possibly sent to the main office. So the main office employees upload whatever they receive.**
Q. How long has Stellar used Yardi?
**A. I don't know that answer.**
Q. But has Stellar used Yardi for as long as you have worked for Tivoli Towers?

Page 41

JESSICA SEEPERSAD

**A. Yes.**
Q. Approximately how many emails did you send to legal about Ms. Prince, concerning Ms. Prince?
MR. MARSHALL: Objection to the form.
BY MS. GAINES:
Q. You can answer.
**A. I only have possibly three emails about Ms. Prince, and that's within -- that's between the Section 8 coordinator.**
Q. Remind me who the Section 8 coordinator is.
**A. Here name is Wanda Sanchez.**
Q. How long has Wanda Sanchez been the Section 8 coordinator? Does Wanda Sanchez work specifically at Tivoli Towers?
**A. No, she works at Stellar Management.**
Q. How long has she been the Section 8 coordinator at Stellar Management?
**A. I would not know that.**
Q. What kind of decisions does Wanda Sanchez make as the Section 8 coordinator?
**A. Wanda is the individual that processes the Section 8 applications.**

Page 42

JESSICA SEEPERSAD

Q. Do you recall what your emails with Wanda Sanchez about Ms. Prince concerned?
**A. It was for us to officially provide her a lease for Section 8.**
Q. Are there any emails between you and Francine Schiff about Ms. Prince?
**A. No.**
Q. Have you ever communicated with Francine Schiff about Ms. Prince?
**A. No.**
Q. Okay, I'm going to move on to some questions about billing --
**A. Wait, retract that.**
Q. Yes?
**A. The only conversation I had was for her to sign the official lease.**
Q. Okay, when was that? And I appreciate you amending the answer.
**A. That was in 20 -- I believe '23 when I was told to officially do her Section 8 lease.**
Q. And Ms. Schiff contacted you about that?
**A. No. I prepared the lease for her to sign so that it could be sent to Wanda Sanchez for**

Page 43

JESSICA SEEPERSAD

**it to be sent to HPD for the final half contract.**
Q. Okay, but I think the question I had asked was whether you had any communications with Francine Schiff about Ms. Prince. So I guess how is Ms. Schiff involved in that?
**A. She's the one that signs off on our leases.**
Q. Okay. So did Francine Schiff instruct you to prepare the lease?
**A. No, Wanda Sanchez did.**
Q. Okay. And then after preparing the lease did you send it to Ms. Schiff?
**A. Yes.**
Q. And that was in 2023?
**A. Yes.**
Q. Who at HPD contacted to let you all know that a tenant should have a lease?
**A. If it's Section 8, they would contact Wanda.**
Q. If it wasn't Section 8, who would they contact?
**A. Section 8 doesn't contact us for leases, to tell us who's getting a lease. When we submit the tenant application file, they approve**

Page 44

JESSICA SEEPERSAD

**it, and then we would do the lease.**
Q. Okay. So just a couple questions about accounting and billing...
You testified Odegard is responsible for billing and accounting. Is that right?
**A. Yes.**
Q. And the billing system is Yardi, correct?
**A. Yes.**
Q. Is there any other kind of system or program used for billing?
**A. Not to my knowledge.**
Q. How are tenant ledgers maintained?
MR. MARSHALL: Objection to the form.
BY MS. GAINES:
Q. You can answer.
**A. Tenant ledgers are maintained in Yardi.**
Q. Are the ledgers updated automatically or by hand?
**A. They're updated automatically within the system. When a tenant pays rent, it is manually updated.**
Q. How do tenants pay rent?
**A. There are a couple ways: They can have**

Page 45

JESSICA SEEPERSAD
**checks being sent from the bank directly to the office; they can come into the office as well and pay in person, and those checks are then mailed to the main office; or they can do it in an online portal called Quickpay.**
Q. Which company accepts payments?
**A. Can you repeat the question?**
MR. MARSHALL: Objection to the form.
BY MS. GAINES:
Q. So you testified previously about this third-party company, GFB. Do they accept payments on behalf of Stellar?
**A. No, GSB just sends --**
MR. MARSHALL: Objection to form.
BY MS. GAINES:
Q. You can answer.
**A. GSB just sends out the rent receipts.**
Q. Okay. When tenants are paying rent, are they paying it directly to Stellar?
**A. Yes.**
Q. Are they paying anyone else?
**A. No.**
Q. Are the payments manually -- how are the payments entered?

Page 46

JESSICA SEEPERSAD
**A. It's entered manually.**
Q. Who does that?
**A. That would be our accounting department. We have an individual that's assigned to our building. His name is Daniel Hamer.**
Q. Can you spell the last name?
**A. H-a-m-e-r.**
Q. Does Daniel work for Stellar?
**A. Yes.**
Q. How long has Daniel been assigned to Tivoli Towers?
**A. That I'm not too sure. He's been assigned since I've been here.**
Q. Does Daniel have other responsibilities apart from manually entering payments?
**A. I wouldn't know what his responsibilities would be.**
Q. Are you aware of any other things that he does apart from entering payments?
**A. Well, to my knowledge, if a tenant has a concern, if a payment is not processed or if a payment was essentially refunded, they would contact him.**
Q. So you described two billing notices

Page 47

JESSICA SEEPERSAD
that are sent. So those receipts are sent at the beginning, before the 1st of the month, and then the billing, like report letters, any arrears letters that are sent on the 15th...
**A. Yes.**
Q. Are those the only bill notices that are sent to tenants?
**A. To my knowledge, yes.**
Q. Does Stellar ever charge fees for services?
**A. Can you rephrase the question?**
Q. For example might Stellar charge a fee for something that was broken or needed to be repaired?
**A. Yes, there are fees that are charged.**
Q. Is there a schedule of fees that are kept, or how would those fees be determined?
**A. They're is a general list that we have for the fees.**
Q. Where is that general list kept?
**A. It is posted in the onsite office.**
Q. Is it anywhere else or just in the onsite office?
**A. I believe it's only in the onsite**

Page 48

**JESSICA SEEPERSAD**
**office, from my knowledge. I don't know if they have it in the main office as well.**
Q. Does Stellar charge late fees?
**A. No.**
Q. Are there any fees associated with late recertification?
**A. There are admin fees if a tenant does not submit the income affidavit.**
Q. What is the admin fee?
**A. The admin fee is $50 for the first two months, then $150 for every month after until it's submitted.**
Q. How is that applied?
**A. That's manually applied.**
Q. Who manually applies it?
**A. So I would create a charge form, and I would send it to one of our leasing agents, and she would input it into the system.**
Q. Okay. Who are the leasing agents?
**A. For my building it is Madeline Reyes.**
Q. How long has she worked as the leasing agent for your building?
**A. I don't know before me.**
Q. Does Stellar charge fees for use and

Page 49

JESSICA SEEPERSAD
occupancy?
**A. Yes, rent.**
Q. When you say "yes, rent," can you explain why you answered like that?
**A. If a tenant is occupying a unit, they'd be charged rent for occupying the unit.**
Q. Is there a destination between rent and use and occupancy?
MR. MARSHALL: Objection to the form.
BY MS GAINES:
Q. You can answer.
**A. I believe it would be the same.**
Q. If a tenant has billing or arrears questions and you don't have the answer to those questions, who would you direct that tenant to speak with?
**A. The legal department.**
Q. Why would it be the legal department?
**A. Anything regarding arrears, if I'm unable to provide an answer, I would contact the billing department as well. If they're not able to, they would contact legal department.**
Q. Does the legal department speak directly with tenants?

Page 50

JESSICA SEEPERSAD
**A. Yes.**
Q. What other things does the internal legal department do?
MR. MARSHALL: Objection to form.
BY MS. GAINES:
Q. You can answer.
**A. Our legal department processes holdovers, evictions, any violation of leases, if they need to make -- if we are putting an account on do-not-accept; like those are the things that they would do.**
Q. What does "do-not-accept" mean?
**A. If we have a holdover, a legal case with a tenant, we do not accept payments for them if we have a legal case.**
**Even though the tenant still has to pay and they're making payments, if we're in court with them, I believe they would put the account so that we will receive the payments, but it wouldn't be processed until the case is done.**
Q. Who decides which tenants should be sued and not in holdover cases?
**A. The legal department.**
Q. Does anyone else make that decision, or

Page 51

JESSICA SEEPERSAD
just the legal department?
**A. I wouldn't know.**
Q. How does Stellar determine which tenants it will sue?
**A. Can you rephrase the question?**
Q. Sure. Can you describe the process for making the decision about who should be sued?
MR. MARSHALL: Objection to the form. The witness already answered, it's another department.
MS. GAINES: Sure, I'm asking this in the capacity as a 30(b)(6) witness.
MR. MARSHALL: I understand that.
MR. ARLEO: I'll state for the record, Mr. Marshall represents the attorney you sued, so when you ask questions regarding what the legal department does, those questions are directly related to his client, and he has every right to note his objection.
MS. GAINES: Yeah, I understand.
BY MS. GAINES:
Q. So Ms. Seepersad, I'm asking about the internal legal department, and I'm asking you to testify to this in your capacity as a corporate

Page 52

JESSICA SEEPERSAD
representative of Stellar...
Can you explain to me how the internal legal department at Stellar makes the decision about which tenants it should sue?
**A. As far as to my capacity, in my knowledge, when a tenant owes over a month and a half of rent, that's when a legal case gets started.**
Q. Are there any other instances where Stellar might sue a tenant apart from where they owe over a month and a half of rent?
**A. They would sue a tenant -- I wouldn't be able to testify. I don't know what -- I don't work in that department, so I wouldn't know what they would be suing people for.**
Q. In the process of preparing for this 30(b)(6) deposition, did you review any of the internal legal department's policies or procedures?
MR. ARLEO: Yeah, I'm going to object to that.
What you're trying to do is claim that this 30(b)(6) witness is also unprepared. So to the extent she's testifying to her

Page 53

JESSICA SEEPERSAD

knowledge, you fail to understand that a witness, even though it's a 30(b)(6) witness, might not know the answer to a specific question. So it doesn't require you to go into an inquisition as to what she did or didn't review.

