UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------x
LISA PRINCE,
Plaintiff,
-against- Case No. 1:25-cv-3679 (NCM)(RML)
TIVOLI BI LLC; MEL MANAGEMENT CORP., d/b/a STELLAR MANAGEMENT; CULLEN & ASSOCIATES, P.C.; and KEVIN CULLEN,
Defendants.
---------------------------------x

REMOTE DEPOSITION of LORNA BLACKMAN, a nonparty fact witness herein, witness located in New York City, held on September 14, 2026, commencing at 10:24 a.m., and before Helene Gruber, a certified shorthand reporter and notary public within and for the state of New York.



A P P E A R A N C E S :
LAW OFFICES OF AHMAD KESHAVARZ
Attorney for Plaintiff
16 Court Street, 26th Floor
Brooklyn, New York 11241
BY: AHMAD KESHAVARZ, ESQ.
ahmad@newyorkconsumerattorney.com
and
Brooklyn Legal Services- Tenant Rights Coalition
1709 St Marks Ave, 2nd Floor
Brooklyn, NY 11233
BY: KAILYN GAINES, ESQ.
SAMAR KATNANI, ESQ.
CRAIG SIMONDS, ESQ.
kgaines@lsnyc.org

ROBERT L. ARLEO, ESQ. PC
Attorneys for Defendants Tivoli BI LLC; Mel Management d/b/a Stellar Management
1345 Avenue of the Americas, 2nd Floor
New York, NY 10105
BY: ROBERT L. ARLEO, ESQ.
robertarleo@gmail.com



A P P E A R A N C E S (Continued)
KAUFMAN DOLOWICH LLP
Attorneys for CULLEN & ASSOCIATES, P.C. and KEVIN CULLEN
135 Crossway Parks Drive, Suite 201
Woodbury, New York 11797
BY: ADAM MARSHALL, ESQ.
amarshall@kaufmandolowich.com

ALSO PRESENT
LUKE LEE



S T I P U L A T I O N S

IT IS HEREBY STIPULATED AND AGREED, by and between the attorneys for the respective parties, as follows:

All objections, except as to the form of the questions, shall be reserved to the time of the trial.

The within examination may be signed and sworn to before any Notary Public with the same force and effect as if signed and sworn to before the court.

Filing of the original transcript of the examination is waived.

Page 5

COURT REPORTER: Please state your name and address.
THE WITNESS: Lorna Blackman; 276 Berriman Street, Brooklyn, NY 11208.
LORNA BLACKMAN,
Having first been duly sworn, was examined and testified as follows:
EXAMINATION
BY MS. GAINES:
Q. Thank you very much for being here. My name is Kailyn Gaines. I represent Lisa Prince in this matter, Prince versus Tivoli and Stellar Management and Kevin Cullen, who are the attorneys representing Stellar and Tivoli.
I am here today with Samar Katnani, who also works with Brooklyn Legal Services, Craig Simonds, who also works with Brooklyn Legal Services, our co-counsel, Ahmad Keshavarz, who is sitting next to you.
On the screen are Adam Marshall, who represents Kevin Cullen and the law firm, and Robert Arleo, who is representing Stellar and Tivoli, and the court reporter is up there as well.
Have you ever taken -- have you ever

Page 6

had your deposition taken before?
A. Yes.
Q. When have you had your deposition taken before?
A. Two years ago.
Q. Was that when you were working for Stellar?
A. No. Prior provider employer.
Q. I will just go over some ground rules to begin. You understand that you are under oath today and that your testimony has the same force and effect as if you were testifying in court before a judge and jury?
A. Yes.
Q. Do you understand that you are required to provide the whole truth? So if I ask something like who did you speak with, you must tell me everyone that you spoke with.
A. Yes.
Q. For my part, I will ask "anything else" or "is that all" to make sure I am getting a complete answer. Does that make sense?
A. Yes.
Q. If you answer a question incompletely

Page 7

and later recall that there is more to an answer, will you tell me and complete your answer?
A. Yes.
Q. Are you feeling well today?
A. Yes.
Q. Are you taking any medication or have you taken any medication in the last 24 hours that would affect your ability to testify truthfully and accurately?
A. No.
Q. Is there any reason, medical, physical, or otherwise, that would prevent you from giving your full and complete testimony today?
A. No.
Q. If at any time you don't understand a question I ask, will you let me know so I can rephrase it?
A. Yes.
Q. If I ask you a question and you don't ask me to rephrase it, is it fair to say that you understood the question?
A. Yes.
Q. Will you answer all questions

Page 8

verbally as opposed to a gesture so that the court reporter can take down your answers?
A. Yes.
Q. I will try to ask clear questions and allow you to finish your answers. Will you allow me to finish my questions before you begin answering so we can have a clear record?
A. Yes.
Q. If either attorney -- I believe we still have Robert on; just his video is off.
MR. ARLEO: I am still here.
MS. GAINES: Just checking because you weren't on the screen.
MR. ARLEO: I just turned off the video.
Q. If either of the attorneys make an objection, you can still answer the question.
MR. MARSHALL: Objection to the form.
MR. ARLEO: That is not true. If I have an objection or Adam has an objection that's based upon a recognized basis for an objection where the witness doesn't answer, then she shouldn't answer.
Q. What did you do to prepare for today's deposition?

Page 9

A. Nothing.
Q. Did you review any documents to prepare?
A. No.
Q. Did you bring any documents with you?
A. No.
Q. Did you speak with your former employer at all before today's deposition?
A. No.
Q. If you need a break at any time, will you let me know?
A. Yes.
Q. As long as there is no question pending, we can take a break. If you need water, coffee, a bathroom, let me know and we can take a break, okay?
A. Yes.
Q. You said your name and your address. What is your phone number?
A. (347) 582-0266.
Q. What is your date of birth?
A. 8/4/68.
Q. Are you currently working?
A. Yes.
Q. Who do you currently work for?

Page 10

A. Riseboro.
Q. What is Riseboro?
A. It is the management company.
Q. How long have you been working for that management company?
A. About five weeks.
Q. Who did you previously work for?
A. Stellar Management.
Q. How long did you work for Stellar Management?
A. Two years.
Q. What did you do at Stellar Management?
A. Property management.
Q. When you say "two years," could you give me the time frame, like from what month, what year to what month, what year?
A. April 8th, 2024, to June 17, 2026.
Q. For that entire period of time, you worked as a property manager?
A. Correct.
Q. Before starting to work with Stellar in April of 2024, where did you work?
A. RY Management.
MR. MARSHALL: What management?

Page 11

THE WITNESS: RY Management.
Q. How long did you work for RY Management?
A. From 2020 to January of 2024.
Q. Have you always worked for various property management companies?
A. I have for several years.
Q. Several years. How many years?
A. I have been doing property management over 20 years.
Q. Was that always in New York?
A. Yes.
Q. Just in Brooklyn, or all over New York?
A. All over.
Q. As a property manager for Stellar, were you responsible for a particular building or multiple buildings?
A. Multi building.
Q. What buildings were you responsible for?
A. Tivoli Towers was one, and Castleton Preservation was the other.
Q. Anything else, or just those two?
A. Just those two.

Page 12

Q. Were you based on site at either of those buildings, or where did you work?
A. Based on site.
Q. At which building?
A. At both, split.
Q. When you say "split," what do you mean?
A. Two days at one, three days at the other.
Q. Each week?
A. Yes.
Q. Did you work in an office at those --
A. Yes.
Q. What were your responsibilities as property manager?
A. Day-to-day activity of the building, overseeing staff, maintenance staff, office staff, dealing with the vendors, go to court, violations.
Q. Anything else?
A. Tenant's concerns.
Q. Who did you answer to? Who was your boss?
A. My supervisor. That was Smajlje Srdanovic.

Page 13

Q. And what was his role?
A. Director of management.
Q. Was he director of management at Stellar, or a smaller --
A. At Stellar.
Q. Was this the person that all of the different property managers answered to?
A. Correct.
Q. What staff members were underneath you, like what staff members worked at the building?
A. Numbers?
Q. What kinds of roles?
A. Superintendent, porters, office staff.
Q. What kind of office staff?
A. Administrative staff, recert specialists.
Q. So administrative staff --
A. Administrative staff and recertification specialists.
Q. When you say "recertification specialists," what do you mean?
A. They do the annual recertification of the tenants.

Page 14

Q. Annual recertification for what?
A. For subsidy.
Q. Besides those people that you named, superintendent, porter, administrative or recertification specialist, were there any other staff members that you managed?
A. No.
Q. As property manager for these buildings, what kinds of decisions would you make?
A. I'm not sure of the question.
Q. Would you make decisions about lease renewals?
A. No.
Q. Who would make those decisions?
A. Between the recertification specialist and the compliance person in the main office.
Q. Who was the compliance person in the main office?
A. Francine Schiff.
Q. Who was the recertification specialist at Tivoli Towers when you were there?
A. Jessica Seepersad.

Page 15

Q. If a decision was being made about whether to offer a renewal lease, Jessica Seepersad and Francine Schiff would make that decision?
A. Yes.
Q. And you would not be involved in that decision?
A. No.
Q. Would they communicate about that decision to you?
A. Jessica may have tell me about it.
Q. Was Jessica Seepersad the recertification specialist for the entire time that you were there?
A. Yes.
Q. Is Jessica Seepersad still the recertification specialist, to your knowledge?
A. Up to my time.
Q. When did Jessica Seepersad become the recertification specialist?
A. She was already a recert specialist when I was hired.
Q. Who were the other staff members who worked in the office that you oversaw while you were there?