MS. GAINES: Okay, I'm going to --

MR. ARLEO: So go ahead and answer the question.

She's here to answer the questions to the best of her knowledge as the designated second 30(b)(6) witness who is sitting here answering questions that you asked two other witnesses that you already know the answers to.

But we know why this is going on.

So you can go ahead and answer the question.

MS. GAINES: I'm going to restate the question.

BY MS. GAINES:

Q. So in the process of preparing for today's 30(b)(6) deposition, did you review any of the internal legal department at Stellar's

Page 54

JESSICA SEEPERSAD

policies or procedures? I'll leave it there.

MR. ARLEO: So I'll also note for the record that the only thing your client was sued for was rent.

MS. GAINES: Okay --

MR. ARLEO: Hang on a second.

So the extent that you're going down a path --

MS. GAINES: I'm going to ask you to refrain from arguing, Mr. Arleo --

MR. ARLEO: Hang on a second. I have a I right to put a statement on the record.

MS. GAINES: Objection.

MR. ARLEO: I understand you think you're the only captain here who controls the ship. I have a right to put a statement on.

MS. GAINES: I am the captain.

MR. ARLEO: To the extent that you're asking her questions on what her employer might sue tenants for other than rent, it's not relevant to this lawsuit.

But go ahead and --

MS. GAINES: Okay, I'm going to --

MR. ARLEO: Jessica, just sit there and

Page 55

JESSICA SEEPERSAD

answer to the best of your knowledge.

MS. GAINES: I'm going to restate the question again.

BY MS. GAINES:

Q. In preparation for today's 30(b)(6) deposition, did you review any of Stellar Management's internal legal department's policies and procedures?

**A. No.**

Q. Are you prepared to testify today as a representative of Stellar as to decision-making around filing lawsuits?

MR. ARLEO: Objection. She already answered that question.

She said if you're a month and a half behind, you get sued.

MS. GAINES: I'm going to rephrase it --

MR. ARLEO: Go ahead, Jessica, sit there, and to the best of your ability, answer these questions.

MS. GAINES: I'm going to restate the question.

Page 56

JESSICA SEEPERSAD

BY MS. GAINES:

Q. Ms. Seepersad, are you prepared today to testify as a corporate witness --

MR. ARLEO: I'm going to object to your question as to what she is prepared to testify to. Ask your specific question.

MS. GAINES: I'm going to ask whatever questions --

MR. ARLEO: You're wasting everybody's time.

MS. GAINES: I'm going to ask whatever questions I want to ask.

MR. ARLEO: Ask your question.

Ask your question, and then you'll have the transcript to make what's obviously going to be another argument that we have not produced an adequate 30(b)(6) witness.

Don't ask her what she's prepared to do. Ask her the questions.

MS. GAINES: I'm going to ask the question as I --

MR. ARLEO: I'm going to direct you not to answer the questions as to what you're prepared to do. You're here to answer

Page 57

JESSICA SEEPERSAD

questions.

So pose your questions to the deponent.

BY MS. GAINES:

Q. My question is are you prepared today to testify --

MR. ARLEO: Objection.

Jessica, don't answer that.

MS. GAINES: On what basis?

MR. ARLEO: Don't answer it.

MS. GAINES: Mr. Arleo, what's your basis for which you're directing the witness not to answer?

MR. ARLEO: I'll tell you. She's here to answer questions, not what she's prepared to do.

You can make your own conclusions as to whether or not she was prepared. Again, you're wasting everybody's time asking her what she's prepared to do.

She's prepared to answer specific questions, so ask them.

MS. GAINES: Okay, I will note for the record that counsel for Stellar Management was ordered by the judge today to produce a

Page 58

JESSICA SEEPERSAD

witness who is prepared to testify to the notice --

MR. ARLEO: And that counsel has done that.

MS. GAINES: I'm going to finish my statement.

MR. ARLEO: Again, again, you can make whatever argument you want to make. Get a copy of the transcript and go ahead and make your predictable argument. But I'm not going to sit here and argue with you as to whether or not she's a competent witness.

So ask your questions and then go make your --

MS. GAINES: It sounds like exactly what you are doing is sitting here and arguing with me when I was --

MR. ARLEO: I'm not.

First of all, I'm protecting my client against harassment, okay? So ask her specific questions. She's not going to answer what she is prepared or not prepared to do.

MS. GAINES: Okay, you've made lengthy

Page 59

JESSICA SEEPERSAD

statements for the record, and I will wrap up my statement for the record, which is this -- or I can ask a question. Or I can ask my question and you can just keep --

MR. ARLEO: I am preserving the record as to what you are doing. Ask your questions.

MS. GAINES: I'm going to continue making my statement for the record, which is that counsel for Stellar Management was directed by the court to provide a witness --

MR. ARLEO: Counsel for Stellar Management has done that. If you would disagree with that, then go make your motion.

MS. GAINES: I'm going to finish --

MR. ARLEO: This is absolutely ridiculous. Continue to ask your questions.

MS. GAINES: Okay, I'm going to note for the record --

MR. ARLEO: She's here to answer questions. Ask your questions.

MS. GAINES: Mr. Arleo, please stop interrupting me.

MR. ARLEO: Don't put statements on the

Page 60

JESSICA SEEPERSAD

record --

MS. GAINES: Please stop interrupting me.

MR. ARLEO: -- as to what Stellar Management was ordered to do.

MS. GAINS: Okay, I'm going to note for the record --

MR. ARLEO: Now you're directing an accusation at me to clearly imply that I've not abided by a court order. That's what you're doing. And it's not true.

MS. GAINES: Okay, I am going to --

MR. ARLEO: And it will be proven not true by when you continue to ask your questions. Ask her the questions.

MS. GAINES: I have been unable to ask a question or make a statement for the past five minutes because Mr. Arleo has been interrupting me.

MR. ARLEO: No, you're not -- no, the question has been, "Are you prepared to answer questions?" That's not a question. It's a waste of time.

MS. GAINES: Then we need to take a

Page 61

JESSICA SEEPERSAD
break.
MR. ARLEO: No, here's what we're going to do, here's what we're going to do: I'm taking your conduct now to conclude that you don't have any further questions. If you have further questions, ask her, and whatever argument you want to make about what I did and who I produced pursuant to a court order, go make it. But stop wasting everyone's time and ask your questions.
MS. GAINES: This is my deposition and I am going to ask the questions that I'd like to ask.
MR. ARLEO: Just because it's your deposition it doesn't mean you can engage in irrelevant conduct, accuse me of violating a court order -- which is what you're doing --
MS. GAINES: Okay, we're going to take a break.
MR. ARLEO: That's exactly what you're doing. Why would you refer to the --
MS. GAINES: We are going to take break because I have been unable to -- I have been unable to --

Page 62

JESSICA SEEPERSAD
MR. ARLEO: You know what? Here you go. Here's two minutes, say whatever you want to say, and then ask your questions.
MS. GAINES: That is not how this is going to go. We are going to take a twelve-minute break until 11:30 --
MR. ARLEO: No, we're not taking a break. No.
MS. GAINES: -- because I am unable to ask --
MR. ARLEO: Jessica, you don't want to take a break.
MS. GAINES: Yes, we are going to take a break.
MR. ARLEO: No, we're not taking a break. Ask your questions.
MS. GAINES: We're taking a break.
I have been unable to ask a question or make a statement for the past six, seven minutes --
MR. ARLEO: Listen, you keep talking, but this is all on the record. I'm going to do what I need to do after I get a copy of the transcript. This is outrageous.