Page 16

A. There was a Quana Williams.
Q. What was Quana Williams' role?
A. She was the administrative assistant.
Q. What did she do as administrative assistant?
A. She would take the maintenance repair call, she would generate the work order tickets, she would distribute to the maintenance staff. She would generate correspondence to the tenants, generate notice to be posted to the building, contact vendors when necessary.
Q. Was she the administrative assistant for the building the entire time that you were there?
A. Until December of last year.
Q. December --
A. 2025.
Q. Was she the only administrative assistant, or were there other administrative assistants?
A. There was another person hired maybe two weeks before I left.
Q. To replace --
A. To replace Quana.

Page 17

Q. Who was that?
A. I don't remember her name. Lindsay. I'm not sure of her last name.
Q. Apart from Quana and Jessica, were there other staff members who you supervised at Tivoli Towers?
A. In the office? No.
Q. Those were the only two, Jessica Seepersad and Quana Williams were the only two office staff members in Tivoli Towers?
A. Correct.
Q. And other folks that you supervised at Tivoli Towers, who were they?
A. Maintenance.
Q. Was there also a superintendent?
A. Yes.
Q. Who was the superintendent?
A. Habdal Wali.
Q. I have been asking or starting to ask questions about decision making, so I asked about lease renewals, and you explained that Francine Schiff at the main office and Jessica Seepersad made decisions about lease renewal.
What about billing? Who made decisions about how to bill tenants?

Page 18

A. It depends on the type of billing.
Q. What do you mean by that?
A. If it's repairs billing, then there's a schedule of charges that we used to bill the tenants.
Q. When you say "schedule of charges," can you describe that?
A. Door, if we have to repair a door, get a price, a cost for that. If we have to replace a toilet, there's a charge for that.
So if the tenant -- we need to replace it because the tenant damaged, then we charge them for it.
Q. What about if there was a late fee? Who would make the decision about whether to charge a tenant for a late fee?
A. We do not charge a late fee.
Q. Do you know what use and occupancy is?
A. Yes.
Q. Can you explain what use and occupancy is?
A. Use and occupancy is the rent the tenant has to pay while living in the apartment.

Page 19

Q. Who would make the decision about whether to charge a tenant money if they didn't have a lease?
A. It is automatic once you live there.
Q. Would anybody else be involved in decision making around billing?
A. Accounts, payable accounts, receivables department.
Q. Who is responsible for that department?
A. I do not know who does the billing.
Q. Do you know who did the billing when you were working as property manager?
A. It's different -- different agent.
Q. When you say "different agent," what do you mean?
A. There is multiple persons in that department. I am not sure who specifically.
Q. Did you have any contact with that department as property manager?
A. Only for invoicing.
Q. When you say "only for invoicing," what --
A. Vendor invoice. I only approve the vendor invoice in that department.

Page 20

Q. Do you know the names of the folks in the accounts payable department?
A. No.
Q. Is there a system in which tenant bills were kept or maintained?
A. I don't think I understand the question.
Q. How would you access a tenant's bill?
A. We would -- I would check through the Yardi system. Yardi is software, management software.
Q. Can you tell me a little bit about the Yardi system?
A. It's record keeping system that we use to input move-ins, move-outs of tenants and keep a record of the rent and their payments.
Q. Apart from move-in, move-out, rent and payments, was there any other information that was kept in the Yardi system?
A. They also have the work order system.
Q. Is that a separate system, or are those also kept in Yardi?
A. Kept in Yardi.
Q. Did Stellar send tenants like monthly bills?

Page 21

A. Yes.
Q. Were those kept in Yardi?
A. The bills are not kept, but if you want to generate it, you can generate it.
Q. Did Yardi automatically calculate bills or the amount owed, or was it like manually calculated?
A. It gives you a summary, so whatever payment it receives, it makes the adjustment.
Q. Could you ever manually go in and update the bills?
A. I could not.
Q. But to your knowledge, could somebody else?
A. You have to have the access for it, which managers do not.
Q. Who would have access?
A. That would be a part of the accounting department.
Q. If a tenant had a concern about their bill, like something being inaccurate, what would you do?
A. I would look at their ledger and try to figure it out. If I could not, then I would reach out to someone in accounting.

Page 22

Q. As a property manager, did you make decisions involving when to take tenants to court?
A. I can make recommendations.
Q. What do you mean by that?
A. If the tenant is in arrears up to a certain amount, or if the tenant is disturbing others, I will make recommendation.
Q. You said arrears up to a certain amount. What do you mean by that?
A. Three months and above.
Q. When you say "three months and above," was that like a personal policy, was that a recommendation from the office? How do you derive the three months number?
A. It's a standard that we use to generate when we reach out to tenants for their arrears, and if they have not responded, then we refer it to legal.
Q. When you say "it's a standard" --
A. It is a standard across the board that most companies use.
Q. How would you know whether a tenant was in three months or more of arrears?
A. I would check their account in Yardi.

Page 23

Q. Were tenant leases also stored in Yardi?
A. We upload. Yes.
Q. Would Yardi indicate whether a tenant did not have a lease?
A. We can look at a recertification and see if they did recertify or not.
Q. Did anybody else -- was anybody else involved in the decision-making process about whether or not to take a tenant to court?
A. We have in-house counsel.
Q. Would in-house counsel also determine whether a tenant should be taken to court?
A. Correct.
Q. You worked together with in-house counsel, or were those separate recommendations?
A. Work together.
Q. How would you communicate with in-house counsel?
A. In phone or in person.
Q. And was in-house counsel specific to a specific building, or was it just in-house counsel for Stellar?
A. The entire portfolio.

Page 24

Q. So it also had lawyers that were different than in-house counsel, correct?
A. Yes.
Q. As a property manager, did you interact with those lawyers?
A. Occasionally.
Q. When you say "occasionally," what do you mean?
A. Whenever I have to go to court.
Q. Is that the only time that you would interact with those lawyers?
A. Yes.
Q. Can you tell me a little bit about the process for -- like let's say you made the recommendation that somebody needed to be taken to court. Could you tell me what would happen next?
A. I would speak to counsel. They would speak to the outside attorneys. Then I would get the hearing date or, you know, if I need to go to court, and that's it.
Q. That's it? Okay. Would you ever be involved in preparing a petition or complaint against tenants?
A. No.

Q. Who would be involved in that?
A. In-house counsel.
Q. How would -- how would they determine like the amount to allege that a tenant owed?
A. Based on rent charge and payment received.
Q. As reflected in Yardi?
A. Yes.
Q. And that's not something you would be involved in?
A. No.
Q. When you would have to go to -- how frequently did you have to go to court?
A. Between the two properties, maybe every other week.
Q. Did you do anything to prepare for these court appearances?
A. I would print the ledger and make sure -- sorry. I don't know how to turn off this phone.
Q. Do you want to take a moment?
(Pause in the proceedings.)
A. I would print the ledger, prepare the file, make sure I have the MDRs, and the deed.
Q. Would you speak to either in-house



counsel or outside counsel and discuss?
A. We would go over the case, yes, with in-house counsel.
Q. Who was in-house counsel?
A. Frederick Bonnier.
Q. Who were the outside attorneys that you used for Tivoli Towers?
A. Cullen & Associates.
Q. And your testimony was that you only interacted with the Cullen & Associates lawyers when you --
A. Yes.
Q. When you were communicating with -- how would you communicate with in-house counsel?
MR. MARSHALL: Objection.
A. By phone.
MR. MARSHALL: Ms. Blackman, at times attorneys who are only on video may object, so just wait a beat to see if we do, okay?
So objection to the form.
You can answer.
Q. You can answer the question.
A. I would speak to counsel via phone or



when I go to the main office.
Q. How often would you go to -- where was the main office?
A. 44 West 28th Street.
Q. And how often would you go to the main office?
A. Once a week.
Q. What would you do there?
A. We would just go over the day-to-day of the building, any issues, any concerns.
MR. ARLEO: I just want to put a general objection on the record to object to any questions regarding her conversations with the in-house counsel.
You can go ahead and answer, but I object to all this, preserve the objection related to all of your conversations and communications with in-house counsel.
Q. I believe the question that I had just asked was who would you go -- when you would go to the main office once a week to talk about the day-to-day of the building, who were you meeting with?
A. Smajlje Srdanovic.
COURT REPORTER: Off the record.



(Discussion off the record.)
MR. ARLEO: This is Robert Arleo. I am not going to continue participating in a deposition where the court reporter cannot hear the deponent's testimony for reasons related to the electronic equipment used by Plaintiff's counsel or the Zoom link provided by Plaintiff's counsel, so Plaintiff's counsel stated they are going to attempt to cure that problem. That's fine. We can take a break and do that, but if it's not going to be cured, then I'm not -- I am going to ask that this deposition be adjourned to a later date when they can produce the proper equipment.
MS. GAINES: We can take five minutes. We will come back at about 11:15.
(A recess was taken.)
Q. Can you tell me who was the property manager at Tivoli Towers before you?
A. Niti.
Q. Is that Niti Jakupaj?
A. Yes.