Page 63

JESSICA SEEPERSAD
Ask your questions.
MS. GAINES: We're taking a break until 11:30.
MR. ARLEO: Oh, really? All right, so, go take your break.
MR. KESHEVARZ: Off the record.
(Recess taken.)
BY MS. GAINES:
Q. I'm going to start with some follow-up questions to questions that I previously asked.
Ms. Seepersad, you testified that you searched for emails. Can you describe how you searched for emails?
**A. I looked through my Outlook email.**
Q. Did you do anything else?
**A. I put in her apartment number and her name in my email search bar.**
Q. Are you aware of anyone else being directed to search her emails?
**A. No.**
Q. To your knowledge did anyone else search their emails?
**A. To my knowledge the only other person would have been our legal department.**

Page 64

**JESSICA SEEPERSAD**
Q. Do you know if the legal department found any emails concerning Ms. Prince?
**A. The only email was regarding the succession.**
Q. Can you describe that email?
**A. It was when we were sent the succession notification that she was approved.**
Q. Is that what you were describing with the Wanda Sanchez email, or is that something different?
**A. It's the notice that was sent. I wasn't on that email prior.**
Q. Okay, who sent that email?
**A. HPD.**
Q. Who did they send it to?
**A. I would have to look.**
Q. Okay, that's an email that went to legal or that legal found?
**A. Yes.**
Q. Did you search your email for either Joyce Lee or Christian Lee?
**A. No.**
Q. Are you aware of anyone searching their emails for Joyce Lee or Christian Lee?

Page 65

JESSICA SEEPERSAD

**A. No.**

Q. You said that the legal department speaks with tenants. Can you tell me a little bit more about that.

**A. I would not be privy to those conversations, but anything that a tenant is concerned about with a notice that they have received from court, I would direct them to legal.**

Q. Who is the person that tenants would speak to at legal?

**A. They would speak to Frederick Bonier.**

Q. Would they speak to anybody else?

**A. He has his own team, so it would be directed to one of them. So it would be either Stacy Perez and recently Heather Hasanoff (phon).**

Q. What are those people's roles?

**A. They are paralegals.**

Q. What kinds of decisions is Frederick Bonier responsible for?

**A. He is the individual that processes legal cases. He's the one that sends whatever legal cases we're going to put to tenants to our legal -- our counsel. I'm not exactly sure what his role would be.**

Page 66

**JESSICA SEEPERSAD**

Q. I have another follow-up question...

So I asked about whether Stellar bills for use and occupancy, and you testified I think that use and occupancy basically is rent.

Give me one moment.

So looking at a ledger, could you tell if an amount owed is for nonpayment of rent or for use and occupancy?

**A. Looking at a ledger, I would see the balances. So I would see what was charged and what the balances are.**

Q. Is there anything in the ledger that would indicate what the charge was for?

**A. Yes. They're specified what it's for. It says "basic rent".**

Q. If there was no lease, would the charge still say "basic rent"?

**A. Yes. The tenant will still be charged rent even if there is no lease. They're still occupying the unit, so rent has to be charged.**

Q. Okay. So is it fair to say that your testimony is that there is no distinction in the system between rent and use and occupancy?

**A. No, there's no differentiation within**

Page 67

**JESSICA SEEPERSAD**

**the charge. No.**

Q. Is there a differentiation anywhere else?

**A. I wouldn't know.**

Q. Who would know?

**A. The charges in our system are very standard. So it's basic rent being charged. It's automatically charged every month.**

Q. If legal decided to initiate a case against someone, does legal request information from the onsite office?

**A. Yes. The information they request is if the tenant submitted payment to us or if they signed a lease or recertified.**

Q. Do they request any other information or just those things?

**A. Just those things.**

Q. Who would be responsible for providing that information to legal?

**A. That would be me.**

Q. And, just to restate for me, that's whether or not they have made payment, whether or not they have recertified, and whether or not they have signed a lease?

Page 68

JESSICA SEEPERSAD

**A. Yes.**

Q. How does that information impact the kind of case that legal might bring against a tenant?

**A. I'm not sure how it would impact. It would just be basic information.**

**If the tenant paid rent, had they signed a lease, are we waiting for them to sign a lease, have they recertified, have they not recertified. It's basic questions.**

Q. Is there a distinction between the type of case that legal would bring against a tenant if there was or was not a lease?

**A. I wouldn't know what cases they would bring against them. I don't know the differentiation in cases.**

Q. Did you speak to anyone with legal in preparation for this deposition?

**A. I spoke to my counsel, and I spoke to Frederick.**

Q. Did you gather information about how legal makes decisions around cases in preparation for this deposition?

**A. The only conversation I had with him**

Page 69

JESSICA SEEPERSAD

**was how they determined how to do a rent arrears case, which would be the month and a half rent that's owed. That's when they start the case for arrears.**

Q. Is that the only information that you have about internal legal's decision-making?

**A. Yes.**

Q. How do you send information about a case to the legal department?

**A. I send it over email.**

Q. Does Stellar also employ outside counsel?

**A. Yes.**

Q. Who does Stellar employ?

**A. I believe it's Cullen & Associates.**

Q. How long has Stellar worked with Cullen & Associates?

**A. I don't have that knowledge.**

Q. What type of work does Cullen & Associates do for Stellar?

**A. They're outside counsel, so they're the ones that are I would assume initiating our cases and putting them to the court. They represent us.**

Q. What's the difference between the work

Page 70

JESSICA SEEPERSAD

that internal legal does and that Cullen & Associates does?

**A. I would not know that.**

Q. How much is Cullen & Associates paid for its representation of Stellar?

MR. ARLEO: Objection to the form.

BY MS. GAINES:

Q. You can answer.

**A. I do not know that.**

Q. How does Cullen & Associates get information about the tenants that Stellar is suing?

**A. They would retrieve that from legal department.**

Q. Are you ever responsible for providing information to Cullen & Associates?

**A. As requested, yes.**

Q. What kinds of information might they request?

**A. They would request the tenant files, rent ledgers, and if the tenants made any type of rent payments, they would request those type of copies.**

Q. Are you the only person who would be

Page 71

JESSICA SEEPERSAD

responsible for providing that information to Cullen & Associates, or would anybody else also be responsible?

**A. For on site it would be myself and in our main office would be the legal department or the billing department.**

Q. Can you tell me whether it is the internal legal department or Cullen & Associates who decides whether a tenant should be sued?

**A. That would be the legal department.**

Q. Which legal department, the internal?

**A. The internal.**

Q. And can you tell me whether it would be the internal legal department or Cullen & Associates who would decide what type of case to bring against a tenant?

**A. That would be internal legal.**

Q. In the ordinary course of business, does Stellar inform Cullen & Associates if the tenant is in the Section 8 program before the suit is filed?

**A. I would not know that.**

Q. Who would know?

**A. The legal department. They're the ones**

Page 72

**JESSICA SEEPERSAD**

**that are in contact with them directly.**

Q. In the ordinary course of business, would Stellar inform Cullen & Associates of the contract rent?

**A. Yes.**

Q. How would they inform them?

**A. It would be as requested in the email if they're requesting -- if they don't have the rent ledger.**

Q. In the ordinary course of business, who tells Cullen & Associates how much a tenant owes?

**A. That would be the legal department.**

Q. In the ordinary course of business does Cullen & Associates ever come back to Stellar and tell them that they should not sue a certain tenants?

MR. MARSHALL: Objection to form.

BY MS. GAINES:

Q. You can answer.

**A. I wouldn't know that.**

Q. Who would know?

**A. That would be a conversation between them and our internal legal.**

Q. Again internal legal is providing

Page 73

JESSICA SEEPERSAD

information to the onsite office via email. Is that right?

**A. Yes.**

Q. Do you ever meet with the internal legal department?

**A. No.**

Q. And the internal legal department works with Stellar's main office?

**A. Yes. All of our communication is either over phone or email.**

Q. Does Cullen & Associates ever speak directly with tenants?

**A. I would not know that.**

Q. Who would be responsible for drafting notices about unpaid money amounts?

MR. MARSHALL: Objection to the form.

BY MS. GAINES:

Q. You can answer.

**A. Notices as far as besides our rent arrears letters? Is that what you're referring to?**

Q. Yes, I'm referring to legal notices. Who would be responsible for drafting those? For example, like notices to terminate or --

Page 74

JESSICA SEEPERSAD

MR. MARSHALL: Please provide specific examples, otherwise I have to keep objecting.

MS. GAINES: Sure.

BY MS. GAINES:

Q. I'm asking who would provide form notices, form legal notices to tenants?

MR. MARSHALL: Objection to form.

BY MS. GAINES:

Q. You can answer.

**A. That would be the legal department. Any legal notices that are being sent to our tenants go through legal. Legal drafts them and submits them.**

Q. And that's internal notices?

**A. That's internal.**

Q. Or internal, sorry.

**A. Yes.**

Q. Who is responsible for serving predicate legal notices on tenants?

**A. That would be a third party.**

Q. Which third party?

**A. I don't work for the legal department. I don't know who they use.**

Q. Who is responsible for drafting

Page 75

JESSICA SEEPERSAD

petitions in cases?