Page 29

Q. Do you know how long he was the property manager before you?
A. I believe ten years.
Q. Remind me when you left Stellar Management.
A. June 17, 2026.
Q. Why did you leave?
A. I was terminated.
Q. Why were you terminated?
A. Financial restructuring.
Q. Can you tell me a little bit more about that?
A. I have no idea.
Q. Is that what you were told?
A. Yes.
Q. Can you tell me the regulatory status of Tivoli Towers?
MR. MARSHALL: Objection to the form.
Q. Is Tivoli Towers a Mitchell-Lama building?
A. Yes.
Q. Can you tell me what that means?
A. It means that it is oversee by HPD.
Q. Is the building rent stabilized?
A. No.

Page 30

Q. Are there any rent stabilized apartments at Tivoli Towers?
A. No.
Q. Did you ever send emails to other people that you work with about tenants?
A. Yes.
Q. And what email platform did Stellar use?
A. Outlook.
Q. Did you use any other platforms to communicate about tenants?
A. No.
Q. Like chat systems or anything like that?
A. No.
Q. Did you ever text about tenants?
A. Occasionally.
Q. Do you have a dedicated work phone?
A. Stellar do provide you with one.
Q. And did you have one?
A. Yes.
Q. But did that have a separate work phone number than your personal number?
A. Yes.
Q. Could you give us that phone number?

Page 31

A. (917) 585-0185.
Q. That was impressive. I don't know my work number.
Who makes decisions about accepting or placing Section 8 vouchers?
A. Section 8 voucher is the tenant and the organization.
Q. When you say "organization," what do you mean?
A. It is either NYCHA or HPD that provides the Section 8 for the building.
Q. But who -- was there somebody at Stellar who would be responsible for communicating with either NYCHA or HPD about the voucher?
A. Yes.
Q. Who is that?
A. Wanda. I don't remember her last name.
Q. Was it Wanda Sanchez?
A. Yes.
Q. Do you know what Wanda Sanchez's role was or title?
A. Subsidy something.
Q. Was that for Stellar as a whole, or

Page 32

particular to Tivoli Towers?
A. Stellar as a whole.
Q. As property manager, did you play any role in voucher placement?
A. No.
Q. How were decisions with voucher placement communicated to you?
A. The voucher is not the building, it's the tenant that has the voucher.
So the tenant has to go to the agency and do their recertification there.
Then the agency would inform us on what the tenant pays and what the agency pays.
Q. When you say "the agency would inform us" --
A. Meaning they will send Wanda a bank ledger.
Q. And then would Wanda pass that information on to you as the property manner?
A. She would input that information into Yardi.
Q. I have a couple more questions about legal proceedings. Would you as property manager be involved in the decision, like in decision-making on how to resolve a case

Page 33

involving a tenant?
A. It depends on the case.
Q. When you say "it depends," what do you mean?
A. If it's an issue that involved arrears, then we would try to get the tenant to pay in a stip, or try to work with a tenant in making payment.
If it's on the issue, say the tenant is on -- a hoarder, that's a decision of the court.
Q. But let's say for like a settlement stipulation like payment, who would make that decision about whether or not to enter into that kind of stipulation?
A. That would be between the attorneys in-house and external.
Q. As a property manager, could you authorize that kind of decision?
A. No.
Q. I am going to clarify two questions. If you were -- in instances where you might have been texting about a tenant, was that using your work phone, or would you ever use your personal device?

Page 34

A. Work phone.
Q. When you emailed -- when you emailed with your coworkers about tenants, did you always include in-house counsel on the emails, or were there ever messages directly --
MR. MARSHALL: Objection to the form.
Q. You can answer the question.
A. Sometimes it's just messages, maybe something about repairs or something the tenant just wanted to talk about.
Q. When would you include in-house counsel on a message about tenants?
A. The tenant is being very rude.
MS. GAINES: We would like to take a ten-minute break, and then we will be ready to move on, so if we can come back at 11:37.
MR. ARLEO: Why are we taking a ten-minute break?
MS. GAINES: We need to take a break.
MR. ARLEO: Why?
MS. GAINES: We are going to take ten minutes.
MR. ARLEO: I want to know why I have to sit here and wait ten minutes for you

Page 35

to take a break.
MS. GAINES: We are going to discuss some questions, we are going to get up and go to the bathroom.
MR. ARLEO: That's fine. So ten minutes, thank you.
(A recess was taken.)
Q. You testified that Stellar uses Outlook. Do you know how emails are stored?
A. No.
Q. Were emails downloaded anywhere, to your knowledge?
MR. MARSHALL: Objection to the form.
Q. You can answer.
A. No.
Q. To your knowledge, were emails ever stored on a cloud?
A. I believe so.
Q. Do you currently have access to your prior emails?
A. No.
Q. Were emails ever deleted?
MR. MARSHALL: Objection to the form.
Q. You can answer.
A. Occasionally.

Page 36

Q. In what kind of circumstances would emails be deleted?
A. I know I had an issue with my disc was full. They took it into IT. They backed it up. They may have deleted unnecessary stuff.
Q. Is it fair to say that was like a storage issue?
A. Yes.
Q. Were you ever asked to search for emails regarding Ms. Prince?
A. No.
Q. If you were asked to search for emails regarding Ms. Prince, what would you do, or how would you do it?
MR. MARSHALL: Objection to the form.
Q. You can answer.
A. I would put her name in the search bar.
Q. Are you aware of any of your coworkers ever being asked to search for emails regarding Ms. Prince?
A. I am not aware.
Q. Did anyone ever ask you to look for emails regarding Ms. Prince?

Page 37

A. No.
MR. MARSHALL: Objection. Asked and answered.
Q. Did you take any emails or documents with you when you left Stellar?
A. No.
Q. In addition to the Yardi online file system, were there also physical files for tenants?
A. Yes.
Q. For every tenant?
A. Yes.
Q. Where are those files maintained?
A. They are maintained in the office where the administrator is.
Q. Is that the building office, or is that the Stellar main office?
A. The main office.
Q. What kind of information is in that physical file?
A. All the moving information, any correspondence relating to the tenant. It may sometimes have work order tickets.
Just any documentation; that if the tenant is someone who does recertification in

Page 38

the office, then all those recertification documents would be in the file.
Q. Can you explain what the difference between the Yardi file and the physical file might be?
A. The Yardi file is just mostly information pertaining to a copy of the lease, will store repairs that -- pertaining to stipulations, will store information regarding their subsidies, but most of the documents are stored in the tenant file, in the physical file.
Q. If you had correspondence with the tenant directly, would that be stored in the physical file?
A. Yes.
Q. Were emails ever like printed out and put into a physical file?
A. Sometimes.
Q. In what circumstances?
A. If there is an issue with a tenant, tenant has been in court, or tenant has been belligerent with you, you document it via email, and you put it in the tenant file.
Q. Print it out?

Page 39

A. Print it out and put it in.
Q. Were things ever removed from those physical files, or they kind of just stayed?
A. The file is purged, especially for the recert documents, because the file will get too big, so they will purge anything more than three years.
Q. When you say "purge," what do you mean?
A. Say a prior tenant who lived there for 20 years, we will remove the recert and leave the most current one. They do not discard it. They put it in a file and put it in storage.
Q. Is it true the physical file will only include information for the past three years? Is that what you said?
A. Yes.
Q. And the information that is purged is put into storage?
A. Yes.
Q. Where are the storage files?
A. The storage is kept in a back office.
Q. A back office in the same building?
A. Same building, yes.

Page 40

Q. So at Tivoli Towers, for example, there might be two files for a tenant?
A. Yes.
Q. One that is kept in storage?
A. Yes.
Q. And then the other one would be kept --
A. With the regular day-to-day files.
Q. But information is never just thrown away?
A. No.
Q. To your knowledge, did anyone ever get the file out of storage, the Lisa Prince file out of storage?
A. Not to my knowledge, but sometimes we do need to take files from storage when we are going to court.
Q. Have you ever looked at the Lisa Prince file from storage?
A. No.
Q. Are you aware of anyone having pulled that file from storage?
A. Not during my time.
Q. Have you personally reviewed the physical Lisa Prince file that is not in

Page 41

storage, the current one?
A. No.
Q. Are you aware of anyone having reviewed that physical file?
A. I am not aware.
Q. Who is responsible for like putting things into storage and maintaining the files in storage?
A. That would be Jessica Seepersad.
Q. Is that one of her responsibilities as the chief of recertification?
A. Yes. She maintains the files.
Q. She maintains the files. Okay.
Who is the bank that Stellar uses?
A. The bank?
Q. Yes. Do you know the bank?
A. No.
Q. Did you have any interaction with the bank as the property manager?
A. No.
Q. I am going to ask some questions about decision making around leases and, like, recertification.
Did you, as property manager, were you involved in any decision making about who

Page 42

was offered a succession lease?
A. Succession is done also by Jessica Seepersad. She would process the paperwork and send it to HPD for approval.
Q. And you as property manager did not have any involvement in that?
A. No.
Q. What would happen if someone did not have a lease and was not given a succession lease and stayed in the building?
A. We would forward that to in-house counsel to start a hold-over.
Q. And why would that be a hold-over?
A. Because she is not a legal tenant.
Q. In this case we asked for communications, internal communications, concerning Ms. Prince for her unit to be turned over, and the attorney for Stellar said that there were emails that may have been deleted or taken by former employees.
Do you have any knowledge about emails that may have been deleted or taken concerning Ms. Prince?
A. I have no knowledge.
Q. Is it company policy to just purge

Page 43

these files after three years, or how -- what --
A. It is a compliance process.
Q. Can you say more about that? What does that mean?
A. Because it's a 236 Mitchell-Lama, there is recertification yearly. A file can hold so much in order to fit in a cabinet, so we have to purge it in order for the file to fit.
The reason is a HUD requirement is that we have to have the last three, the most three years current. We have to keep everything that related to the moving has to be in a file.
Then the recertification would be the most current three years.
Q. Were those documents in the physical file, were they also scanned into a computer or Yardi, or did they just exist in the physical file?
A. They just exist in the file.
Q. Is it only the recertification documents that are purged from the file, or would other information also get purged?