**A. That's the legal department, internally.**

Q. And who is responsible for serving petitions on tenants?

MR. MARSHALL: Objection to the form.

BY MS. GAINES:

Q. You can answer.

**A. I'm not sure who the legal department uses in those cases.**

Q. Can you describe the process for initiating a lawsuit against a tenant?

MR. MARSHALL: Objection to the form.

BY MS. GAINES:

Q. You can answer.

**A. Can you rephrase the question?**

Q. What steps does the legal department take if they want to bring a lawsuit against a tenant?

MR. MARSHALL: Objection, asked and answered.

BY MS. GAINES:

Q. You can answer.

**A. I don't work in that department. I**

Page 76

**JESSICA SEEPERSAD**

**don't know what steps they take. I don't know their processes. I don't work in that department.**

Q. And you're not prepared to testify to their processes today?

MR. ARLEO: I'm going to object to the line of questions.

First of all the answers to those are already known. They're obvious. But I'm also going to object to any statements as to whether or not the client, the deponent is prepared.

You can make your own conclusions based upon her responses to your questions, but she's not going to answer any questions as to whether or not she is prepared.

You decide that; not her. So please move on.

BY MS. GAINES;

Q. Did you prepare to answer questions about the legal department, the steps the legal department takes before serving tenants?

**A. No.**

Q. Can you tell me who reviews a petition and makes sure that it is accurate?

Page 77

JESSICA SEEPERSAD

**A. That would be the legal department.**

Q. Can you describe the process for that review?

**A. As I stated before, I don't know what processes they use. I don't work on that side, so I don't know what they are reviewing.**

Q. What happens if a tenant disputes a rent demand?

**A. They would speak to legal or they would go to court.**

Q. What is the process for resolving a lawsuit against a tenant?

**A. I don't work in that department. I can't give an answer to that.**

MR. ARLEO: I'm just going to object to this entire line of questioning.

Jessica you continue to answer.

But you've sued Kevin Cullen. He's the person to answer these questions...

But Jessica, you can go ahead and continue to answer.

BY MS. GAINES:

Q. If someone does not have a lease to an apartment, what legal actions can Stellar take

Page 78

JESSICA SEEPERSAD

against them?

MR. MARSHALL: Objection to form.

BY MS. GAINES:

Q. You can answer.

**A. I'm sorry. Rephrase the question.**

Q. Sure. What legal actions can Stellar take against a tenant who does not have a lease to an apartment?

MR. ARLEO: I'm going to object to that it calls for a --

MR. MARSHALL: I'm going to object, yeah.

MR. ARLEO: It calls for a legal conclusion.

But go ahead, Jessica. You can answer.

**THE WITNESS: I believe the process would be eviction if a tenant doesn't have rights to the unit.**

BY MS. GAINES:

Q. Can you tell me what kinds of cases?

MR. MARSHALL: Objection to the form.

BY MS. GAINES:

Q. You can answer.

**A. I'm not sure what case you're referring to.**

Page 79

**JESSICA SEEPERSAD**

**If a tenant is not a tenant on record, or if they don't have a legal lease, they don't have rights to the unit. So I believe they would proceed to eviction being that the tenant doesn't have any legal rights to the unit.**

Q. I'm going to go back to a couple questions about Section 8.

**A. Mm-hmm.**

Q. Actually I'm going to go to succession.

**A. Okay.**

Q. Can you remind me, I believe I asked who was responsible for offering succession leases, but can you remind me who that is?

**A. So succession, a tenant would have to apply for succession. We just don't offer succession.**

Q. Okay.

**A. A tenant has to come into the office and apply for succession, provide the predicate -- the documents that prove that they have succession rights.**

**So we just don't offer a lease. They have to apply, like an application. It has to be**

Page 80

**JESSICA SEEPERSAD**

**reviewed by management and HPD, and HPD makes the final decision whether they are denied or approved for succession.**

Q. Does the tenant come into the onsite office to submit that application?

**A. Yes. They would receive the application from us; I would give them the instructions of the information that needs to be provided with the succession application; and then once they have completed that and they have returned it, I would then send it to our department management head, which would be Francine; she would review it, and then she would then instruct me to send it to HPD for approval or denial.**

Q. How long does that process take typically from an application submission until a decision is made?

**A. It depends. It varies depending on once the application is received by HPD, if there is more information that they're requiring from the tenant.**

Q. It varies, but about how much time do you estimate? Is it possible?

Page 81

JESSICA SEEPERSAD

**A. I wouldn't have the information.**
**In my case, from me being here, the fastest I've seen it is probably four months.**
Q. What's the slowest you've seen?
**A. It can take up to years. It all depends on the tenant and what they're providing and if HPD is requesting more information.**
Q. When a tenant moves out or dies, what happens to their account in Yardi?
**A. The account stays up until a person succeeds, gets a succession or succeeds.**
Q. What happens if there's arrears on the account in that case?
**A. If there is an account of the person that is applying the success occupying the unit at that time, whether they're in the succession process or not, they would be deemed responsible as a stipulation for the succession.**
Q. And is that Stellar's policy?
**A. No, that's succession policy. That's in Mitchell-Lama, a tenant that is applying for succession, as long as they're occupying the unit, their rent must be paid.**
Q. Would you accept rent from an occupant

Page 82

JESSICA SEEPERSAD

of a unit prior to succession being approved?
**A. Yes.**
MR. ARLEO: Objection to the form.
BY MS. GAINES:
Q. And then what would happen if that tenant was ultimately denied succession?
**A. The rent would still be paid. They occupy the unit. There is a stipulation in the policy for the Mitchell-Lama succession that use of occupancy still determines rent. So you still would have to pay the rent for that.**
Q. Is there anything in the system that would indicate that there is no lease or that the person is applying for succession?
**A. We indicate it on their accounts.**
Q. Where would it be indicated on the accounts?
**A. It would be in Yardi in their notes.**
Q. In the case where there's an occupant in the apartment, would the account be in the occupant's name?
**A. Not unless they are granted succession.**
Q. Okay. So otherwise it would accrue under the previous tenant's name. Is that right?

Page 83

JESSICA SEEPERSAD

**A. Yes.**
Q. Now I have a couple questions about Section 8...
I believe you testified that Wanda Sanchez is the current Section 8 liaison, correct?
**A. Yes.**
Q. Is she the person who is responsible for making decisions about accepting or placing vouchers?
**A. Her responsibility is processing the application. HPD is the one that determines who to give vouchers to.**
Q. Okay. Even in situations where HPD has determined that somebody can have a voucher, is there somebody at Stellar who decides whether or not they will accept that HPD voucher?
**A. No. If a tenant is granted a voucher, and they have rights to the unit, and succession is approved, then we would process it.**
Q. Are there any cases in which HPD might give somebody a voucher but Stellar denied processing the voucher?
MR. MARSHALL: Objection to the form.

Page 84

JESSICA SEEPERSAD

BY MS. GAINES:
Q. You can answer.
**A. No.**
Q. How are tenants notified that a Section 8 voucher has been processed and placed at the building?
**A. They receive correspondence from HPD.**
Q. Does the building send any correspondence around that?
**A. So once HPD sends the correspondence to the tenant, they also send it to our liaison, and she will then inform myself to make a lease for that tenant.**
Q. And are records around Section 8 placement or processing kept anywhere in the tenant's file?
**A. The vouchers are put in our file, and it's on Yardi, on their tenant file's data.**
Q. If HPD was trying to get in touch with somebody, or was trying to get in touch with Stellar about a tenant or a voucher, who would be the person that HPD would contact?
**A. They would contact Wanda.**
Q. Do you know how they're typically in

Page 85

JESSICA SEEPERSAD

contact with her?