Page 44

A. It was the recert, most of the recert documents.
Q. When you say "most," what else could be purged?
A. We have files that has years and years of communication with tenants. We hold that.
Especially the file is so big, we have to create a separate file just for the communications, so we would purge those and put it in a file.
Q. And the new file would also go in storage?
A. No. The new file, we put that with the file, but in a separate file.
Q. I guess to understand, it might be the case, then, that if there is a lot of information about a tenant, there might be two files?
A. There might be two files.
Q. Do you know if there were two files on Lisa Prince?
A. That I don't know.
Q. Again, your testimony is that Jessica Seepersad is the one who maintains the files?

A. Correct.
Q. Are you familiar with a Joyce Lee?
A. A what?
Q. Joyce Lee. Do you know who Joyce Lee is?
A. No.
Q. Are you familiar with a Christian Lee?
A. No.
Q. Are you familiar with a Lisa Prince?
A. Yes.
Q. How are you familiar with her?
A. I met her because she put in a complaint, and I went to inspect.
Q. Can you tell me a little bit more about that?
A. She put in a complaint regarding there's a hole in her window sill, and I went to inspect it.
Q. I guess to back up, was Lisa Prince a tenant at Tivoli Towers?
A. Yes.
Q. Do you know what unit she was in?
A. I don't remember. I remember it's the 28th floor, but I'm not -- I don't remember



the exact apartment.
Q. Is it fair to say 28L? Does that sound familiar?
A. Possibly, yeah.
Q. Was Lisa Prince living at Tivoli Towers for the entire time that you were a property manager there?
A. Yes.
Q. Do you know how long she lived there?
A. No.
Q. Do you know whether Ms. Prince had a lease for that unit?
A. I remember we were told by in-house counsel to generate a lease.
Q. Do you know when that was?
A. Sometime this year.
Q. When you say "this year," do you mean --
A. 2026, yes.
Q. Prior to 2026, to your knowledge, did Ms. Prince have a lease for that unit?
A. I don't believe so.
Q. You previously testified that you became familiar with Ms. Prince when you responded to a complaint about a hole in her



window sill. When was that?
A. It was sometime in, I want to say, May.
Q. May of when?
A. 2026.
Q. You started working as property manager for Tivoli Towers in April of 2024, right?
A. Correct.
Q. Did you have any interactions with Lisa Prince between April of 2024 and before, I guess, May of 2026?
A. No.
Q. None at all?
A. Not with Ms. Prince, no.
Q. When you say "not with Ms. Prince," do you mean anything by that?
A. I am aware of her account because it was a huge balance, and so I spoke with counsel, but that's as far as any interaction.
Q. When did you first become aware of her account?
A. June of 2024.
Q. A few months after you started working as property manager?



A. Correct.
Q. How did you become aware of the account?
A. I pulled up all the arrears in Yardi.
Q. Did anyone -- did anybody bring the account to your attention, or did it just -- was it just through review of the arrears that you became aware?
A. Just through review of the arrears.
Q. And after you saw this arrears balance, what did you do? Did you do anything?
A. I went to our in-house counsel. I asked what was the situation, and I was told that's a special case.
Q. What do you mean by a special case?
A. That's what I was told.
Q. What is your understanding of why it was a special case?
A. Complications, either succession issue or just non-payment.
Q. Do you know specifically what the complications were?
A. I know it had something to do with succession.
Q. Can you describe the succession

Page 49

issue?
A. I never got any details with it.
Q. Were you aware of any previous attempts to evict Ms. Prince?
A. Not during my time.
Q. Are you aware of any attempts that happened -- that occurred prior to your time?
A. Rephrase that.
Q. Do you know if Stellar had attempted to evict Ms. Prince before you started working as property manager?
A. I believe so.
Q. Do you know how many times they attempted to evict Ms. Prince?
A. No.
Q. Do you know what kind of cases they brought against Ms. Prince?
A. No. It was a succession hold-over issue.
Q. Are you aware of any other cases that were brought against Ms. Prince other than succession hold-over?
A. Maybe non-payment as well.
Q. Do you know who the attorneys representing Stellar in the previous cases

Page 50

were?
A. Cullen.
Q. Were you aware of the resolution of any of those previous cases?
A. I believe she was awarded a succession.
Q. Do you know when that was?
A. I don't know the specific date.
Q. Do you have a general date?
A. About May when we were told to generate a lease.
Q. So to your knowledge, she was awarded succession around May 2026?
A. Or before.
Q. Or before. When you say "or before," in your mind, how far before could that have been?
A. February.
Q. Just to be clear, to your knowledge, Ms. Prince was awarded succession around February -- between February and May of 2026?
A. Correct.
Q. And you are not aware of any lease before that?
A. No.

Page 51

Q. Are you of Ms. Prince having a Section 8 voucher?
A. Yes.
Q. When did you become aware that she had a Section 8 voucher?
A. When I pulled up the arrears, I noticed there was payment coming in. When I checked the history, I saw it was Section 8.
Q. You say when you pulled up the arrears. When was this you pulled them up?
A. I pull up arrears monthly.
Q. And I believe you testified the first time you pulled up arrears in this case was around June 2024?
A. Yes. It was my first time.
Q. At that point, were payments coming in from Section 8?
A. No.
Q. When, to your knowledge, did the payments start coming in from Section 8?
A. It was sometime in 2025.
Q. Do you know when?
A. Not offhand.
Q. How could you tell looking at the system that payments were coming in from

Page 52

Section 8?
A. It's a part of the Yardi system that you can look at a history of rent received, and you can tell from where it's coming from; if it's an organization, or it's the tenant directly.
Q. How is that indicated on the ledger?
A. It states Section 8.
Q. Did you ever see looking at the ledger that payments were also coming in from Ms. Prince?
A. I believe I did.
Q. When did you see that those payments were coming in?
A. It was around about the same time that Section 8 started paying.
Q. And your testimony was that was sometime in 2025?
A. Yes.
Q. Do you recall around what month?
A. Not offhand, no.
Q. Are you aware of a 2024 non-payment suit against Ms. Prince?
A. I don't believe it started in 2024. I believe it was prior to.

Page 53

Q. When do you believe it started?
A. I believe it started before I got there.
Q. To your knowledge, there was already a case going against Ms. Prince when you started working as property manager?
A. Yes.
MS. GAINES: Just a housekeeping thing.
Off the record.
(Discussion off the record.)
MS. GAINES: I would like to mark this as Exhibit 1 for identification. .
(Non-payment petition dwelling document marked Exhibit 1.)
Q. Ms. Blackman, do you recognize this at all?
A. It is a non-payment petition.
Q. And can you see who the petitioner is?
A. Lisa Prince.
Q. The petitioner?
A. Tivoli BI LLC.
Q. Do you see who the respondent is?
A. Lisa Prince.

Page 54

Q. Is this a true and accurate copy of a non-payment petition that was filed against Ms. Prince?
MR. MARSHALL: Objection to the form.
Q. You can answer.
A. I guess so.
MR. MARSHALL: Counsel, you haven't even presented the whole document. It isn't even on the screen.
MS. GAINES: I will continue to scroll.
Q. Have you seen this before?
A. I can't recall. I may have.
Q. Is this your name on the second page? I can highlight it.
A. Yes.
Q. That's your name as the agent?
A. Yes.
Q. Did you review non-payment petitions that were filed against tenants as a property manager?
A. Only if it needs my signature.
Q. Do you recall ever having reviewed this petition?
A. I can't recall.