**A. It's usually email they would contact her.**

Q. Are you familiar with a Joyce Lee?

**A. No. That was the prior tenant, but I don't have any information regarding her.**

Q. Okay, the prior tenant where?

**A. For that particular unit.**

Q. Is that 28L Tivoli Towers?

**A. Yes.**

Q. When you say you don't have any information on her, what do you mean?

**A. That was prior to me being here, so I don't have any information.**

Q. Do you know what happened to Ms. Lee?

**A. The only understanding I have is that she passed.**

Q. Are you familiar with Lisa Prince?

**A. Yes.**

Q. Do you know what Lisa Prince's relationship was to Ms. Lee?

**A. No.**

Q. Are you familiar with Christian Lee?

**A. All the information I have is that he**

Page 86

**JESSICA SEEPERSAD**

**was in the unit prior to.**

Q. You don't have any other information about Christian Lee?

**A. Only things that are in their file.**

Q. Did you review anything in the file concerning Christian Lee or Joyce Lee?

**A. When I was submitting the documents to legal, I was requesting to see if there was anything regarding Christian Lee, and the only things were nuisance cases and some statements from our security.**

Q. Did you review those in preparation for today's deposition?

**A. No. I'm just privy because that's what I needed to scan. So those were things that were in the file.**

Q. Are you aware of Christian Lee and Lisa Prince seeking succession rights to 28L?

**A. The only person that I know that was seeking succession was Lisa Prince, but that was also prior to me.**

Q. Actually are you able to tell me or to describe the history of Lisa Prince and Christian Lee seeking succession?

Page 87

JESSICA SEEPERSAD

**A. The only information I have is the letter which I stated in the beginning that I have that says that she applied.**

Q. Can you remind me of when that letter was from?

**A. So, let me -- the letter, I'm looking at it on my screen. This is the approval letter. So I don't know -- so this approval letter was -- she requested succession January 31st, 2020, and the approval was sent June 18th, 2020. That's when the form was processed.**

Q. June what, I'm sorry?

**A. June 18th, 2020 is the date on the form.**

Q. Is the date on the form that indicates that succession was processed?

**A. Yes. That's when succession was processed.**

Q. How long after succession is processed do you typically offer a lease?

**A. Usually in best case scenario it would be immediately. I wasn't given the succession form until 2023.**

Q. Why is that?

Page 88

JESSICA SEEPERSAD

**A. I can't allege what happened before. I just know that the email correspondence that I had with Wanda was the approval for her Section 8 that stated that she was granted succession.**

**This is during COVID, so I don't know if there was maybe a delay.**

Q. When was the succession form sent to Wanda?

**A. I can't attest to that. The only email correspondence I have is from 2023.**

Q. So your testimony is that you don't know what happened to this form between 2020 when it was processed and 2023 when it was sent to you?

**A. Yeah.**

Q. To go back to the succession form, do you know when Section 8 first reached out to Stellar about placing Ms. Prince's voucher?

**A. I am not privy to that. That would be Wanda.**

Q. Apart from the fee information that has been sent to you, did you review anything in preparation for today's deposition about Ms. Prince's Section 8 approval?

**A. No.**

Page 89

**JESSICA SEEPERSAD**

**As I stated prior, the only information I got was the 2023 correspondence to generate a lease because she was approved for Section 8.**

Q. Okay. Do you have any information about a 2019 HPD decision stating that Christian Lee was entitled to a lease to the apartment?

**A. No.**

Q. And I guess to back up, so, in 2023 you got this correspondence about the Section 8. After that did you produce a lease?

**A. Yes.**

Q. When did that lease go out to Ms. Prince?

**A. I can tell you. Let me.**

(Witness reviews her computer screen.)

**A. (Continuing) So I was informed to create a lease on August 29th, 2023.**

Q. Mm-hmm.

**A. For the lease date of 9/15/2023 to 9/14/2024.**

**Ms. Prince came down to sign her lease on August 29th of 2023.**

Q. Where are you looking when you're looking that information up?

Page 90

JESSICA SEEPERSAD

**A. I'm looking at the lease in her tenant file on Yardi.**

Q. Okay.

**A. Previously I looked at an email that was sent to Wanda to me for her to sign the lease.**

Q. Okay. Do you know that she signed on August 29th just because that's the date of the lease, or are there any like notes or anything that you're looking at?

**A. She signed the lease with me directly.**

Q. Okay.

**A. So that was the date that I contacted her, and she came to sign the lease.**

Q. Okay. Did Ms. Prince have a lease before this?

**A. No.**

Q. So the September 15th, 2023 start date lease was the first lease that Ms. Prince had to the apartment.

Is that right?

**A. Yes.**

Q. When was the last time someone living in that unit, 28L, had a lease to that unit?

**A. Prior to Ms. Prince?**

Page 91

**JESSICA SEEPERSAD**

Q. Yes.

**A. Let me check.**

(Witness reviews computer screen.)

**A. I would have to go back into the file that was sent.**

Q. Is that because you're not seeing another lease in Yardi?

**A. Yeah, it's not uploaded. Her lease is not uploaded. The lease that I see is the lease for Ms. Prince.**

Q. The 2023 lease?

**A. Correct.**

Q. And you're not seeing one before that?

**A. No, it's not uploaded.**

Q. Either independently or in your capacity as a corporate representative are you aware of another lease, a previous lease?

**A. No.**

Q. Do you have any information about Stellar's actions after a 2019 HPD decision stating that Christian Lee had succession rights and was entitled to a lease to the unit?

**A. No.**

MR. MARSHALL: Objection to form.

Page 92

JESSICA SEEPERSAD

**THE WITNESS: No.**

BY MS. GAINES:

Q. Can you tell me how many times Stellar has attempted to evict either Christian Lee or Lisa Prince from the unit?

MR. MARSHALL: Objection to the form.

BY MS. GAINES:

Q. You can answer.

**A. I would not know. That's the legal department. I wouldn't know how many times they tried.**

Q. Are you familiar with any of the lawsuits that Stellar has filed against either Christian Lee or Ms. Prince?

**A. No. I don't follow the cases that are being put against tenants.**

Q. Okay. Did you do anything to prepare to testify about these incidents today?

MR. ARLEO: Objection.

Go ahead and answer, Jessica.

**THE WITNESS: No, I didn't look at any previous cases.**

**I was asked and informed about this one, and this is what I was prepared for.**

Page 93

**JESSICA SEEPERSAD**
MR. ARLEO: Do you have any idea as to how much longer you have?
MS. GAINES: I'm hopeful that we can wrap up by 1:00, given that I don't think this witness is going to be able to answer any questions about the lawsuit.
That might change as we move forward.
MR. ARLEO: Just let me note for the record that you put in your 30(b)(6) notice, and as demonstrated by the questions today, specific questions regarding the legal process and how it came to be that the plaintiff was sued and what's the prerequisites for that, yet again I state that you've also named the lawyer who did that as a defendant.
So to the extent that there is an alleged issue with her knowledge or lack thereof of the specifics of legal action in the responses to defendants, I'm just noting that for the record.
But go ahead.
MS. GAINS: Yeah, I'll note too that there's an internal legal department with

Page 94

JESSICA SEEPERSAD
Stellar headed by Frederick Bonier. The witness has testified that Stellar are the people who prepare petitions, who send notices, who do all of this initial legal leg work. So that's the information that we're hoping to get from Stellar about the legal processes. But this witness is not prepared to testify as to those things.
MR. ARLEO: Jessica, are you okay continuing 'till 1:00 o'clock?
**THE WITNESS: Yep, that's fine.**
MR. ARLEO: Okay.
MS. GAINES: Thank you.
BY MS. GAINES:
Q. Do you have any familiarity with the 2024 nonpayment lawsuit against Lisa Prince?
**A. No.**
Q. Does Lisa Prince owe Stellar money?
MR. MARSHALL: Objection to the form.
BY MS. GAINES:
Q. You can answer.
**A. Yes.**
Q. How much money does Lisa Prince owe Stellar?

Page 95

JESSICA SEEPERSAD
**A. That would be on the ledger.**
**Do you want the exact amount that is stated on the ledger?**
Q. Yes.
(Witness reviews computer screens.)
**A. The exact amount on the ledger at the current time today of 9/30, it is $190,757.19.**
Q. Can you tell me how that amount is calculated?
**A. This amount is calculated by the rent charges that are being placed into the system, that are generated in the system.**
Q. How far back do the alleged arrears go?
MR. MARSHALL: Objection to the form.
MR. ARLEO: Objection.
**THE WITNESS: The last time a zero balance was on this account was February 1st, 2014.**
BY MS. GAINES:
Q. I'm not going to introduce the ledger as an exhibit, just to save everybody time. We looked at the ledge before in another deposition.
Can you tell me -- and tell me if this is not possible based on what you're looking at --

Page 96

JESSICA SEEPERSAD
but is it possible for you to tell me, as of July 2nd, 2024, what Lisa Prince owed Stellar?
**A. Okay, so as of July 1st, 2024, the balance was $195,982.25.**
Q. Can you tell me then why in July 2024 Stellar sued Ms. Prince for $5,483?
**A. That was the rent prior to her receiving the Section 8.**
**So when we received the correspondence, and we were waiting for the issuing of her Section 8, she was charged for the -- in my notes, she was charged for June, July, and August rent, which was totaling close to that amount.**
Q. So you're saying June, July, August of this year?
**A. Of 2024 -- sorry, 2023. That was prior to her getting the lease.**
Q. How much was the rent for each of those months?
(Witness reviews computer screens.)
**A. So June of 2023 the rent was $1,753. The rent for July and August was $1,893 for both months.**
Q. Why did go up between June 2023 and

Page 97

JESSICA SEEPERSAD

July 2023?