Page 55

Q. Do you see the date at the top of this document?
A. Yes.
Q. Can you read that for me?
A. 7/3/24.
Q. So you previously testified that you thought a non-payment suit was started against Ms. Prince before you started. Now, looking at the petition that was filed in July of 2024 against Ms. Prince, does that refresh your recollection at all as to when the case was filed against Ms. Prince?
A. No.
Q. Again, that is your name on this petition?
A. Yes.
Q. And you started working in April 2024 so this was filed after you had started?
A. Correct.
Q. And it is true that this petition alleges that Ms. Prince owed $5,483; is that right?
A. That's what the paper says.
Q. Were you aware that Ms. Prince did not have a lease at the time that this lawsuit was filed?
A. I don't believe so. I don't believe I was aware.
Q. Were you aware that Ms. Prince had paid -- I will back up.
Is it true that this petition alleges that Ms. Prince had not paid her rent from September 2023 until May 2024?
A. That's what the petition states.
Q. Are you aware that Ms. Prince was actually paying her rent during those months?
MR. MARSHALL: Objection to the form.
Q. You can answer.
A. I was not aware she was paying rent.
Q. Did you review the -- Ms. Prince's ledger before this case was filed?
A. When I reviewed the ledger back when I just started, there was no payment made.
Q. Do you know what happened to this lawsuit?
A. No.
Q. You don't know how this lawsuit was resolved?
A. No.
MS. GAINES: I will stop sharing

Page 57

this.
Q. Are you aware of Ms. Prince sending a letter stating that she did not owe the money that was sought in this case?
A. I did not receive that letter.
Q. Did anybody make you aware that she had sent a letter stating that she did not owe the money?
A. No.
Q. Are you aware that Brooklyn Legal Services sent a letter stating that she did not owe this money?
A. No.
Q. Are you aware that this case was discontinued because she did not owe this money?
A. No.
Q. Did you appear in court in connection with this case?
A. No.
Q. Who would have appeared in court?
MR. MARSHALL: Objection to the form.
Q. You can answer.
A. I don't know when the case was.
Q. So the case started in July 2024. Do

Page 58

you know who would have appeared in court in connection to this case?
MR. MARSHALL: Objection to the form.
A. I would appear.
Q. But you do not recall having appeared in this case?
A. No.
MS. GAINES: I want to take a five-minute -- let's call it ten minutes. I want to take a ten-minute break to pull up another exhibit.
MR. ARLEO: Why are we taking a break?
MS. GAINES: I am going to pull up another exhibit.
MR. ARLEO: Why can't you do that now?
MS. GAINES: Because I need to take a break.
MR. ARLEO: Do you know how much longer we have to go?
MS. GAINES: Not very much longer.
MR. ARLEO: All right. Go ahead.
(A recess was taken.)
Q. I am going to share my screen again.

Page 59

MS. GAINES: I would like this marked as Exhibit 2 for identification, please.
(NY split ledger marked Exhibit 2.)
Q. Can you tell me what this is? This is the first page of it.
A. It is a summary of the ledger.
Q. Is this the way -- is this how summaries of ledgers appear in Yardi?
A. Yes.
Q. I am going to scroll through the pages.
A. That is actually the ledger.
Q. You said this is actually the ledger?
A. Yes.
Q. I am going to keep scrolling. So this is the ledger as it appears in Yardi?
A. Yes.
Q. Can you read the name here?
A. Lisa Prince.
Q. This says balance as of. Can you read that?
A. 03/03/2025.
Q. To your knowledge, is this a true and accurate copy of the ledger as it would have appeared in Yardi as of March 3, 2025?

Page 60

MR. MARSHALL: Objection to the form.
A. Yes.
Q. So this summary says that Ms. Prince's rent amount was $658; is that correct?
A. As per that ledger.
Q. When you say "as per the ledger," what does that mean?
A. I don't remember what her rent is.
Q. Okay, sure, but the ledger says her rent is $658, correct?
A. That's what that states, yes.
Q. The ledger states she had a lease from September 1, 2024. Is that right? Up at the top here.
I can also zoom in a little bit, if that's helpful.
A. That's what it says, not necessarily meaning that she has a lease. Sometimes the lease recertification is from that time and ends on that date, the other date.
Q. So is it your testimony that sometimes Yardi might say that there is a lease start date, but it might not mean that there is a lease?
A. A physical lease available, yes.

Page 61

Q. Can you explain that again?
A. Because recertification is yearly, the system is going to generate the lease starts this date and ends that date. It doesn't necessarily mean the person has recertified and has a lease.
Q. If the person had no lease --
A. It still would show that lease from the lease to date.
Q. Is that only in the case of a person who hasn't recertified?
A. Not only.
Q. Okay.
A. So recertification is on a certain date. There is certain tenants that recertify by a certain date for one year.
So whether the person recertified or not, the system is going to generate that that lease should start at this date and end that date.
MS. GAINES: We are on page 2 of the document, just to be clear for the record.
Q. The summary says that Ms. Prince has a Section 8 lease; is that correct?
A. That's what it says, yes.

Page 62

Q. This summary page shows -- I am going to ask for your help here with some of these things.
What does this Billed column mean right here? What are those items?
A. That is the type of building.
Q. So one of them is base rent, right?
A. Yes.
Q. What does that mean?
A. That means a tenant portion, the tenant portion of the rent. That's not what the full rent is.
Q. So here the base rent is 658?
A. Yes.
Q. And so that would be the tenant's portion?
A. That's the tenant's portion.
Q. What does the next thing -- what does damages mean?
A. Whatever we charge her for. If we have to repair a door or any other item that is chargeable, then that's where that will fall.
Q. So damages that she may cause?
A. Yes.
Q. What does the surcharge -- is that

Page 63

surcharge?
A. Surcharge is the difference between a base rent and a max rent for tenants who are high income.
Q. Then I see Section 8.
A. That's the Section 8 portion.
Q. Here the Section 8 portion would be --
A. 1386.52.
Q. Just to be clear, that is the amount that would be paid by Section 8 directly to?
A. Directly to.
Q. Is that the same thing that is happening in this next column around non-tenant total?
A. Yes.
Q. What is the grand total?
A. The actual rent per unit, so it is the base rent plus Section 8 added.
Q. Got it. So this column here is arrears?
A. Yes.
Q. Here it shows that Ms. Prince as of March 3, 2025, had an arrears balance of $189,067.64?

Page 64

A. That's what caught my eye.
Q. So that's what would have caught your eye when you reviewed the ledger?
A. Yes.
Q. So you are familiar with this and the arrears amount?
A. Yes.
Q. And the arrears amount always looked this high?
A. Yes.
Q. How is it, why is this arrears amount different from this amount with the arrow next to it, the balance, which is $189,725.64?
A. It's the arrears plus the current that added to that.
Q. Where is the current -- is the current on here somewhere?
A. Go back.
Q. Here?
A. Yes.
Q. I see. So this is arrears, this is the current rent, and so this is the balance that is due?
A. Yes.
Q. This number down here is even bigger.

Page 65

Why is that --
A. Because if I'm --
Q. I'm sorry. I'm just going to read the amount. It is $190,115.64.
A. Yes.
Q. Why is that higher?
A. There is a damages charge of 40, and a surcharge of 350.
Q. Do you know what these amounts are for, the surcharge or the damage?
A. No.
Q. This number here, the grand total balance, is $194,395.51. How do we calculate that? Where are those numbers coming from?
A. Section 8 did not pay some sort of payment, and so that is added to the balance.
Q. How did you tell based on this that Section 8 hasn't made a payment?
A. Because it shows there under the arrears 4,279.87.
Q. So what you are saying is that represents an amount that --
A. Section 8 did not pay.
Q. What are these numbers, these credit and adjustment numbers?

Page 66

A. What they received from Section 8, so they have an arrears of 4,000. Section 8 pays one month, which is the 1386, so the balance of the 4,000 is carried over and added to the 190.
Q. To your knowledge, why was Ms. Prince's balance so high?
A. If you will scroll down to the ledger, you will see.
Q. Now we are on page 1 of the ledger.
A. Keep scrolling down.
Q. You stop me when you think it is starting to show why the balance is so high.
A. Go back up.
Q. Let me make it clear for the record. We are now on page 4 of this document, and these are amounts starting in 2012 to -- I am going to read them out just to be clear. That is May 1, 2012, to August 1, 2015.
A. If you look at January of 2014 was the last time there was a zero balance.
Q. Okay.
A. And since then, there was no payment at all, so that's how the balance accumulates.
Q. To be clear, this middle column here represents --

Page 67

A. What is received, payment.
Q. And this column --
A. Is the charge.
Q. And this column describes what the charge is?
A. Yes.
Q. So your testimony is that the amount is so high because there is no payments being made, and so it's just racking up?
A. Correct.
Q. Are you aware of there being a lease? I think your testimony previously was there was a lease that was -- to your knowledge, a lease was first issued to Ms. Prince between February and May of 2026, correct. Correct?
MR. MARSHALL: Objection to the form. That mischaracterizes the witness's testimony.
Q. Is it true that you testified that a lease was generated between February 2026 and May 2026?
A. We were told to generate the lease around about that time.
Q. Around about February 2026 to May 2026?

Page 68

A. Yes.
Q. And you also testified -- I just want to be clear -- you also testified that you weren't aware of there being a lease before that, correct?
A. No.
Q. My question, then, is if there was not a lease before then, why is it that rent was being charged beginning in, I guess, back -- why was rent being charged in February 2014 if there is no lease?
A. The rent will always be charged as long as someone is in the apartment, even if there is no lease.
Q. So now we are on page 5 of the document, and there is still --
A. No payments.
Q. No payments being made. Okay. We are on page 6 now. This is 2020 to 2024. So from November 2020 until December 2023, it shows that there are no payments being made; is that correct?
A. Correct.
Q. But we are starting to see -- can you explain to me, in the middle of page 6 at

Page 69

August 10, 2023, we are starting to see some different stuff show up in this column. Can you explain to me what this stuff means?
A. So each person has to submit an income affidavit every year around March, April.
If they fail to provide an income affidavit, they are charged $50.
Q. So that's here?
A. Go up.
Q. Surcharge rent $50?
A. Yes.
Q. And the columns above it say failure to submit income affidavit?
A. Yes.
Q. So now we are at a line on September 27, 2023, that says, "as per Wanda - new Section 8 voucher effective September 15, 2023, tenant share $689."
Can you explain what that would mean?
A. That means the tenant applied for Section 8, and she was approved for it.
Q. On what date?
A. 9/15/2023.