**A. We had an HPD commissioner order a eight-percent increase. That was a building-wide increase. So the basic rents were increased at that time.**

Q. When you're looking at your notes, what notes are you looking at?

**A. I just wrote down those dates of prior to her getting her Section 8 lease.**

Q. Okay. Why then does the lawsuit, the July 2024 lawsuit, allege that she had unpaid rent from September 2023 to May 2024?

**A. I'm sorry, can you repeat that?**

Q. So you just testified that Lisa Prince was being sued for unpaid rent prior to her Section 8 voucher being possessed. So that's for June through August of 2023...

I'm asking why then the July 2024 lawsuit is seeking rent from September 2023 to May 2024?

MR. ARLEO: Objection to the form.

BY MS. GAINES:

Q. You can answer.

**A. Well I believe on that -- I don't know**

Page 98

**JESSICA SEEPERSAD**

**that form particularly, but from my understanding it was a breakdown of the Section 8 rent.**

**So what happened was when she started paying for her rent in September, that money was applied to her previous balance. When you have a rent arrear, the money will pay a prior rent arrear. So I am assuming, because I see a lot of payments here from December, when she paid that amount, those amounts for the Section 8 rent was applied to her rent that she owed, so that in fact made it that she owed those Section 8 rents for those months, because that's what those totaled.**

Q. So is your testimony that the process for Stellar is applying payments first to balances rather than to the month that they're paid in?

**A. Yes.**

**Usually when a tenant pays for rent, unless it is identified for a particular month, whatever amount that they're paying, whatever payment that's received will automatically go to the pass due balances.**

Q. Is that indicated anywhere on the ledger?

**A. I would have to check where the checks**

Page 99

**JESSICA SEEPERSAD**

**were applied to.**

**Usually when the checks are received, you have to apply them to the rent charge, so it would be in that statement.**

Q. In which statement?

**A. In our Yardi system there is a charge form and receipt form. So when you're able to click it, you'd be able to see where that payment was applied to.**

Q. Okay, is that something like separate from the ledger?

**A. It's within the ledger, but you wouldn't be able to -- what you're receiving is a printed ledger. You would have to go directly into those payments to see where they were applied.**

Q. So to know where Ms. Prince's payments for each of these months alleged, what they were applied to, we would have to look at a charge form, a separate charge form for each of those months?

Is that right?

**A. Yes, to see where they were applied to.**

Q. Okay, to your knowledge, have those

Page 100

JESSICA SEEPERSAD

been produced?

**A. That I would not know.**

Q. Again who has access to those, to the charge forms?

**A. Our billing department.**

Q. Does anyone else have access?

**A. I'm not a hundred percent sure if every department has those accesses. I don't know what access they have on our Yardi system.**

Q. Do you have access?

**A. Yes.**

Q. Could you check now?

**A. Yes.**

Q. So specifically from September 2023 until May 2024 where those payments were applied?

**A. I would have to go into each one of them individually.**

Q. That's fine.

**A. Through all the payments.**

Q. That's fine.

**A. Can you repeat the dates again one more time, please?**

Q. Sure, so September 2023 through May 2024. So I think that's one, two, three, four,

Page 101

JESSICA SEEPERSAD
five, six, seven, eight, nine; nine months.
**A. So September '23. So payments were not made until December of 2023.**
Q. Okay. Let's start then in December 2023. Where were those payments applied?
**A. Okay, so the first payment of the $660, this was applied to her rent of February 1st, 2014 to February 8th, 2014.**
Q. Okay.
**A. Then the next payment was another $660.**
Q. What's the date on that payment?
**A. They were all processed on the same date; date received was all 12/28/2023.**
Q. Okay. So the second payment on 12/28/2023?
**A. Is another $660.**
MS. GAINES: I said that I wasn't going to pull up a ledger, but I may. I'm just going to scroll to the page -- actually, I'll keep it here for a second. Okay, I'm going to share my screen.
Can everybody see this? Can everybody see this?
**THE WITNESS: Yes.**

Page 102

**JESSICA SEEPERSAD**
MR. MARSHALL: Yes.
BY MS. GAINES:
Q. Ms. Seepersad, do you recognize this?
**A. Yes, that's a split ledger. That gives you the summary of all of the rent ledger.**
Q. Okay, are you looking at something similar on your computer?
**A. I'm looking at the full rent ledger.**
Q. Okay.
MS. GAINES: I'd like to mark this as Exhibit A.
(Split Ledger was marked Plaintiff's Exhibit A, for identification.)
BY MS. GAINES:
Q. I'm going to scroll. We were at December 2023, yes. Okay, and then there are a number of payments that you said came in on December 28th, 2023, right?
**A. Yes.**
Q. So I think we were here (indicating).
**A. Yes.**
Q. So we are first talking about check number -- and this is page -- let me make this less. This is page six of the ledger.

Page 103

JESSICA SEEPERSAD
So at the bottom of page six we were first talking about the check ending in 6121, a payment of $660, and your testimony was that that was based on the -- this is just a question...
Is it something that you're clicking over here in this column that's showing you the charge (indicating)?
**A. Yes.**
Q. Okay.
**A. So when you click on this column in Yardi, obviously it will show you where the payments were applied to.**
Q. So you're saying that when you click on this column first, 6121, you testified that it indicates that that payment was applied to February 2014?
Is that right?
**A. Yes.**
Q. Okay, so we're moving on to the next one, which is the check ending in 7613.
**A. Yes.**
Q. Where is that applied?
**A. So that paid the remainder of February 1st, 2024 and paid a portion of March 1st, 2014.**

Page 104

**JESSICA SEEPERSAD**
Q. Okay. How about the following check on December 28th, check ending in 7106?
**A. Let me click it.**
**That paid a portion of March 1st, 2014.**
Q. Okay. And then the following check for $460, check ending in 6445, where was that applied?
**A. That was applied to a portion of March 1st, 2014 and a portion of April 1st, 2014.**
Q. Then one more check for $230 ending in 7238, where was that applied?
**A. That was applied to a portion of April 1st, 2014.**
Q. Okay. So then the next one, so I see January 2024, a Clickpay check ending in 5841 for $660. Where was that applied?
**A. That one was applied to a portion of April 1st, 2014.**
Q. Okay. And then next month, February 2024, the check ending in 1551 for $660, where was that applied?
**A. That was applied to a portion of April 1st, 2014, and a portion of June 1st, 2014.**
Q. Then the next check, March 2024, ending

Page 105

JESSICA SEEPERSAD
in 0862, for $660, where was that applied?
**A. I'm sorry, which check number?**
Q. Zero eight six two, March 8th, 2024.
**A. Okay, that check was applied to a portion of June 1st, 2014.**
Q. Okay. I have April 9th, 2024, check ending in 5712 for $660, where was that applied?
**A. A portion of June 1st, 2014.**
Q. What about the May check, May 10th, 2024, ending in 8658, for $620?
**A. That check was applied to a portion of June 1st, 2014 and a portion of July 1st, 2014.**
Q. Is there anything on the charge form that indicates whether or not any of these checks were earmarked for specific months?
**A. I'm not understanding the question.**
Q. If a tenant's check for a specific month of rent was like earmarked for a specific month, where would that be indicated?
**A. When the person receives the check, when Daniel Hamer receives the check, if it's a money order and it's indicated on the money order, he will apply it for a specific month.**
**However, Ms. Prince was paying through**

Page 106

**JESSICA SEEPERSAD**
**our third party, Clickpay, and the way Clickpay is set up it cannot differentiate the month. So it automatically goes to the prior balance.**
Q. And if that money order is earmarked for a specific month, is that indicated anywhere in the system?
**A. No, it wouldn't --**
MR. MARSHALL: Objection to the form.
BY MS. GAINES:
Q. You can answer.
**A. No, it wouldn't specifically show on Yardi.**
Q. Is there any way for a tenant paying through Clickpay to indicate that they want their rent applied to a specific month?
**A. No. Clickpay is not set up that way.**
**Clickpay is just a system where it's similar to if you were to pay a credit card payment. As soon as you make the payment, it will just go towards the entire balance. It wouldn't specify where it's getting designated to.**
Q. I'm going to stop sharing. Thank you for going through this with me.
Going back to the June 2023, July 2023,

Page 107

JESSICA SEEPERSAD
August 2023 payments, why was Stellar billing Ms. Prince for those amounts prior to the lease being signed in August?
**A. So she did a -- she was supposed to recertify with me, prior to her getting her Section 8 application approved. Her Section 8 application was submitted in June of 2023. So from June she was supposed to start paying the rent as far as before Section 8. She was responsible for the rent prior to her Section 8 application being approved.**
**So the application was submitted in June. So from June, July, and August she was responsible for the full rent, and in September she was then granted the Section 8.**
Q. So just help me understand the timeline...
So Ms. Prince applied for Section 8 in June 2023. Is that right?
**A. Yes, her application was submitted in June 2023.**
Q. Did she submit that application with you or with someone else?
**A. She submitted it with Wanda. I was**

Page 108

**JESSICA SEEPERSAD**
**just responsible for her signing the form that needed to be submitted to the Section 8 eight.**
Q. How do you know that the application was submitted on that date?
**A. That was the date that the email was sent out.**
Q. Okay, and then Section 8 was approved when?
**A. As I stated before, Section 8 was approved. The approval came to us on August 29th, 2023.**
Q. Can you help me understand the interaction between Section 8 and the succession that happened in 2020 that you didn't hear about until 2023?
**A. So I wasn't privy to that information prior. The person before me was the person that initially did the succession with Ms. Prince, so I don't know what the conversations were or what was done during that time frame.**
**When I started, I started in May of '23, like I stated before. So I was just kind of privy to her signing her lease. I don't know the correlation between the two of them.**

**JESSICA SEEPERSAD**

Q. Okay. I guess, so maybe my question is this: Is it that Ms. Prince couldn't apply for Section 8 until June of 2023 because that was when you first became aware of her having succession rights, being approved for succession for the apartment?