Page 70

MR. ARLEO: Excuse me. I am going to ask the deponent to be provided with some water.
MS. GAINES: We have been offering for the --
MR. ARLEO: Because of throat clearing, please.
MS. GAINES: We have asked her and she declined. We are not going to force water on the deponent.
MR. ARLEO: No one asked anyone to force water down the deponent's throat, okay? I am asking that she be provided with a bottle of water. If she doesn't want it, she doesn't have to drink it, but don't make an accusation like that.
MS. GAINES: We are getting her water. I promise you, I have been offering her water and coffee and probably annoying her with my offers at this point.
Q. So Section 8 would have been effective September 15, 2023, correct?
A. Correct.
Q. And the column on the row below starting October 1, 2023, says that the base

Page 71

rent is $658; is that right?
A. Yes.
Q. Again, can you explain what that means?
A. That means the tenant portion of the rent.
Q. Would be $658. Okay.
Does this ledger also reflect how much -- the Section 8 payment or what the Section 8 portion of the rent would be?
A. If this is a full ledger. Sometimes there is different layers of the ledger.
Where you have the full ledger, you have the size. Where you have the non-half where it is just the tenant portion you --
Q. I am going to scroll to the top, because that would be indicated at the top of the ledger, correct?
A. Yes.
Q. On page 6 -- I am going to scroll to the top.
This says NON HAP. What does that mean?
A. That means that's just the tenant portion.

Page 72

Q. So any payments made that are reflected here are what the tenant actually paid?
A. Yes.
Q. We are back on page 6. We are at October 2, 2023. This says, "As per Jessica, tenant submitted income affidavit crediting August and September." Is that through a $100 payment?
A. Yes.
Q. And that would mean that Ms. Prince submitted the income affidavit?
A. Yes.
Q. And the two columns below for November 1st, 2023 and December 1st, 2023, what do those columns show?
A. The base rent tenant portion.
Q. The amount that is being charged?
A. Yes.
Q. Because there is now this Section 8 voucher in place, correct?
A. Correct.
Q. And that is $658?
A. Correct.
Q. So that's December 1st, 2023.

Page 73

Later that month, December 23, 2023, does it show -- what does that column show?
A. Payment received from the tenant.
Q. In what amount?
A. Various different charges.
Q. I am looking at this line right here. What amount does that show was paid?
A. 660.
Q. On December 28, 2023?
A. 660.
Q. Does it look like -- there is one column showing an amount with a check ending in 121. If we move to the column below, there is a check ending in 613 also on December 28, 2023. Does that reflect a second payment that is also being made for 660?
A. Yes.
Q. And then below that we have a third check ending in 106. Does that also reflect -- does that reflect a third check for 660?
A. Yes.
Q. Also made on December 28, 2023, correct?
A. Correct.
Q. And then a fourth payment on

Page 74

December 28, 2023, a check ending in 445 in the amount 460, correct?
A. Correct.
Q. And then a fifth check December 28, 2023, ending in 238, for $230, correct?
A. Correct.
Q. That's a total of -- who can do math really quickly? Who can pull out their calculator really quickly?
A. It's about 25, 2600.
Q. Is this a total of $2,640 paid by Ms. Prince on December 28, 2023, reflected on the ledger?
A. Yes.
Q. And this column, the date, does that represent the date the tenant made the payment or the date the payment was received?
A. The date the payment was received.
Q. Does anything about this indicate how the payment was made?
A. It was a check payment.
Q. That was in December. Now we are in January 2023, and it looks like the base rent of $658 was charged, correct?
A. Correct.

Page 75

Q. And then a payment by check was made for 660, correct?
A. Correct.
Q. The same for February, correct?
A. Correct.
Q. The same for March, correct?
A. Correct.
Q. We are on now page 7 of Exhibit 2 at the top. The same goes for April, right? A base rent of $658 was charged, and then a payment by check for 660 was made, correct?
A. Correct.
Q. The same for May?
A. Correct.
Q. Except the payment was made for 620, correct?
A. Correct.
Q. And then in June the rent of 658 was charged, and a payment was made by check for $470, correct?
A. Correct.
Q. In July, the rent of 658 was charged, and checks for $660 and $90 was paid, correct?
A. Correct.
MR. ARLEO: I am going to object to a

Page 76

line of questioning concerning the witness on what the statement says. Whether that's correct or not, it is on the statement. She believes it's correct so I don't want to sit here and go through every entry on a written document that reflects payments.
I mean, the document speaks for itself.
MS. GAINES: I understand. Your objection is registered for the record. I am going to continue.
Q. In August, the same goes. A rent was charged for 658, and payments were made by check for $100 and 660?
A. Yes.
MR. ARLEO: I am going to do more than object. This is a waste of time because the document speaks for itself, and every question you ask her on this document, she is going to say correct, so why do we have to sit here and listen to that?
MS. GAINES: Because it is my line of questioning. We are almost done.

Page 77

MR. ARLEO: Your line of questioning is improper. I object to it.
MS. GAINES: It is not improper. I am going to continue.
MR. ARLEO: Again, I am not going to sit here and have you ask her questions on what a document says and she is going to say correct.
MS. GAINES: I am going to continue asking these questions.
MR. ARLEO: No. We are going to the magistrate, because we are not doing this.
MS. GAINES: Would you like to call the magistrate?
MR. ARLEO: I am going to call.
MS. GAINES: Should we take a break for you to call the magistrate, or continue?
MR. ARLEO: The magistrate is going to make a ruling.
MS. GAINES: I am going to note for the record we are on page 7 of the exhibit, which is the last page. We are five columns up from the bottom of the document, and Mr. Arleo is insisting on

Page 78

calling the magistrate.
MR. ARLEO: You have five more entries to question her on for her to say correct. Is that what you are saying?
MS. GAINES: That is what I am saying.
MR. ARLEO: Are you going to introduce any more billing records and do the same thing?
MS. GAINES: This is the only ledger.
MR. ARLEO: So no other ledgers.
Okay. Finish up.
Q. We were at September 2024, I believe. Base rent of 658 was charged, and a payment was made by check for 660, correct?
A. Correct.
Q. The same for October: 658 was charged, 660 was paid?
A. Correct.
Q. The same for November: 658 was charged, and 660 was paid by the tenant?
A. Correct.
Q. In December of 2024, 658 was charged, and 658.22 was paid by the tenant by check, correct?

Page 79

A. Correct.
Q. In January 2025, 658, the base rent, was charged, and 658 was paid by the tenant by check?
A. Correct.
Q. And in February, 2025, 658 was charged, and 658 was paid by the tenant by check, correct?
A. Correct.
MS. GAINES: I am going to stop sharing my screen.
Q. You said that the date column that is reflected is the date that the payment was received by the office. Do you mean that it is the date that your office received it, or the date that it is cashed?
A. The date they received it. There were two ways of receiving payment: ClickPay where they go on the computer and pay, or through mail.
Q. And some of these entries show ClickPay, correct?
A. Correct.
Q. And other ones don't. Would that indicate that a check was mailed?

Page 80

A. Correct.
Q. Can you tell by looking at the ledger how Ms. Prince was paying her rent?
A. For these lump sums here --
Q. What payment?
A. On the December payment was mailed check, and it looks like HRA checks.
Q. Why does that look like HRA checks to you?
A. Because this is how they pay.
Q. So various correspondence indicate HRA to you?
A. Correct.
MS. GAINES: I am going to stop sharing the screen.
Q. Before looking at the ledger, we looked at the petition, and the petition stated that Ms. Prince hadn't paid her rent from September -- her portion of the rent -- from September 2023 until, I believe, May 2024, correct?
A. Correct.
Q. But the ledger shows that she had made those payments, right?
A. Correct.

Page 81

Q. Do you understand why Ms. Prince would have been sued in a case saying that she had not paid those portions and the ledger indicated that she had?
A. I know most of the time when its calculated, it is calculated based on the -- the dates are calculated based on the old rent. The payment is applied to the current, and then go backwards.
Q. What do you mean by that?
A. So whatever the arrears is and whatever the payment is received is applied to the current rent, and then distributed to the rest of the arrears, so it will show -- it's something that confused me.
Q. I am a little confused now. Can you explain that to me?
A. Well, if the tenant owes ten months' rent and a payment is made, it is applied to the current and then goes back.
Q. When you say "current," you mean --
A. The current month it is received going backwards.
Q. So is what you are saying -- correct me if I am wrong -- is what you are saying that

Page 82

we are seeing a balance of -- like a six figure balance for all these months where no payment was received, and then Ms. Prince starts making these payments. Is what you are saying is that amount is applied to that balance first?
A. No.
Q. Okay.
A. If I remember clearly in the first exhibit, it is in the year -- not 2025. 2024 was the prior year we are saying she was --
Q. I can pull it up again. I am going to share my screen.
Can everyone see my screen?
MR. MARSHALL: Yes.
Q. So we are looking again at Exhibit 1. This is on page 1.
Paragraph 6 in the middle says that she owes May 24, 658, April 24, March 24, et cetera, so between September 2023 and May 2024 that she owed $219 for that month, but then 658 for the rest.
Just going on to the ledger, and seeing that Stellar was receiving these payments for these months, why does the ledger say she wasn't making these payments?