**A. No.**

**So there are times when judgment for things are made and we're not given that information until later on.**

**It could have been an instance where she applied for succession. From looking at the succession letter I'm seeing here, she went through a company, a third party, the Brooklyn Legal Services or Tenant Rights Coalition, and it seems as though they were kind of helping her for the succession.**

**So we didn't get this information. This was sent back to them. We were on the receiving end.**

**From what I can tell you in my report, we were on the receiving end in '23. Well, myself, I was on the receiving end in '23. I don't know anything prior to that.**



**JESSICA SEEPERSAD**

**But she did go through another company. From my understanding she did the succession through a legal service.**

Q. Do you know when HPD first contacted Stellar about Section 8 for Ms. Prince?

**A. That would be Wanda. I wouldn't get that correspondence.**

Q. Did Section 8 issue any retroactive payments to Ms. Prince?

**A. I would not know that information. Whatever is on the ledger is the only thing I can refer to.**

Q. If they did submit retroactive payments, would that be applied to the amount that Ms. Prince owes?

**A. Yes.**

Q. So I guess just to be clear, so because she applied for Section 8 in 2023, she became responsible for paying the full amount of rent for June, July, August of 2023?

**A. Yes, from prior to her receiving the Section 8 voucher.**

Q. Are you familiar with the billing letters that are being sent to Ms. Prince?



JESSICA SEEPERSAD

**A. Which billing letters are you referring to; the rent receipts or the rent arrears letters?**

Q. I believe the rent arrears letters, the ones that are signed by a property manager.

**A. Am I aware of them? I'm aware of them. I don't particularly look at them, but I am aware of them.**

Q. Did you review any in preparation for today's deposition?

**A. No.**

Q. Is there a statute of limitations on unpaid rent?

**A. No.**

MR. MARSHALL: Objection to the form.

BY MS. GAINES:

Q. When you started working at the building, did anybody tell you anything about Ms. Prince or her situation?

**A. No.**

Q. When did you first become familiar with Ms. Prince?

**A. When I received the information for her lease.**

Q. So did you have any contact with her



JESSICA SEEPERSAD

prior to that?

**A. The only contact I would have prior to that would be when she would come into the office to pay the rent in money order.**

Q. Like when is that? When were those occasions?

**A. I would have to look back into our rent receipt books to see when she paid rent in the office.**

Q. What is the rent receipt book?

**A. So we keep a record of all tenants that pay within the office. So if a tenant pays in a money order or check, a bank check, we make a copy of it for our own records as well as give the tenant a copy of it as well.**

Q. Okay. Is there any other information included in the book beyond just a copy of the check or money order?

**A. It just says check, money order, the date it's received, and the apartment number on it.**

Q. Did you review those in preparation for today's deposition?

**A. No.**

JESSICA SEEPERSAD

Q. Have you turned those over to legal or to anybody else as part of this lawsuit?

**A. No.**

Q. Is this book something separate from the onsite file?

**A. Yes, it is.**

Q. But is it kept in the onsite office?

**A. Yes.**

MS. GAINES: Okay let's take five minutes and come back. I'll just see if there's anything else, and then hopefully we can wrap up.

So we can come back at -- what's five minutes from now; 12:52?

(Recess taken.)

MS. GAINES: Thanks, everybody; just a few more questions and we're ready to wrap up.

BY MS. GAINES:

Q. I'm just going back to a couple things.

So Ms. Prince signed the lease August 29th, 2023 after her Section 8 voucher was processed and approved.

Can you explain again why she owed rent



JESSICA SEEPERSAD

from June 2023 on?

**A. So once I was --**

MR. ARLEO: Hang on a second. I'm going to object to the question. You said, "Can you explain again," so she's obviously answered that question.

BY MS. GAINES:

Q. Okay, you can answer.

MR. ARLEO: Well, hang on a second. The objection is asked and answered.

But go ahead.

**THE WITNESS: So once she applied for the Section 8 voucher, she was stating that she was responsible. She took responsibility for that rent for that time period prior to her Section 8.**

**So she was charged the full rent of that unit between June, July and August within the application process of the Section 8.**

BY MS. GAINES:

Q. Is that Stellar's policy across the board?

**A. Yes.**



JESSICA SEEPERSAD

Q. So even without a lease she is responsible for the rent by making the application. Is that right?

**A. Yes. Once she was granted succession, she was responsible for the rent.**

**She was responsible for the rent once she was granted succession, so she was responsible for all of that rent prior to.**

**However, in the process of her Section 8, prior to her Section 8 being approved, the months of June, July and August, because her application process took the three months, is what she was essentially charged for.**

Q. Okay. But your testimony is that she would have been responsible for rent since beginning from when her succession was approved. Is that right?

**A. As far as when it comes to succession.**

**However the stipulation for succession is, as long as you are occupying the unit, you're responsible for the rent.**

Q. Okay, so what is the distinction then between "prior to" and "after" succession is approved.



JESSICA SEEPERSAD

**A. So for you to be granted succession, you have to prove that you were occupying the unit prior to your applying for succession.**

**So one of the rules for succession is you have to occupy the unit at least two years prior to you applying for it.**

**So she proved that she was in the unit more than two years.**

Q. Okay. And I guess my question, though, is what do those things have to do with rent?

So why are you saying that she's responsible for rent after she's approved for succession?

**A. So succession is making you the tenant on record. So being that she's the tenant on record, she would be responsible for the rent from when she was the tenant on record.**

**However, the stipulation for you to a apply for succession, the rules for you to apply for succession with Mitchell-Lama is you have to occupy the unit two years prior.**

**Ms. Prince proved that she was in that unit more than two years. So anything prior to the two years, she would have been responsible**

Page 117

JESSICA SEEPERSAD

**for.**

Q. Okay. I guess why are you testifying that Ms. Prince is responsible for her rent beginning in June 2023 when she applied for Section 8 --

MR. ARLEO: Objection, form.

Go ahead, answer.

BY MS. GAINES:

Q. -- whereas when you previously stated that she's responsible since succession is approved?

But what changes between May 2023 and June 2023?

**A. So she wanted to get the application again. I don't make the motions for why they decided to put those particular months in it. However, because she was starting to get a subsidy, that was the starting of her application process to get the subsidy.**

**So I don't know why in particular that those months, only those month were chosen. Again I'm not a part of the legal apartment. I can't attest to why those months were chosen.**

**You asked me why those months were**

Page 118

JESSICA SEEPERSAD

**chosen. I just explained what rents -- why was she responsible for those particular rents.**

Q. And where are you looking to see that those are the months that are chosen?

**A. That you asked me -- that was the question that you asked.**

Q. So I had asked about September 2023 to May 2024, because those are the amounts that are included in the nonpayment petition.

So you actually had brought up the June 2023 to August 2023. So I'm wondering where you got those from.

**A. So that was a form that was submitted by legal. That was a form that I have.**

Q. When you say "a form submitted by legal," what are you talking about?

**A. The particular month that you asked for was the 5,000.**

Q. Yeah, mm-hmm.

**A. I explained why that $5,000 was calculated that way; it was because of the -- her application possess, that's when it started. But that is on a form that was submitted.**

Q. To legal?

Page 119

JESSICA SEEPERSAD

**A. Yes, legal submitted that form.**

Q. Who did legal submit that form to?

**A. That was a court document that was sent to Ms. Prince of months that she owed.**

**I was just breaking down why it looked like that structure of she owed from September, the amount was from June to August.**

Q. Okay. And I'm sorry if I'm being dense here, but what you're looking at, does this form have the months listed out, or are you independently arriving at that breakdown?

**A. So on the form it states the months of -- hold on.**

(Brief pause.)