Page 83

A. That is for the year, 2023.
Q. I'm sorry?
A. For the year 2023, not 2024.
Q. But we started in 2023, didn't we? And then 2024 certainly she made those payments.
A. She was making payments --
Q. We can look back at the ledger too.
A. What I am saying is whatever she owes is applied to the month that they receive it to the current month, not starting from 2023 and then forward. They start it from 2025 going backwards.
So whatever is not paid is applied to those months.
Q. Let me try to isolate that to one month to see if that helps me understand more, and I am sorry if I am being dense.
Let's look at February 2024. It's just in the middle. The petition says that she had not paid 658 in February 2024. If we go to the ledger and we go to February 2024, it shows that on February 9, 2024, a check by ClickPay was received for 660, so how do those things square?

Page 84

A. I don't know how to explain it to you.
Q. Can you try?
A. I just tried.
Q. Is it something that I am not getting about the month that that is applied to, or is it an error, or is it that she -- it says that she didn't pay and she did?
MR. MARSHALL: Objection to the form.
Q. You could answer.
A. It's something legal. It's not that it's not paid; it is how it is processed. I don't know how to explain that.
Q. I am just trying to -- I asked this question. I think you are saying no, but your testimony is not that the 660 here, looking back to Exhibit 2, the February 9, 2024 -- is it your testimony that that payment is applied to the six figure balance, or no?
A. No. This is applied wherever -- whenever received. I am just saying when they do the non-pay, how they apply it, it is a legal thing.
Q. Okay.
A. I don't know how to explain that part

Page 85

of it.
Q. When you say "how they apply it," what do you mean by that?
A. How they generate that sheet.
Q. So your testimony is it is a legal question how they generate the amounts on the petition?
A. Yes.
Q. That may not follow what is actually being paid and reflected on the ledger?
A. It may not match what is on the ledger.
Q. But that's a decision that is made by legal? That's your testimony?
A. Yes.
Q. Is that a decision that you were involved in?
A. No.
Q. When you say legal, do you mean in-house counsel, or who do you mean?
A. Whoever does that petition.
Q. So if we scroll until we are back on Exhibit 1 of the petition, we are going to scroll to -- this is page 2 of it. This petition was prepared by Kevin Cullen.

Page 86

A. Correct.
Q. Is it your testimony that it is Kevin Cullen who decides how these amounts are --
MR. ARLEO: I am going to ask the witness -- it is 1:11 p.m. I am going to ask if the witness needs a lunch break, or let me know how much longer you think you have to go.
MS. GAINES: Fair enough.
Do you want to break for lunch?
MR. ARLEO: Can you let me know how much longer you have to go?
MS. GAINES: I don't think that it's going to be -- I think we should take a lunch break.
THE WITNESS: I get back to work at 3:00. I have a meeting.
MS. GAINES: I think you should be able to get back at 3:00.
MR. ARLEO: Hold on a second. If she doesn't want to take a lunch break because she needs to be back at 3:00, we are not going to take a lunch break, and we should finish up.
MS. GAINES: Let me take five minutes

Page 87

to confer with the rest of my team, and we will make a decision about whether we are breaking for lunch, if there are any questions we want to ask her before lunch, and also have a better idea of how much longer we are going to go if the witness has to be at work at 3:00.
Off the record.
(Discussion off the record.)
Q. This is just like a -- one question before we go back to talking about the ledger and lawsuits and things like that.
Do you know somebody named Jailene?
A. Yes, I know somebody named Jailene.
Q. Who is Jailene?
A. Jailene works in the compliance department at Stellar.
Q. Do you know what Jailene's last name is?
A. Baez.
Q. Baez; is that what you said?
A. Yes.
Q. Does she work with Francine Schiff?
A. Yes.
Q. Would Jailene be doing -- like would

Page 88

she be involved in Section 8 processing?
A. No.
Q. Did you have any interaction with Jailene when you were property manager at Tivoli Towers?
A. Yes.
Q. What was your interaction with Jailene?
A. I would interact with her when it comes to the violations. She does certify them.
Q. Okay.
A. So I will deal with her in lease signing. She would put them together for Francine to sign. Then she'll give it back to me to take it back to the site.
Q. A couple of other questions about the ledger. So it was your testimony that -- I guess my question is, from the face of a ledger, can you tell whether there is a lease in place or not?
A. By looking at the ledger?
Q. Yes.
A. No.
Q. Before someone is sued for alleged arrears, how would a lawyer know whether or not

Page 89

there is a lease?
A. They would request it from the office, Jessica.
Q. And is that standard practice? Is that what would always happen?
A. Yes.
Q. They would always ask Jessica whether or not there was a lease?
A. Yes.
Q. And Jessica was responsible for telling the lawyers whether or not there was a lease?
A. Correct.
Q. And when you say "the lawyers," are we talking about in-house counsel or outside counsel?
A. In-house.
Q. And how does Jessica know whether or not there is a lease?
A. Jessica does the recertification. She generates the lease.
For a Section 8 tenant, once they recertify with Section 8, then we will generate a lease on our end so they will have one in the file.

Page 90

If we don't get anything from Section 8 saying that they recertified, then there is no lease to generate.
Q. If there is no lease, would Stellar still file a non-payment case?
A. Yes.
Q. Is that like a regular occurrence, that Stellar would sue tenants for non-payment even if there was not a lease?
A. Yes.
Q. When you would go to court on behalf of Stellar, what would you do? What were your responsibilities there?
A. To testify whether or not the petition is accurate, and if I am aware if the tenant make any payment.
Q. What would you do to prepare to testify?
A. I would print the ledger. I would go to the ledger to see why there is a non-payment, and if there is any discrepancy, I will let my in-house legal know, and we try to figure out if it is or isn't arrears.
Q. Is it your testimony that you would only do that kind of review if you were getting

Page 91

ready to testify in a case?
A. Correct.
Q. It was not part of your job to just kind of do that review for every case that was filed, or was it?
A. No.
Q. A question that I have, when we were looking at the non-payment petition in this case, it was seeking like a $5,000 amount for those specific months. Can you explain why the non-payment petition -- let me finish the background.
So the petition was seeking the $5,000 amount, but then when we looked at the ledger, it was alleging like $180,000 of arrears.
How come the petition was only seeking the $5,000 amount and not the $180,000 amount?
A. That's where it gets complicated. That's why I said it's a complicated case, and I didn't go into it.
I just asked why is there such a balance, and I was told there is a history there, and I just left it like that.

Page 92

Q. Who told you that there was a history there?
A. In-house counsel.
Q. Is your testimony that you don't know why the petition sought the $5,000 amount versus the $180,000 amount?
A. As I said before, I know it has something to do with succession.
Q. What do you mean by that?
A. That the payment related to the prior head of household.
Q. To your knowledge, could Stellar have sued Ms. Prince for this $180,000 amount in court?
MR. MARSHALL: Objection to the form.
Q. You could answer.
A. Possibly.
Q. Why do you say that?
A. Because Ms. Prince was living in the apartment during the head of household prior to being deceased.
Q. Just to be clear about that, can you say that a different way?
A. The original head of household deceased, and Ms. Prince was still living

Page 93

there, so that would be considered use and occupancy.
Q. Why do you say use and occupancy?
A. Because she was living there.
Q. Why are you using the term use and occupancy instead of rent?
A. Because use and occupancy means that you are living in the apartment, and you are responsible for the rent.
Q. But why are you using that term? Are you using that term --
MR. MARSHALL: Object to form.
Q. Are you using that term because there is no lease?
A. No. It's just a term I use when someone still occupies the unit and doesn't pay rent.
Q. And it is your testimony that Stellar sues -- regularly sues tenants for use and occupancy in non-payment cases?
MR. MARSHALL: Objection to the form.
Q. You can answer.
A. Yes.
Q. Could you estimate how many people living at Tivoli Towers are in that kind of

Page 94

situation where they are staying in an apartment that they don't hold a lease for?
MR. ARLEO: Objection to the form.
Q. You could answer.
A. From my knowledge of succession cases --
MR. ARLEO: I am going to object. That calls for speculation.
Q. You could answer.
A. Maybe ten.
Q. Apart from succession cases, and again, I am asking you to estimate based on your knowledge and experience working at the building, how many people are living so like apartment succession all together without a lease in that building?
A. I wouldn't know offhand.
Q. More than ten?
A. Yes.
Q. How common is it to file cases against people who are living there without leases?
MR. MARSHALL: Objection to the form.
Q. You can answer.
A. Repeat the question.

Page 95

Q. How common is it to file cases against people who are living there at the building without a lease?
MR. MARSHALL: Objection.
Q. You can answer. I think we maybe cross spoke. What was your answer?
A. Very common.
Q. What is very common? Can you give me a sense what that might mean?
A. According to the management, it is very common to start legal cases for reason for non-compliance by not signing lease.
Q. Non-payment cases?
A. From not signing lease, it's common to start a hold-over case.
For non-pay, it's very common to start a case.
Q. Against someone who is there without a lease?
A. Yes.
MR. MARSHALL: Ahmad, how about you just ask the question?
MS. GAINES: I think I got it.
Q. Your testimony was that Jessica Seepersad is the person who would be

Page 96

responsible for communicating to counsel whether or not somebody had a lease?
A. Yes.
Q. You testified that in-house counsel told you that this was a complicated situation. Were there other things you had heard about Ms. Prince or her situation when you became property manager at Tivoli Towers?
A. No.
Q. Did Ms. Prince have any sort of reputation among management?
A. Not to my knowledge. I didn't have an issue with her.
Q. Did the landlord intend -- did Stellar intend to cause Ms. Prince to leave the building?
MR. MARSHALL: Objection to the form.
Q. You can answer.
A. I do not know.
Q. Are you aware of a situation in which Ms. Prince was trapped inside of her apartment?
A. No.
Q. If that kind of thing happened, would there be information about that kind of thing anywhere in a file?

Page 97

A. There should be an incident report.
Q. Where would an incident report live?
A. In her file.
Q. In a physical file?
A. Yes.
Q. And depending on the amount of time, that could be in storage?
A. No.
Q. So it wouldn't be moved to the storage file; that would stay in her physical file?
A. Yes.
Q. Would it be in Yardi, or just her physical file?
A. Physical file.
Q. Were you aware of a situation where the landlord refused to give Ms. Prince a key to a door with a ramp?
MR. MARSHALL: Objection to the form.
Q. You could answer.
A. I am not aware, because those keys and situations were prior to my time.
Q. Would those issues involving those keys be documented somewhere?
A. No.

Page 98

Q. If there were emails about those, would those be accessible?
A. Should be.
Q. How would they be accessible?
A. Whoever emailed, whomever was emailed.
Q. By searching those emails?
A. Correct.
Q. I want to show one other thing.
MS. GAINES: I am going to share my screen first, and then I am going to move this over, if I can.
Can you all see my screen?
I would like this marked as Exhibit 3, please.
(Letter dated 11/15/24 marked Exhibit 3.)
Q. Do you recognize this?
A. This is an arrears Yardi-generated letter.
Q. Can you read the date on the letter?
A. November 15 or 16, 2024.
Q. Is that your name at the bottom of that?
A. Yes.

Page 99

Q. Is this a fair representation of a letter -- of the letter that was signed November 15, 2024?
A. Yes.
Q. You said this is a Yardi-generated letter. Can you explain what that means?
A. That means this is a prompt that the administrator's assistant would run every 1st and 15th of the month, and an arrears letter is sent out to the tenants.
Q. Are you testifying that the system automatically prompts you to --
A. Yes.
Q. How is it calculating the amount that is owed?
A. Whatever is in Yardi, whatever balance is in Yardi, the system picks it up and generates a letter.
Q. And that balance in Yardi would be the same that is on the ledger?
A. Correct.
Q. Like the ledger that we just reviewed?
A. Correct.
Q. And this letter, so from November 15, 2024, says that Ms. Prince owes $189,067.66, correct?

Page 100

A. Correct.
Q. Are these letters saved in the Yardi file after they are generated?
A. No. They are saved in the tenant file.
Q. In the physical file?
A. Yes.
Q. They go to the tenant once a month or twice a month?
A. Twice a month.
Q. How are they delivered to the tenant?
A. Mail.
Q. We previously discussed that the reason this number is 189,067.85 is because that's the balance that is calculated for those years in which a payment was not received, correct?
A. Correct.
MS. GAINES: Let me take five minutes just to ask my peers if there is anything else we want to ask, and then I think we should be ready to wrap up.
Are you going to ask any questions,

Page 101

Adam?
MR. MARSHALL: I may.
MS. GAINES: We will take five minutes just to discuss.
MR. ARLEO: I don't have any questions.
(A recess was taken.)
MS. GAINES: We have no further questions so we are ready to wrap up.
Adam, do you have anything?
MR. MARSHALL: Just a few.

EXAMINATION

BY MR. MARSHALL:
Q. Good afternoon now, Ms. Blackman. My name is Adam Marshall. My firm represents Kevin Cullen and Cullen Associates PC.
I am not going to go through the instructions again. All the same instructions and rules of this deposition continue to apply.
I just have a few follow-up questions for you based on your testimony earlier today.
My first question -- and I apologize if some of the ground that I cover has already

Page 102

been discussed in some shape or form -- my first question is, how frequently did you interact with Kevin Cullen or other employees of Cullen & Associates while you were with Stellar Management?
A. I only interact when I am in court.
Q. Do you mean physically in court?
A. Physically in court.
Q. Did you communicate with attorneys or employees of Cullen & Associates prior to your attending court?
A. Only by email if they are requesting documents or informing me of a hearing.
Q. You were previously shown a copy of a verified --
MR. MARSHALL: Withdrawn.
Q. You were previously shown a copy of a non-payment petition. Do you recall that?
A. Yes.
Q. And that non-payment petition concerned Lisa Prince. Do you remember?
A. Yes.
Q. Is it your testimony you do not recall seeing that document before being shown it by Plaintiff's counsel today?

Page 103

A. I don't remember seeing it, no.
Q. In the normal course of your employment for Stellar Management, did you review 30 day notices to tenants for rent?
A. I'm not sure I understand the question.
Q. Are you familiar with a document that would be titled 30 Day Notice to Tenant Rent Demand?
A. If it's something that I have to sign, then yes.
Q. And if you didn't have to sign it, you wouldn't be familiar with it; is that fair to say?
A. I would not see it, no.
Q. Before you were asked several questions about the decision-making process concerning, let's say, amounts owed in a petition. Do you remember being asked about that, how amounts were determined, generally?
A. No.
Q. I will ask you a very simple question, then. You started your employment with Stellar Management in April 2024, I think you testified, right?

Page 104

A. Correct.
Q. Do you remember the day in April?
A. April 8th.
Q. How soon after you began employment with Stellar Management on April 8, 2024, did you become involved in non-payment cases brought against tenants at Tivoli Towers?
A. Maybe around two, three months after.
Q. So is it fair to say that you would not have been involved in, let's say, rent demands that were sent in May of 2024?
A. No.
MR. MARSHALL: I have no further questions.
MS. GAINES: I think we have one further questions.

FURTHER EXAMINATION

BY MS. GAINES:
Q. You just testified that sometimes you would communicate with Kevin Cullen or Cullen & Associates via email. What were the nature of those emails, like what kind of information was exchanged?
MR. MARSHALL: Objection. Asked and answered.

Page 105

Q. You could answer.
A. They would request MDRs, deeds, they would request any information that is in a tenant file, or if they are requesting a lease.
Q. Anything else?
A. No.
Q. You just testified that you weren't involved in cases for two or three months until after you started. Who was handling cases during that time period?
A. Niti, because the MDRs were in his name.
Q. That is Niti Jakupaj?
A. Correct.
Q. And he was the previous property manager?
A. Correct.
Q. That's everything for us.
MR. ARLEO: Yes, I will order a copy of the transcript.
COURT REPORTER: Mr. Marshall?
MR. MARSHALL: Yes, we will order one as well.
(Time noted: 2:03 p.m.)

Page 106

INDEX TO TESTIMONY


| WITNESS | BY | PAGE |
|---|---|---|
| Lorna Blackman | Ms. Gaines | 5 |
| | Mr. Marshall | 101 |


INDEX TO EXHIBITS


| PLAINTIFF'S | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Non-payment petition dwelling document | 53 |
| Exhibit 2 | NY split | 59 |
| Exhibit 3 | Letter dated 11/15/24 | 98 |


Page 107

CERTIFICATION

I, HELENE GRUBER, a New York State certified shorthand reporter, hereby certify that the foregoing transcript is a complete, true and accurate transcript in the matter of Prince v. Tivoli BI et al held on September 14, 2026.

I further certify that this proceeding was reported by me and that the foregoing transcript was prepared under my direction.

Date: September 24, 2026

HELENE GRUBER

Page 108

Our Assignment No. J15448919
Case Caption: Prince
vs. Tivoli BI et al
DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my Deposition taken in the captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

_________________________________
Lorna Blackman
Subscribed and sworn to on the ______ day of
____________, 20____ before me,

__________________________________________
Notary Public,
in and for the State of ____________________

Page 109

DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:______________
__________________________________________________
Reason for change:________________________________
Page No._____Line No._____Change to:______________
__________________________________________________
Reason for change:________________________________
Page No._____Line No._____Change to:______________
__________________________________________________
Reason for change:________________________________
Page No._____Line No._____Change to:______________
_______________________________________________
Page No._____Line No._____Change to:______________
__________________________________________________
Reason for change:________________________________
Page No._____Line No._____Change to:______________
__________________________________________________
Reason for change:________________________________

SIGNATURE:_______________________DATE:_________
Lorna Blackman

Page 110

DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:______________
_______________________________________________
Reason for change:________________________________
Page No._____Line No._____Change to:______________
_______________________________________________
Reason for change:________________________________
Page No._____Line No._____Change to:______________
_______________________________________________
Reason for change:________________________________
Page No._____Line No._____Change to:______________
_______________________________________________
Reason for change:________________________________
Page No._____Line No._____Change to:______________
__________________________________________________
Reason for change:________________________________
Page No._____Line No._____Change to:______________
__________________________________________________
Reason for change:________________________________

SIGNATURE:_______________________DATE:_________
Lorna Blackman