**A. (Continuing) It was a court document that was sent to her. I can't locate it at the current moment. But it was a court document that was sent to her for the rent arrears that she owed for that time period, and the months that was on the time period was the rent for Section 8, but how they did it was they applied it to another previous balance.**

**But that $5,000 would have been, if you tally up the rents for those three month, that**

Page 120

JESSICA SEEPERSAD

**would have been the $5,000 prior to her getting the Section 8 voucher.**

Q. Okay.

**A. I can't locate the notice at the moment.**

Q. I guess, so just like how there were like these charge forms that showed, like is there anything that reflects that that's how they tallied it.

**A. No. I'm just speculating based on the application process. Usually that's how the application process is.**

Q. Okay, understood.

Do you know who Maria Figueroa is?

**A. That was my predecessor. She was the person here before me.**

Q. Do you know how long she was there before you?

**A. I believe eight years.**

Q. And in your role as recertification occupancy?

**A. She was here prior to me. So I've been here since May of '23. So she was here up until I believe February of '23.**

Page 121

JESSICA SEEPERSAD

Q. Another question is, so if Lisa Prince owed all this money to Stellar, why was she not sued for nonpayment before 2024?

**A. I can't attest to that. I'm not the legal department.**

Q. Another question: So is there anything on the face of the ledger that indicates whether or not a tenant has a lease for a unit --

**A. On the helper? On the ledger, no. It would be in her data on when she has leases. The leases are uploaded into her data on Yardi.**

Q. When you say "data," is that something separate than just like attachments?

**A. Yeah, that's attachment. Sorry, on Yardi the tab is called "Data," and then the attachments are under there.**

Q. When a case is brought against a tenant, do you provide anything to the attorneys to indicate whether or not a lease is in effect?

**A. I would send them the leases, the signed leases if not on Yardi already.**

Q. Does Stellar file nonpayment cases against tenants even if there is no lease?

**A. Yes.**

Page 122

JESSICA SEEPERSAD

Q. Are all of the leases given to the lawyers?

**A. Yes.**

Q. Do the lawyers independently have access to the documents on Yardi?

**A. Yes.**

Q. Is that both internal and at Cullen & Associates?

**A. I'm not sure if Cullen has access to it, but I know our internal does. I don't know what permissions Cullen has.**

Q. Does the internal legal department have full access to everything on Yardi?

**A. Yes.**

MS. GAINES: Sorry, give my one second.

(Brief pause.)

BY MS. GAINES:

Q. So you testified that you were told that Ms. Prince was granted succession and you were instructed to provide her with a lease in 2023, but that succession had actually been approved in 2020...

Are there any documents that are generated when succession is approved?

Page 123

JESSICA SEEPERSAD

**A. Just the form, the document that's usually sent to us by HPD that it was approved.**

Q. So there's an HPD form?

**A. HPD is the people that approve the succession. That's who the succession is granted by.**

Q. Okay.

**A. As I stated, according to the form that I see for her succession, it was not specifically sent to us. It wasn't directly sent to us. It was directed and sent to an organization that she worked with.**

Q. And that other -- no, go ahead.

**A. Yeah, so they would have received it; we wouldn't have received it.**

**So it could have been, I'm speculating, but it could have been a disconnect between them sending it to us, or maybe it just fell through the cracks.**

**Again this is COVID time, no I'm not a hundred percent sure.**

Q. Are there any documents that are associated with the processing of this Section 8 in 2023?

Page 124

JESSICA SEEPERSAD

**A. Yes.**

MR. MARSHALL: Objection to form.

BY MS. GAINES:

**A. Wanda would have that. Wanda is the one that emails and sends the forms to Section 8.**

Q. Do you know if those documents were produced as part of this lawsuit?

**A. No, I don't have knowledge of that.**

MS. GAINES: Okay, that's everything for us. Thank you so much for your time.

MR. ARLEO: Can you please provide dates on which the plaintiff is available for an in-person deposition.

MR. KESHAVARZ: We're waiting for Adam to give us the lawyer's deposition dates.

MR. ARLEO: Yeah, well I'm not agreeing with that. I have a right to depose the plaintiff. I'm not going to depend on you scheduling a deposition with another defendant.

Okay, you've taken three depositions of my client and I want the plaintiff's deposition. So I'll put it in writing.

Everybody have a nice day.

MR. KESHAVARZ: Wait. Stay on the record. I'm not off the record.

We have an agreement in court and in filings that the attorney defendants will be deposed before of our client.

So if you want to go into dates, Mr. Marshall, you want to just give us dates for the Cullen depositions we've been asking for for a few months, and then we can line a date up for my client.

MR. ARLEO: Yeah, well I'm going to ask the magistrate to vacate that order.

Everybody have a nice day.

MR. KESHAVARZ: Wait, wait, wait.

Mr. Marshall, can you give us a date? Can you let us know when you can give us a date? Can you let us know by the end of the week some dates?

MR. MARSHALL: NO.

MR. KESHAVARZ: When can you let us know?

MR. MARSHALL: I'll let you know when I know.

MR. KESHAVARZ: Yeah, but you've been



saying that for two months.

MS. GAINES: The court reporter is asking for everybody to stay on.

MR. ARLEO: Okay, well, I'm not going to be involved.

THE COURT REPORTER: I'm just trying to ask for the orders.

First, Mr. Marshall, do you have any questions --

MR. MARSHALL: We will be ordering the transcript, thank you, electronic only with a condensed version, please.

THE COURT REPORTER: And Mr. Arleo, did you want a copy?

MR. ARLEO: Sure.

THE COURT REPORTER: Regular delivery? Does anyone want a rough or anything? Do you want regular delivery?

MR. ARLEO: Regular is fine.

MR. MARSHALL: Yes, regular for us as well. Thank you.

MR. KESHAVARZ: And for the plaintiff you can bill my office, only electronic, please. Do not kill any trees. Just email



it to us. That will be fine.

(Whereupon at 1:13 p.m. the deposition of Jessica Seepersad concluded.)



I N D E X

DEPOSITION OF JESSICA SEEPERSAD


| EXAMINATION BY: | PAGE: |
|---|---|
| Ms. Gaines | 4 |

INDEX OF DEPOSITION EXHIBITS:

| PLAINTIFF'S EXHIBITS: | PAGE: |
|---|---|
| Plaintiff's Exhibit A. Split Ledger | 102 |


(Exhibit attached to original transcript.)

JESSICA SEEPERSAD

ACKNOWLEDGEMENT OF WITNESS

I, JESSICA SEEPERSAD, do hereby acknowledge that I have read and examined the foregoing testimony, and the same is a true, correct and complete transcription of the testimony given by me, and any corrections appear on the attached Errata sheet signed by me.

___________________ _______________________________

(DATE) (SIGNATURE)



JESSICA SEEPERSAD

C E R T I F I C A T E

STATE OF NEW YORK )
: Ss.
COUNTY OF NEW YORK )

I, Kim M. Brantley, Shorthand Reporter, and Notary Public within and for the State of New York, do hereby certify:

That JESSICA SEEPERSAD, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by the witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 6th day of October, 2026.

[signature]
_____________________
Kim M. Brantley

My Commission expires May 31, 2030.



JESSICA SEEPERSAD

ERRATA SHEET FOR THE TRANSCRIPT OF:

Case Name: Lisa Prince vs. Tivoli Bi, LLC, et al
Dep. Date: September 30, 2026
Deponent: Jessica Seepersad

CORRECTIONS:

| Pg. | Ln. | Now Reads | Should Read | Reason |
|---|---|---|---|---|
| ___ | ___ | ___________ | _____________ | ______________ |
| ___ | ___ | ___________ | _____________ | ______________ |
| ___ | ___ | ___________ | _____________ | ______________ |
| ___ | ___ | ___________ | _____________ | ______________ |
| ___ | ___ | ___________ | _____________ | ______________ |
| ___ | ___ | ___________ | _____________ | ______________ |
| ___ | ___ | ___________ | _____________ | ______________ |
| ___ | ___ | ___________ | _____________ | ______________ |
| ___ | ___ | ___________ | _____________ | ______________ |
| ___ | ___ | ___________ | _____________ | ______________ |
| ___ | ___ | ___________ | _____________ | ______________ |
| ___ | ___ | ___________ | _____________ | ______________ |
| ___ | ___ | ___________ | _____________ | ______________ |
| ___ | ___ | ___________ | _____________ | ______________ |
| ___ | ___ | ___________ | _____________ | ______________ |
| ___ | ___ | ___________ | _____________ | ______________ |
| ___ | ___ | ___________ | _____________ | ______________ |
| ___ | ___ | ___________ | _____________ | ______________ |
| ___ | ___ | ___________ | _____________ | ______________ |
| ___ | ___ | ___________ | _____________ | ______________ |
| ___ | ___ | ___________ | _____________ | ______________ |
| ___ | ___ | ___________ | _____________ | ______________ |

_____________________
Signature of Deponent

SUBSCRIBED AND SWORN BEFORE ME
THIS____DAY OF_____________, 2026
_________________________
(Notary Public)

MY COMMISSION EXPIRES: